1  AYNUR BAGHIRZADE
   1968 S. Coast Highway #2429
2  Laguna Beach, CA 92651
   Phone: 619-630-6646
3  Email: contact@aynurlawyers.com
   *IN PRO SE*

4

5              **UNITED STATES DISTRICT COURT FOR THE**
6              **SOUTHERN DISTRICT OF CALIFORNIA**

7  AYNUR BAGHIRZADE, an individual,        )   Case No.: 24CV1077 RSH MMP
                                           )
8                  Plaintiff,              )   Presiding Judge: Hon. Robert S. Huie
                                           )
9          vs.                             )   **SECOND AMENDED COMPLAINT FOR**
                                           )   **DAMAGES AND INJUNCTIVE RELIEF;**
10 ARMENIAN NATIONAL COMMITTEE OF          )   **REQUEST FOR INVESTIGATION**
   AMERICA, a Non - Profit Corporation; ARAM )
11 HAMPARIAN, an individual; ARMENIAN      )
   NATIONAL COMMITTEE OF AMERICA           )   1. **Racketeering activity in violation of Sec. 1962 (c)**
12 WESTERN REGION, a California Nonprofit   )      **et seq. of the Racketeer Influenced and Corrupt**
   Public Benefit Corporation; ARMEN       )      **Organizations Act;**
13 SAHAKYAN, an individual; YELP Inc., a    )   2. **Control of the Enterprise conducting**
   Delaware Stock Corporation; JEREMY      )      **racketeering activity in violation of Sec. 1962 (b)**
14 STOPPELMAN, an individual; GOOGLE       )      **et seq. of the Racketeer Influenced and Corrupt**
   LLC., a Delaware Limited Liability Company; )  **Organizations Act;**
15 ALPHABET Inc., a Delaware Stock         )   3. **Conspiracy in violation of Sec. 1962 (d) et seq. of**
   Corporation; Youtube LLC, a Delaware    )      **the Racketeer Influenced and Corrupt**
16 Limited Liability Company; SUNDAR       )      **Organizations Act;**
   PICHAI, an individual; ORANGE COUNTY    )   4. **Conspiracy in restraint of trade or commerce in**
17 BAR ASSOCIATION, a California Nonprofit  )      **violation of the Sec. 1 et seq. of the Sherman &**
   Mutual Benefit Corporation; TRUDY       )      **Clayton Act 15 U.S.C.;**
18 LEVINDOFSKE, an individual; TERESA      )   5. **Denial of Public Accommodation in Violation of**
   VUKI, an individual; LOS ANGELES        )      **Section 2000a of Civil Rights Act 42 U.S.C.;**
19 COUNTY BAR ASSOCIATION, a California     )   6. **Prohibited Restraints on competition in Violation**
   Nonprofit Mutual Benefit Corporation;   )      **of Sec. 16720, et seq. of California Business &**
20 SETH CHAVEZ, an individual; COCO SU, an  )      **Professional Code;**
   individual; ATTORNEY SEARCH             )   7. **Unfair Competition in violation of Section 17200,**
21 NETWORK, a California Stock Corporation; )      **et seq. of California Business and Professional**
   JAKE BALOIAN, an individual; Nolo, a    )      **Code;**
22 California Stock Corporation; MH SUB I, LLC, ) 8. **Denial of Public Accommodation in violation of**
   a Delaware Limited Liability Company;    )      **Sec. 51, et seq. of California Civil Code;**
23 LEGALMATCH CALIFORNIA, a Nevada         )   9. **Harassment in violation of Sec. 527.6 of the Code**
   Domestic Corporation; ESTRELLA          )      **of Civil Procedure;**
24 SANCHEZ, an individual; See attached.   )   10. **Defamation;**
                                           )   11. **Malicious Prosecution**
25                                         )   12. **Intentional Infliction of Emotional Distress**
                                           )   13. **Negligent Infliction of Emotional Distress**
26                                         )   14. **Invasion of Privacy by Placing in False Light**
                                           )
27                                             **DEMAND FOR JURY TRIAL**

28

| SECOND AMENDED COMPLAINT | 24CV1077 RSH MMP |

1  ZARTONK MEDIA LLC, a California Limited Liability Company;
   ZAVEN KOUROGHLIAN, an individual;
2  VAN DER MEGERDICHIAN, an individual;
   HAIRENIK ASSOCIATION, a Nonprofit Corporation;
3  ANI TCHAGHLASIAN, an individual;
4  LEGALSHIELD, Domestic For Profit Business Corporation;
   PARKER - STANBURY LLP, a California Limited Liability Partnership;
5  GREYSTAR CALIFORNIA Inc., a Delaware Stock Corporation;
6  KIA AMERICA Inc., a California Stock Corporation;
   DOES 1 - 289
7
                Defendants.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED COMPLAINT**                                24CV1077 RSH MMP

PLAINTIFF AYNUR BAGHIRZADE ("PLAINTIFF") alleges and complains against DEFENDANTS ARMENIAN NATIONAL COMMITTEE OF AMERICA, a Non-Profit Corporation ("ANCA"); ARAM HAMPARIAN, an individual; ARMENIAN NATIONAL COMMITTEE OF AMERICA WESTERN REGION, a California Nonprofit Public Benefit Corporation ("ANCAWR"); ARMEN SAHAKYAN, an individual; YELP Inc., a Delaware Stock Corporation ("YELP"); JEREMY STOPPELMAN, an individual; GOOGLE LLC., a Delaware Stock Corporation ("GOOGLE"); ALPHABET Inc., a Delaware Stock Corporation ("GOOGLE"); YOUTUBE LLC, a Delaware Limited Liability Company ("YOUTUBE"); SUNDAR PICHAI, an individual; ORANGE COUNTY BAR ASSOCIATION, a California Nonprofit Mutual Benefit Corporation ("OCBA"); TRUDY LEVINDOFSKE, an individual; TERESA VUKI, an individual; LOS ANGELES COUNTY BAR ASSOCIATION, a California Nonprofit Mutual Benefit Corporation ("LACBA");   SETH CHAVEZ, an individual; COCO SU, an individual; ATTORNEY SEARCH NETWORK, a California Stock Corporation ("ASN"); JAKE BALOIAN, an individual; NOLO, a California Stock Corporation ("NOLO"); MH SUB I, LLC, a Delaware Limited Liability Company ("NOLO"); LEGALMATCH CALIFORNIA, a Nevada Domestic Corporation ("LEGAL MATCH"); ESTRELLA SANCHEZ, an individual; ZARTONK MEDIA LLC, a California Limited Liability Company ("ZARTONK MEDIA"); ZAVEN KOUROGHLIAN, an individual; VAN DER MEGERDICHIAN, an individual; HAIRENIK ASSOCIATION, a Nonprofit Corporation ("HAIRENIK"), ANI TCHAGHLASIAN, an individual; LEGALSHIELD, Domestic For Profit Business Corporation ("LEGALSHIELD"); PARKER - STANBURY LLP, a California Limited Liability Partnership ("PARKER STANBURY");   GREYSTAR  CALIFORNIA, Inc., a Delaware Stock Corporation ("GREYSTAR"); KIA AMERICA Inc., a California Stock Corporation ("KIA") as follows:

## I. PARTIES

1.      PLAINTIFF's business (initially Law Offices of Aynur Baghirzade and then ACCURA LAW FIRM) provided and currently provides legal services in Orange, San Diego

and Los Angeles counties of the State of California. Plaintiff currently resides in San Diego county, California, and the address hereby is used only for the mailing purposes.

2.    PLAINTIFF is confused about true incorporation status of DEFENDANT ANCA as the purpose of the organization announced on its web-site does not conform to the purpose of the tax exemption form PLAINTIFF discovered about this organization. According to DEFENDANT ANCA'S website this organization is "the largest Armenian American political organization", but according to IRS forms it is tax exempt "educational" organization. PLAINTIFF therefore sues DEFENDANT both as a political organization and as any kind of tax exempt non-profit organization, or in any other its form and capacity. PLAINTIFF also is informed and believes, and based thereon alleges, that DEFENDANT ANCA is a resident of Washington, DC.

3.    PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT ARAM HAMPARIAN, is an Executive Director of DEFENDANT ANCA. PLAINTIFF sues DEFENDANT ARAM HAMPARIAN in both his Executive Director capacity and personally;

4.    PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT ANCAWR is a regional division of DEFENDANT ANCA, which is based in Glendale, California.

5.    PLAINTIFF is informed and believes and based thereon alleges, that INDIVIDUAL DEFENDANT ARMEN SAHAKYAN is an Executive Director of ANCAWR. PLAINTIFF sues DEFENDANT ARMEN SAHAKYAN in both his Executive Director capacity and personally.

6.    PLAINTIFF is informed and believes and based thereon alleges, that DEFENDANT YELP Inc., is a Delaware Stock Corporation with its headquarters in San Francisco, California.

7.    PLAINTIFF is informed and believes and based thereon alleges, that INDIVIDUAL DEFENDANT JEREMY STOPPELMAN is an Executive Director of DEFENDANT YELP. PLAINTIFF sues DEFENDANT JEREMY STOPPELMAN in both his Executive Director capacity and personally;

8.    PLAINTIFF is informed and believes and based thereon alleges, that DEFENDANT GOOGLE LLC, is a Delaware Limited Liability Company with headquarters in Mountain View, California.

| SECOND AMENDED COMPLAINT | 24CV1077 RSH MMP |

9.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT ALPHABET Inc., is a Delaware Stock Corporation with headquarters in Mountain View, California;

10.    PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT YOUTUBE LLC is a Delaware Limited Liability Company based in San Bruno, California.

11.    PLAINTIFF is informed and believes, and thereon alleges, that DEFENDANT SUNDAR PICHAI is Chief Executive Officer of DEFENDANT GOOGLE. PLAINTIFF sues SUNDAR PICHAI in both his Chief Executive Officer capacity and personally.

12.    PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT OCBA is a Nonprofit Mutual Benefit Corporation organized under the laws of the State of California.

13.    PLAINTIFF is informed and believes and based thereon alleges, that INDIVIDUAL DEFENDANT TRUDY LEVINDOFSKE was an Executive Director of DEFENDANT OCBA at the time when PLAINTIFF was a member of the organization and referral service. PLAINTIFF sues DEFENDANT TRUDY LEVINDOFSKE personally;

14.    PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT TERESA VUKI is a Public Services Manager at DEFENDANT OCBA, who also manages Lawyer Referral Service of DEFENDANT OCBA.PLAINTIFF sues DEFENDANT TERESA VUKI both in her professional capacity and personally;

15.    PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT LACBA, is a Nonprofit Mutual Benefit Corporation organized under the laws of the State of California;

16.    PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT SETH CHAVEZ is a Director of Operations at DEFENDANT LACBA. PLAINTIFF sues DEFENDANT SETH CHAVEZ in both his professional capacity and personally;

17.    PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT COCO SU is a Director at DEFENDANT LACBA'S SMART LAW REFERRAL SERVICE. PLAINTIFF sues DEFENDANT COCO SU in both her professional capacity and personally;

18.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT ASN is a Stock Corporation organized under the laws of the State of California.

19.     PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT JAKE BALOIAN is an Executive Director at DEFENDANT ASN. PLAINTIFF sues DEFENDANT JAKE BALOIAN in both his professional capacity and personally.

20.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT NOLO, is a Stock Corporation organized under the Laws of the State of California.

21.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT MH SUB I, LLC is a Delaware Limited Liability Company headquartered in El Segundo, California.

22.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT LEGAL MATCH is a Nevada Domestic Corporation headquartered in Reno, Nevada;

23.     PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT ESTRELLA SANCHEZ is a Key Account Manager at DEFENDANT LEGAL MATCH. PLAINTIFF sues ESTRELLA SANCHEZ in both her professional capacity and personally;

24.     PLAINTIFF is informed and believes, and based thereon alleges, that ZARTONK MEDIA LLC, a California Limited Liability Company with its headquarters in Reseda, California;

25.     PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT ZAVEN KOUROGHLIAN is a co-founder of DEFENDANT ZARTONK MEDIA LLC and thus sues him as a co-founder of DEFENDANT ZARTONK MEDIA LLC and personally;

26.     PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT VAN DER MEGERDICHIAN is a co-founder of DEFENDANT ZARTONK MEDIA LLC, and thus sues him as a co-founder of DEFENDANT ZARTONK MEDIA LLC and personally;

6

27.    PLAINTIFF is informed and believes, and based thereon alleges, that HAIRENIK ASSOCIATION is a Nonprofit Corporation with its headquarters in Watertown, Massachusetts;

28.    PLAINTIFF is informed and believes, and based thereon alleges, that INDIVIDUAL DEFENDANT ANI TCHAGHLASIAN is a President of DEFENDANT HAIRENIK ASSOCIATION, and thus sues her both as a President of DEFENDANT HAIRENIK ASSOCIATION and personally;

29.    PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT LEGALSHIELD INC., is a Domestic For Profit Business Corporation with its headquarters in Ada, Oklahoma;

30.    PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANT PARKER - STANBURY LLP, is a California Limited Liability Partnership with its main office in Los Angeles, California;

31.    PLAINTIFF is informed and believes, and based there alleges, that DEFENDANT GREYSTAR CALIFORNIA Inc., is a Delaware Stock Corporation with its regional office in Solana Beach, California;

32.    PLAINTIFF is informed and believes, and based there alleges, that DEFENDANT KIA AMERICA Inc., is a California Stock Corporation with its headquarters in Irvine, California as follows:

## II. JURISDICTION AND VENUE

33.    PLAINTIFF brings this action under the Racketeering Influenced Corrupt Organization Act, 18 U.S.C. Sec. 1962 (a) - (d).; Sherman & Clayton Act, 15 U.S.C.; Civil Rights Act, 42 U.S.C.

34.    This Court has jurisdiction pursuant to the following statutes:

a.    18 U. S. C. Sec. 1964 (a) under Racketeer Influenced Corrupt Organization Act ("RICO").

7

b.    28 U.S.C. Sec. 1331 for claims arising under U.S. Constitution and U.S. Laws.

c.    Under diversity of jurisdiction as one or several of the DEFENDANTS are residents of different states.

35.    Venue is proper in this judicial district pursuant to the following statutes:

a.    18 U.S.C. Sec. 1965 under RICO

b.    15 U.S.C. Sec. 15(a) under Sherman and Clayton Act

c.    28 U.S.C. Sec. 1391 (b) because the DEFENDANTS targeted PLAINTIFF and her business in this district.

### III. GENERAL ALLEGATIONS

36.    This lawsuit is brought because PLAINTIFF'S U.S. business suffers significant losses as a result of DEFENDANTS' actions.

37.    PLAINTIFF is a citizen of the Azerbaijan Republic, who is currently a green card holder and resides in San Diego, California.

38.    PLAINTIFF got her green card in 2016 as a professional with advanced degree & outstanding ability (EB-2 with National Interest Waiver), and moved to the United States on a permanent basis in 2021, after pandemic.

39.    Azerbaijan, where the PLAINTIFF is originally from, has long standing - over 2 centuries conflict with neighborhood Armenia, violent clashes between two countries happen on a regular basis. These violent clashes happen between members of the community on a foreign soil as well.

40.    On or around July 21, 2020, on the information and facts PLAINTIFF has DEFENDANT ANCAWR organized a demonstration of Armenians near Azerbaijan consulate in Los Angeles. More than 300 Armenians attacked a group of people of around 30 Azerbaijanis and it got very violent very soon. Group of Azerbaijanis called for the help to Los Angeles sheriff, ethnically Azerbaijani Fakhri Mirzaguliyev. Fakhri Mirzaguliyev organized buses and departure of

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

Azerbaijanis from the area close to the consulate. Many Azerbaijanis were beaten, got severe damages, some of them ended up in hospitals with longstanding bone fractures and other damages. After this incident, a group of Armenians with intent to defraud by using mail and wire sent numerous complaints to Los Angeles Police Department about sheriff Fakhri Mirzaguliyev demanding his resignation, all of those complaints investigation proved to be false and defamatory.

41.    In November 4, 2020, group of Armenians attacked family owned Turkish restaurant in Los Angeles, they "stormed inside, threw hard wooden chairs at the victims, smashed glassware, destroyed a plexiglass barrier, and overturned tables." Later two of them were indicted for hate crimes *(Case USA v. Stepanyan, et al.,  # 2:21-cr-00188).*

42.    PLAINTIFF upon information and facts believes that DEFENDANTS ANCA and ANCAWR with intent to defraud by using mail and wire organizes smear campaigns against representatives of Azerbaijani and Turkish origin on a regular basis, stalk their residential, businesses addresses as well as their banking information in the United States, and by using its network of Armenians working for the U.S. companies (Armenian Enterprise) regularly harass and defame them to damage their reputation, income, emotional wellbeing and generally to make their life hard in the United States. DEFENDANT ANCA and ANCAWR specifically target people of Azerbaijani and Turkish origin, who do not recognize Armenian genocide and who by using their 1st Amendment rights speak up the truth about the conflict.

43.    In 2022, DEFENDANTS ANCA and ANCAWR with intent to defraud targeted Doctor Mehmet Oz during his election campaign to U.S. Senate. Before launching a smear campaign against Dr. Oz DEFENDANT ANCA and ANCAWR several times using wire asked him by tagging his Twitter account whether he recognizes Armenian genocide or not. After getting no response from Dr. Oz, DEFENDANTS ANCA and ANCAWR started calling different ethnic groups not to vote for Doctor Oz and give their voices to another candidate. DEFENDANTS ANCA's and ANCAWR's arguments in launching this outrageous campaign was based specifically on its racist agenda and goals, and had nothing to do with anything else.

44.    On several occasions, PLAINTIFF noticed how DEFENDANTS ANCA and ANCAWR with intent to defraud and using wire targeted Azerbaijani and Turkish businesses in the United States, by encouraging people to demand from the U.S. businesses to stop selling Turkish and Azerbaijani goods, because those countries are "genocidal".

9

45.     Turkish and Azerbaijani owners of the businesses throughout U.S. and in California report that their business accounts at Yelp and Google were shelled with negative reviews, when in 2020 a war started between Azerbaijan and Armenia, which ended up with Armenia's defeat and Azerbaijan's victory.

46.     PLAINTIFF upon information and facts alleges that DEFENDANTS ANCA and ANCAWR use DEFENDANT YELP platform to harass Azerbaijani and Turkish business owners, whose views they do not like in order to suppress their speech in the United States. YELP is also used against those business owners who dared not to recognize Armenian Genocide. Thus, presumably an Armenian account under the name goliath.the.great in the Instagram targeted a Sacramento business, because his owner openly suggested that he does not believe in Armenian genocide. Immediately afterwards, goliath.the.great using wire and with the intent to defraud public asked his community to leave this business "great reviews" on YELP. After getting multiple negative reviews in his business account the owner of the business, stressed and lost, apologized in Instagram. Goliath.the. great didn't stop on this business owner's apology, but asked him to donate to the Armenian genocide cause, which the latter did, and only afterwards all negative reviews were deleted from his business account.

47.     PLAINTIFF upon information and facts alleges that the same, presumably Armenian account with slightly changed account name but the same picture goliath.da.great in the Instagram early in 2023 targeted another person - this time a doctor of Iranian Azerbaijani descent - Frank Aryan's social media business pages with calls to his community to leave there negative reviews, because they didn't like his patriotic videos.

48.     In 2020, when a war started between Azerbaijan and Armenia, a group of Armenian people announced a reward to anybody, who will report to them the addresses of the Azerbaijani and Turkish residents in California, obviously not to send them flowers.

49.     In March 30, 2023, Australian court issued a judgment for the Plaintiff of Azerbaijani descent Khuraman Armstrong in a defamation lawsuit against people of Armenian origin -  Yulia Assatryan, Anna Gabrielyan, Katya Kahramanian *(Case No. Cl-21-01623)*, who maliciously made multiple defamatory statements under social business media posts of Khuraman Armstrong in Facebook falsely claiming that they were her customers and didn't like her products.

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

50.     PLAINTIFF upon information and facts believes that DEFENDANTS ANCA and ANCAWR are either governed or have significant ties with Armenian Revolutionary Federation ("Dashnaktsutyun' or "ARF") - a national and socialist political party, which was founded in 1890 in Russian Empire. Dashnaktsutyun was used by Russian empire in its plans first to divide and occupy Turkey and then Azerbaijan. Members of the Dashnaksutyun party were responsible for multiple atrocities and terror acts both in Azerbaijan and Turkey. A research paper prepared by the Terrorism Analysis branch in coordination with FBI in 1984 titled "Global Terrorism: The Justice Commandos of the Armenian Genocide" states that "Terrorism has been an important tactic of ARF since its inception ".

51.     PLAINTIFF  upon information and facts believes that DEFENDANTS  ANCA and ANCAWR have significant ties with other terror groups besides ARF.   On or around March 11, 2021, DEFENDANT ANCA made a posting on its page in Facebook, expressing gratitude to Governor Newsom for the release of convicted terrorist Hampig Sassounian. Hampig Sassounian  is one of the men who back in 1982 killed a Turkish Consul General Kemal Arikan in Los Angeles.

52.     A 1996 ATF investigation of decaying dynamite, decoration cord and blasting caps found in Ohio storage locker, led to Mourad Topalian, a Chairman of the DEFENDANT ANCA and JCAG (another recognized terror group). JCAG was responsible for numerous bombings and murders of Turkish officials in the United States and Canada. This investigation helped to unravel JCAG related bombings in California, Philadelphia, Pennsylvania, New York City, New York, and the original theft of the dynamite stolen from Kalkaska, Michigan, in 1976.

53.     In October 4, 1977, Professor Stanford Shaw's house in Los Angeles was bombed. Professor Stanford Shaw was teaching Ottoman History at the University of California in Los Angeles (UCLA) and was one of those who didn't recognize Armenian Genocide.

54.     A research paper prepared by the Terrorism Analysis branch in coordination with FBI in 1984 titled "Global Terrorism: The Justice Commandos of the Armenian Genocide" states that "The ethnic cohesiveness of the Armenian community and its inherent distrust of non-Armenians provide a distinct advantage for Armenian terrorists. In addition to a reluctance of Armenians to talk to police, some segments of the community rallied around arrested Armenian terrorists, providing financial and moral assistance. " On February 5, 2002, Armenian community proudly declared that they raised more than $ 70, 000 for convicted terrorist - Hampig Sassounian's defense.

**SECOND AMENDED COMPLAINT**                                                      24CV1077 RSH MMP

55.    PLAINTIFF upon information and facts believes that cult of terrorism is widely supported among US Armenian attorneys as well. On or around March 15, 2024, attorney of Armenian descent Aroutin Hartounian placed a photo glorifying the terrorist Soghomon Tehlirian in his Twitter account with the logo of his law firm - Hartounian, a professional law corporation. Soghomon Tehrilian was responsible for murdering of at least two people. Operation Nemesis was carried out by Armenian Revolutionary Federation (ARF), which is now very closely associated with DEFENDANTS ANCA and ANCAWR.

56.    Later, on May 12, 2024, California licensed attorney Aroutin Hartounian, placed another photo of an old woman with rifle on Mothers' Day, wishing that every Armenian woman follow the example of this mother on a photo. In the similar way Aroutin Hartounian used his law corporation's logo on the picture.

57.    PLAINTIFF upon information and facts assumes that since cult of terrorism is so widely supported by Armenians, the chances that the money earned by them in the United States go for sponsoring of terrorism are high, the same it can be said about the same money coming from terrorist organizations back to U.S. banks and organizations.

58.    PLAINTIFF upon information and facts assumes that the chances that the money earned by the law firms managed by Armenians end up in terror organizations, or for the terror purposes are high, the same can be assumed about the flow of this money coming from the terror groups back to U.S. organizations, including bar associations through their respective members.

59.    PLAINTIFF upon information and facts believes that DEFENDANTS ANCA and ANCAWR have significant ties and/or  sponsored by Russia's certain circles to achieve their geopolitical goals. Thus, DEFENDANTS ANCA and ANCAWR are against current democratically elected government of Armenia, and mostly support pro-Russian political candidates. PLAINTIFF noticed on several occasions calls made by the members and leadership of these organizations in Twitter to overthrow an elected government in Armenia, and even assassinate Pashinyan - democratically elected current President of Armenia.  Some of their members are even banned from entering Armenia by the current Armenian government for the security reasons.

60.    On or around May 28, 2024, Arshak Makichyan - an Armenian political activist from Russia, who left the country because of persecution, blamed DEFENDANT ANCA in his Twitter account in being agents of Russia, as they were completely indifferent to his case and didn't help

12

him when he needed it the most, and they also attacked him for his anti-Russian views. On another occasion, PLAINTIFF noticed how another Armenian researcher Sossi Tatikyan complained in her Twitter account that she was receiving threats of being raped for 2 days in row for criticizing DEFENDANT ANCA's  pro-Russian tweet.

61.    PLAINTIFF upon information and facts alleges that she is stalked by DEFENDANTS ANCA and ANCAWR from the time she moved to the United States, because of her origin and her critical views on ANCA's activity and in general on Armenian-Azerbaijan conflict.

62.    PLAINTIFF upon information and facts alleges that Armenian Enterprise employed by all DEFENDANTS as well by the State Bar of California, stalks her confidential information, passes it to its other members, to DEFENDANTS ANCA and ANCAWR  in order to harass, to intimidate and to damage her business and reputation.

63.    PLAINTIFF upon information and facts believes that her bank information as well as IOLTA information is stalked by the Armenian Enterprise employed by the State Bar of California and it is passed and disseminated to other its members for the purpose to harass, to intimidate, to stalk and to damage her business and reputation.

64.    Plaintiff became active in social media speaking about the conflict approximately from 2020, and since that time she became a target of Armenian Enterprise trying to silence her.

65.    On or around February 2022,   Plaintiff was first time massively harassed on her Twitter account by various Armenian account users, because she was allegedly "using inappropriate sign of wolf". The person, who was specifically active in doing so was Simon Maghakyan.  Simon Maghakyan presents himself as a researcher and PHD student in heritage crimes and has very good ties with ANCA, as evidenced by his numerous speeches on ANCA's events. Press - release from ANCAWR from 2015 shows that Simon Maghakyan was appointed as a Community Development Coordinator for this organization, thus Simon Maghakyan was presenting and representing ANCA in harassing PLAINTIFF. Simon Maghakyan not only harassed PLAINTIFF by spreading misinformation about her license, but also copied her address displayed at the State Bar's web-site and placed it on Twitter, tagged State Bar and made complaint on her. Simon Maghakyan also multiple times placed defamatory reviews in PLAINTIFF'S YELP account, presenting himself as a client of PLAINTIFF, who was damaged by  PLAINTIFF'S services.

13

66.     PLAINTIFF believes that she lives in a free country with 1st Amendment rights and she can't be persecuted in this country because of her use of the certain national attributes, cultural and historical signs. Sign of a wolf has historical meaning for Turks and any its display is protected by the U.S. Constitution, and thus any attempt to harass and threaten PLAINTIFF for its use was inappropriate effort to suppress PLAINTIFF's Constitutional rights and force PLAINTIFF to follow "new rules" established by the group of people, who think that they are above Constitution.

67.     After Mr. Maghakyan placed information about PLAINTIFF's business and her address on Twitter, PLAINTIFF received two other threats - one in her inbox on Twitter and another one in her phone. One in her Twitter account was that "For every time you will open ….mouth" (and here the Sender compared Turks to cockroaches), "another Khojali will happen, and this time in Irvine." Khojali is a name of the city in Karabakh region of Azerbaijan, where back in 1992-1993 around 613 people, including kids, elderly and women were brutally tortured, raped and killed. This tragedy known as a Khojali genocide was committed by the members of Armenian terror organizations such as ASALA, ARF and others together with Russian 366 CIS regiment. This message was in fact a death threat sent to the PLAINTIFF. PLAINTIFF suffered emotional breakdown, shock and severe anxiety, as the address she put on her State Bar of California website was her real home address. PLAINTIFF was a single woman living alone in quite suburban Irvine environment.

68.     On or around February 20, 2022, PLAINTIFF received another message to her phone stating "The Armenians have put your information everyone all over the night please change your profile, pictures and number take your info off your bio I don't want you losing the license. Armenians in California have a lot of influence. " PLAINTIFF at that time was forced to restrict her account in order to avoid further exposure to the brutal harassing behavior.

69.     While PLAINTIFF tweeted in her restricted Twitter account, she wasn't bothered by anyone. However, on or around April - May, 2023 PLAINTIFF removed all restrictions from her account and made her tweets public again. Immediately afterwards she noticed couple of the defamatory reviews in her business Yelp account. These first defamatory reviews were deleted after PLAINTIFF complained on them to Yelp.

70.     On or around May, 2023, PLAINTIFF started getting questions from various Twitter account users and also over the phone "Do you recognize Armenian genocide ?". Approximately at

14

**SECOND AMENDED COMPLAINT**                                      24CV1077 RSH MMP

that time she received a call from the person, who refused to identify himself, asking her whether she accepts genocide and telling her in a terrible voice that Artsakh (Karabakh region) will be returned back to Armenians. On her question why her tweets so much bother them she received a simple answer "because you become famous"…

71.     On or around May - June, 2023, PLAINTIFF was repeatedly harassed on Twitter for denying Armenian genocide and for her critical views on Azerbaijan - Armenian conflict, again people from various accounts using wire threatened her with disbarment, placed her information in public, promised to teach her a lesson. At the same time her business account in Yelp was attacked by numerous people, who with intent to defraud and by using wire placed there multiple defamatory reviews, claiming that they were clients of PLAINTIFF, openly lying and not even concealing the fact that they want to ruin her business, damage her reputation and /or even physically harm her. One of the PLAINTIFF's business videos disappeared from her business page on Facebook, and was circulated in Twitter, her social media advertisings from her Linkedin business page disappeared as well. PLAINTIFF's further requests to Linkedin management gave no results.

72.     On or around April - June 2023, after PLAINTIFF complained to DEFENDANT YELP and requested it to remove all defamatory reviews, explaining to DEFENDANT YELP that they are all coming from people, who have never been her clients and it is an organized smear campaign to ruin her business, all of them were removed. However, on or around May 26, 2023, someone named E. Kerimli (registered in Glendale) with intent to defraud and using wire placed another defamatory review on PLAINTIFF's business platform, claiming that PLAINTIFF took his money and didn't provide him with any service, which was a lie. The fact how the person placed a defamatory review speaks for itself - he placed a review under non - Armenian surname, claiming that PLAINTIFF takes people's money and do not provide a service, thus to make public (including PLAINTIFF's own community) to believe that PLAINTIFF is not an honest person and deceives her clients. PLAINTIFF believes that this review was aimed to damage PLAINTIFF's business as much as possible. PLAINTIFF immediately complained on this review to DEFENDANT YELP and asked to remove it from the platform as soon as possible.

73.     On or around May 30, 2023 DEFENDANT YELP with intent to defraud and using wire responded that they can't remove a review because " When reviewing user content, we look at a number of factors, including potential conflicts of interest, privacy concerns, threatening or lewd

15

commentary, and whether the content has been posted to the correct business page. If a review falls within the bounds of our tolerance for strong language, appears to meet our guidelines and reflects the user's personal experience and opinions, it is our policy to let the user stand behind their review." . DEFENDANT YELP by doing so in fact gave its platform to certain group of people to damage PLAINTIFF's business and reputation, to harass and persecute her because of her national origin, religion, color, ancestry and her political opinion. PLAINTIFF also believes that DEFENDANT YELP did so in open violation of its own policy, requiring this platform to remove any review, which comes from the non-clients. It is also necessary to mention that the same person's review was immediately deleted from Avvo and BBB platforms, because the account user didn't respond to the inquiries coming from these platforms requesting proof of the legal service.

74.    Approximately from the period April - June, 2024, PLAINTIFF noticed that some old reviews, which were deleted by DEFENDANT YELP on her request, appeared back on her business page **with her old dated comments under them**, which clearly suggested that there was inside job at this company to defraud public and to damage and destroy PLAINTIFF'S business.

75.    PLAINTIFF upon the information and facts she received alleges that DEFENDANT YELP's platform is used to suppress business owners, who do not recognize Armenian genocide, and generally to kill businesses of those business owners, who do not live up to the agenda and expectations of DEFENDANT ANCA. PLAINTIFF upon information and facts she received also alleges that DEFENDANT YELP is a part of Armenian Enterprise and is engaged in an organized crime of bullying and harassing businesses upon requests from the Armenian Enterprise.

76.    On or around June 17, 2023, a Twitter account user under name Ray (@raydar07) tweeted that PLAINTIFF must understand that actions have consequences, openly admitted that he is a representative of the "Armenian mafia" and proposed her a "deal" - to delete the Yelp reviews in exchange for the PLAINTIFF to delete her Twitter account or at his orders to delete the tweets he wants, adding that the PLAINTIFF will get "a special treatment". PLAINTIFF refused in either deleting her Twitter account or deleting her tweets.

77.    On or around June 13, 2023, late in night,  PLAINTIFF while being in her own apartment in Irvine, heard strange noises in her garage (the garage was adjacent to her apartment). Plaintiff didn't pay attention to the noises, however on the following day she discovered a dead rat laying next to her car in the garage. The rat was unusually white and looked well fed for the regular

16

street rat. Horrified and worried PLAINTIFF called to the Property management and asked them to remove the rat. Property management's employee upon arrival confirmed that it was not a rat, but most likely a pet, and someone brought and put it in her garage. This was right after PLAINTIFF's business account in Yelp was attacked with numerous fake reviews and she got multiple threats in her inbox and phone.

78.    On or around June 16, 2023, someone under account name @identicalobject on Twitter by using wire harassed PLAINTIFF by "reminding" her that her career in California is in the hands of California Armenians, which caused great outrage among PLAINTIFF's own community and other community members. Some of other members of the Armenian community like Lusine Yaghjyan and others with intent to defraud and by using wire placed the link of the State Bar of California on Twitter and publicly asked people to make a complaint about the PLAINTIFF to the Bar. PLAINTIFF suffered severe emotional distress, frustration, shock and embarrassment as a result of such horrible harassment compaign. Lusine Yaghjyan profile shows that she follows DEFENDANT ANCA and supports this organization.

79.    From approximately January, 2024, till the end of February, 2024, for about two months,  DEFENDANTS ANCA and ANCAWR continuously made defamatory statements about PLAINTIFF in Twitter, Instagram, Reddit and other Platforms by taking her single tweet out of context, distorting, manipulating it and blaming PLAINTIFF that she called for genocide of Armenians, which was a complete lie.  Immediately after this, PLAINTIFF'S emails, social media platforms, her phone number was flooded with threats and intimidating messages, among others calling for her death and disbarment. Among the messages PLAINTIFF received were some stating "Do not cry in Twitter like a Jew", "Niggar", you'll be soon killed, and one message was actually a rap song describing in every detail how PLAINTIFF will be killed similarly as a black guy who was shot in the street in the song (at the time when PLAINTIFF received this message she had no information that it was actually a song).

80.    PLAINTIFF, through some of the tweets under her posts in Twitter back in January 2024, was informed that people know where she lives, one account holder sent her a message " be careful in that glass building".

81.    While DEFENDANTS ANCA and ANCAWR blamed PLAINTIFF in racism, discrimination and other nonexistent characteristics, she was harassed by multiple people because

17

she is a "Jew", a "Black" and therefore she deserves only the death. PLAINTIFF suffered tremendous emotional shock, was very much concerned about her life, was afraid to go out and couldn't work or think about doing any kind of job for about three months. PLAINTIFF'S phone was also attacked from unidentified phone numbers, calling her nonstop at least 20 times per day, screaming obscenities in her ear every time she dared to answer it.

82.    Thus, on or around January 8, 2024, DEFENDANT ANCA by using wire and with the intent to defraud made a post in its Twitter account that "in response to US - based attorney @BaghirzadeAynur (licensed in CA) openly calling for #genocide of Armenians… 1) Twitter should ban her for inciting genocide; 2) California State Bar should investigate her.." By doing so, Defendant ANCA used only part of Plaintiff's tweet by deliberately omitting all other parts. First of all, Plaintiff's tweet was in response to another person's tweet, where she accused Azerbaijanis in committing Khojali genocide (which is officially recognized as committed by Armenian terror groups and CIS regiment #366 in Karabakh region of Azerbaijan), second, even though in this Tweet's first part Plaintiff mentioned that 'it's clear that we have to delete Armenian project as soon as possible", her another tweet in this thread was that  "We have to think how to join Armenia to us..", and then other tweets in this thread were also about "Armenia joining us", not about massacring and killing people. Tweet was horribly manipulated, cut off, another person's tweet disappeared from the thread, her first tweet was pictured and spread publicly as " a call for genocide". Defendant ANCA acted maliciously when it manipulated PLAINTIFF's tweet and made it a public news as a "call for genocide".

83.    On January 8, 2024, DEFENDANT ANCA reposted a tweet of Amy Tarkanian calling State Bar of California to revoke her license for calling for the #genocide of Armenians. PLAINTIFF didn't call for the genocide of Armenians.

84.    On or around January 9, 2024, DEFENDANT ANCA made another public tweet that "1. Calling out genocidal incitement is not a threat. Just the opposite.. 2) Genocidal threats represent rightful grounds for a @StateBarCa moral turpitude investigation…. 3) Her doubling down on genocidal threats (see screenshot)  simply adds to the case for action.. ". This tweet again was both defamation and harassment all inclusive, because none of the PLAINTIFF'S tweets called for mass killing and extermination of the people, and it was a harassment as it had a threat that PLAINTIFF will be disbarred as a result of expressing her political opinion in Twitter.

18

85.    On or around January 9, 2024, DEFENDANT ANCA again made a statement in its account at Twitter, this time by reposting tweet of U.S. Azerbaijanis Network and tagging State Bar of California's Twitter account that PLAINTIFF'S actions represent an act of moral turpitude and is a ground for disciplinary action. This tweet was another harassment PLAINTIFF was enduring nonstop from the DEFENDANTS ANCA and ANCAWR.

86.    On January 11, 2024, DEFENDANT ANCA tweeted again "Having repeatedly incited #genocide against Armenians - then doubled down on her calls to "delete" and "get rid of" Armenia - @baghirzadeaynur is now ranting about some sort of great satanic replacement theory". Again, this tweet was a defamation because PLAINTIFF didn't call for the genocide of the Armenians and though in one of her tweets she called for "deleting Armenian project", Armenian project didn't specifically mean Armenia, it meant project of expansion of Armenia (Great Armenia project) on the account of neighborhood states, the theory which many Armenian nationalistic parties were trying to implement at different stages of the history.

87.    On or around January 19, 2024, DEFENDANT ANCA made another posting in Twitter about Plaintiff: "The most compelling argument for: 1) The @StateBarCa disbarring @BaghirzadeAynur; 2) @X banning this CA licensed immigration lawyer … Right here - her one-hour genocidal rant today @XSpaces, raging on the very existence of #Armenia". In this tweet again DEFENDANT ANCA maliciously and intentionally distorted the entire meaning of her speech in Twitter public space by calling it "genocidal rant". Plaintiff's view on existence or nonexistence of any state does not come to the meaning of killing or exterminating its people. Considering 2 centuries of the ongoing conflict in the region and utterly nationalistic political agenda of certain groups in Armenia, this was the only solution PLAINTIFF saw, and her opinion in fact was about saving people's life, not killing them, as it is clear that utterly nationalistic policy of Armenian groups will bring nothing to tiny Armenia in the region besides tragedy (and history proved it true). Besides, being defamatory DEFENDANT ANCA'S tweets were harassing PLAINTIFF with disbarment, were made publicly, so that everyone knows and sees it, her social media accounts, business emails, phone number were flooded with threats and accusations. DEFENDANT ANCA also used her photo without her permission, and by spreading false information about her placed her in a false light.

19

88.     On or around January 20, 2024, DEFENDANT ANCA  made another tweet about PLAINTIFF,  tagged State Bar of California account and blamed her again in calling for genocide, this time using her another tweet, where she named Armenia a "carcinoma", which must be reformed… Reasons behind naming Armenia a "carcinoma" quite obvious for PLAINTIFF. In 1992-1993 because of joint invasion of Azerbaijan by Armenian terror groups and Russian forces the democratically elected government in Azerbaijan was overthrown and long standing pro-Russian dictatorial regime was established. Russia used Armenian terror groups (ASALA, ARF - which Russia created herself) to crash democracy in Azerbaijan, now it uses regime in Azerbaijan to do the same in Armenia. If not for Armenian terror groups, the region would have been free from Russian influence long time ago. By calling it "carcinoma" PLAINTIFF didn't mean any harm to Armenians specifically, she meant that it has to be reformed to eradicate nationalistic Njdeh philosophy of Aryan race superiority to which Armenians worship till now and which actually keeps killing people both in Armenia and Azerbaijan.

89.     On or around January 26, 2024, DEFENDANT ANCA posted another tweet in its account - this time by taking another part from her tweet thread, omitting everything where she mentioned that "We have to think on how to join Armenia to us" and making emphasis this time that she wants "to get rid of Armenia". DEFENDANT ANCA again used PLAINTIFF'S picture and accused her in calling for genocide, which was absolutely not what PLAINTIFF meant.

90.     On or around January 26, 2024, DEFENDANT ANCA made another tweet that PLAINTIFF after taking a break from "calling for genocide" (an act of moral turpitude punishable by the @StateBarCa) attacked ANCA DC and posted another her picture without her permission by placing her in a false light. This tweet was also another harassment as DEFENDANT ANCA threatened PLAINTIFF again with disbarment.

91.     On or around January 26, 2024, DEFENDANT ANCA made another tweet to investigate whether a CA licensed lawyer's actions constitute an act of moral turpitude to be disciplined.

92.     On or around February 6, 2024, DEFENDANT ANCA tweeted "Dark day for the California State Bar : The @StateBarCA has refused to act on a complaint against Aynur Baghirzade - @BaghirzadeAynur (a lawyer licensed to practice in California) - for publicly tweeting

20

calls for the eradication of #Armenia and Armenians ". PLAINTIFF has never tweeted on eradication of Armenians.

93.     PLAINTIFF based on facts and information alleges that while DEFENDANT ANCA was continuously harassing her and posting nonstop defamatory news about her, another person - named Chelsea Heart as PLAINTIFF believes on DEFENDANT ANCA's orders was posting harassing and defamationry news about her as well, using her different tweets at different times, using her picture and making different accusations against her, including blaming her in a genocide, in calling for the genocide, being a Nazi and etc. As Chelsea Heart acted as an agent for DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN, PLAINTIFF holds DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN responsible for the defamatory content and harassment contained in all those publications too. PLAINTIFF was shocked, devastated, scared and horrified by the continuous attacks on her personality.

94.     Immediately after DEFENDANTS ANCA and ANCAWR made defamatory statements about PLAINTIFF her Yelp business account was flooded with fake reviews, claiming that they were clients of the PLAINTIFF, that the service was dissatisfactory and that the PLAINTIFF takes money and do not provide services. One Yelp user put an actual threat in PLAINTIFF'S account that "we will come after you", some other messages in her phone number also suggested that "people will come after you". PLAINTIFF'S business photos were manipulated, distorted and inappropriate photos were placed in her Yelp business account. Despite PLAINTIFF'S complaints the damaging reviews, including one with the threat and inappropriate pictures were kept at her business profile for significantly long period of time and were not removed, thus making sure that PLAINTIFF'S business gets damaged as much as possible and she suffers an emotional shock as long as possible.

95.     On or around February 6, 2024, someone named Solomon S. using wire placed a defamatory review in PLAINTIFF'S Yelp account that PLAINTIFF provided "terrible service" to him. This review came along with hundreds of other fake reviews into PLAINTIFF'S account at the same time. This review was immediately requested by the PLAINTIFF to be removed, however in or around February 8, 2024, DEFENDANT YELP with intent to defraud and by using wire refused from taking down this review and provided absolutely illogic argument for it that "after careful

SECOND AMENDED COMPLAINT                                              24CV1077 RSH MMP

consideration they decided to keep this review." PLAINTIFF does not know what was this "careful consideration" about, while her page was under constant attack for about two months on a daily basis and DEFENDANT YELP was alerted to the fact that something unusual was happening, which had nothing to do with how PLAINTIFF provided services. Moreover, DEFENDANT YELP at the same time kept removing positive reviews about PLAINTIFF'S business to ensure that she has a poor rating.

96.     In or around April 30, 2024, after Armenians got unhappy about PLAINTIFF'S another tweet in her personal Twitter account, someone under the name H.G. placed another defamatory review in her business Yelp account claiming that PLAINTIFF "stole his money" and didn't provide the service.   PLAINTIFF believes that such vicious reviews were placed by Armenian Enterprise with the the single goal to leave her without any client and any income, and thus punish her for her speech. Despite PLAINTIFF'S complaints to DEFENDANT YELP this review was kept at her business page unchanged under the similar ground that DEFENDANT YELP "carefully reviewed it". Old reviews with old comments started appearing at her business page again and PLAINTIFF, shocked and embarrassed, was forced to ask DEFENDANT YELP to remove them again.

97.     On or around January 17, 2024, PLAINTIFF sent an email to DEFENDANT YELP asking it to close her business page as she does not want to keep it open, and also asked to remove from the platform all reviews. On or around February 9, 2024, DEFENDANT YELP with the intent to defraud responded that they will not close her page unless she pays a fee for the past advertisement. PLAINTIFF YELP was clearly in violation of its terms and conditions when it refused from closing PLAINTIFF'S business page, as there was nothing there allowing YELP to act in this manner or suggesting that the user must pay for the advertisements or any other debts in order to have its page closed. PLAINTIFF asked for the invoice for the advertisement and the amount she was due, but no such information was provided to her. Moreover, PLAINTIFF remembers it very well that she did the advertisement for immigration services, but for unknown reasons she was getting leads in tax law !!!  PLAINTIFF believes that DEFENDANT YELP was in conspiracy with Armenian Enterprise for a quite a long time to damage her business, much longer time before fake reviews started appearing at her page. PLAINTIFF believes that DEFENDANT

YELP clearly kept her business page open in order to allow Armenian Enterprise to continue harassing her, and payment for the ad was just an excuse.

98.    Multiple business owners also report that DEFENDANT YELP is corrupt and bullies and harasses businesses to get from them money in exchange for good reviews at their Platform.

99.    In or around April 15, 2024, PLAINTIFF changed the name of her law firm to ACCURA LAW, and started social media campaign on her Facebook, Instagram and other pages. Immediately her Facebook account was flooded with multiple messages from the people she didn't know claiming that PLAINTIFF is in violation of someone's copyright or trademark.

100.    From around June, 1 to June 15, 2024, DEFENDANT YELP continued changing the name of her law firm from old to a new one, while PLAINTIFF was trying to remove all this information. Afterwards, DEFENDANT YELP eventually locked her business name, phone number and other information, so that she can't change anything. At the same time DEFENDANT YELP also disabled PLAINTIFF'S option to edit her comments under the review and to make a comment at all!

101.    When DEFENDANT ANCA and ANCAWR realized that they couldn't disbar PLAINTIFF,  with the intent to defraud they placed her distorted tweet, where as they allege she "called for genocide" in Google Search under her name, DEFENDANTS ANCA and ANCAWR also took care that the headlines for all her name search results come with "to disbar or disbarring Aynur Baghirzade", so that to make any potential client of the PLAINTIFF to believe that PLAINTIFF is disbarred - the act, clearly aimed on discouraging the clients to work with her, to disparage PLAINTIFF'S reputation, and to leave her with no income and money. It is quite interesting that while many Twitter users supported PLAINTIFF when she tweeted on disagreement with conclusions of DEFENDANTS ANCA and ANCAWR regarding her tweets, those tweets miraculously do not appear in Google search results under her name while ANCA's tweets appear multiple times. PLAINTIFF believes that no one besides the State Bar of California can make a decision on PLAINTIFF's disbarment and these acts of the DEFENDANTS were barbaric attempt to defraud the public into their own decision on PLAINTIFF.

102.    PLAINTIFF upon information and facts alleges that DEFENDANT GOOGLE and DEFENDANT SUNDAR PICHAI conspired and acted on the orders of DEFENDANT ANCA and

ANCAWR from approximately June, 2023 by deliberately harassing, intimidating PLAINTIFF and damaging her reputation. Thus, on or around June 11, 2023, after PLAINTIFF'S YELP account was shelled with negative reviews, she started noticing harassing and defamatory images under her name appearing in Google search results. Some of those images associated her with criminals (like a picture of the criminal was appearing under her name), some of the pictures of her tweets were appearing under her name, some contained insidious threats like "Justin McCarthy is no longer at the University of Louisville" implying that PLAINTIFF'S speech can cost her her career. Though PLAINTIFF admits that Google search could give such results, it was interesting that all this information started appearing immediately after PLAINTIFF'S accounts were shelled and after she was harassed in her Twitter account. As far as PLAINTIFF understands it, GOOGLE SEO needs some time to accumulate information and show it in the search results, how it happened that GOOGLE results were giving this defamatory and misleading information immediately after PLAINTIFF was harassed in Twitter is still a mystery.

103.    One of the headlines, which appears under PLAINTIFF'S name in Google Search is that she as an immigration attorney who "called for genocide". DEFENDANTS ANCA and ARAM HAMPARIAN knew that PLAINTIFF renders services in Immigration Law - one of the most sensitive areas of Law. Calling for genocide would for sure make clients (especially asylum seekers) to keep away from the PLAINTIFF as an attorney, and this was a particular a goal which DEFENDANTS ANCA and ARAM HAMPARIAN   wanted to achieve by placing or ordering to place such information in Google Search under the PLAINTIFF'S name. This was another way how DEFENDANTS ANCA and ARAM HAMPARIAN wanted to castrate PLAINTIFF as an attorney from the practice of Law, bypassing State Bar's decision.

104.    PLAINTIFF upon information and facts alleges that DEFENDANTS GOOGLE and SUNDAR PICHAI do everything to place any defamatory information under her name to appear in Google Search. While DEFENDANT ANCA'S tweets and headlines about PLAINTIFF appear in Google Search, none of PLAINTIFF's tweets opposing to DEFENDANT ANCA'S opinion are there. PLAINTIFF also observed how links to particular defamatory and damaging false and manipulated information regularly appears under her name in Google Search, this concerns to every her step, every her move - she is under constant surveillance by DEFENDANT ANCA.

105.    PLAINTIFF recalls that her Google business page under her old name suddenly disappeared from the internet. The page was verified by GOOGLE.

106.    Approximately at the beginning this year PLAINTIFF created again her new GOOGLE business page, which was verified by DEFENDANT GOOGLE and active. On or around April 15, 2024, PLAINTIFF changed the name of her law firm to ACCURA LAW, and following this change she did the same edits in her GOOGLE business account. When she attempted to change the address - immediately she was asked for another verification, and not only for simple phone call verification, but she was asked to provide a video of her location. Since the time, when PLAINTIFF was first harassed by Armenians, she got a virtual address for her business, because simply she was scared for her life. PLAINTIFF wrote to DEFENDANT GOOGLE  multiple emails trying to explain them that she will not be using her real address, that she will be using virtual address and that she does not want to provide her real place of residence, because she does not want it to be known. For unknown reasons DEFENDANT GOOGLE was insisting on video verification and required her actual address, this is after couple of months when her business under its old name was verified by DEFENDANT GOOGLE!

107.    On or around April 15, 2024,   PLAINTIFF had a meeting with DEFENDANT GOOGLE  representative, who required her to show her business license and business cards. When PLAINTIFF explained to her that she has 40 days after changing the name of her business to apply for fictitious name registration, and GOOGLE is not an authority to check her registration, and that in any case she is a solo practitioner, and she doesn't even need a license to provide a service, representative didn't want to hear her and continued insisting on showing the license and business cards.

108.    On or around May 2,  2024, when next time PLAINTIFF made a GOOGLE search for ACCURA LAW she was shocked by discovering that GOOGLE business page of Accura Advokatpartnerselskab - the Denmark law firm appears in search results for San Diego and Orange County areas, while this law firm was not present in California. For comparison, when PLAINTIFF makes a GOOGLE search for VODKA none of the VODKA producing companies in Russia appears in the search results, the results shows vodkas only in San Diego and nearby areas! PLAINTIFF is sure that it was organized campaign of the Enterprise together with  DEFENDANTS GOOGLE and SUNDAR PICHAI to deliberately damage her business. PLAINTIFF'S clients

applying for her services were confused and constantly asked her questions - where are you guys located ?   PLAINTIFF'S further requests to correct the situation were faced with DEFENDANT GOOGLE's staff's complete indifference, with some of them arguing that she had to verify her business for her page to be corrected. For unknown reasons, PLAINTIFF'S website was not first appearing in Google Search results, and first for the searches in San Diego and Orange County areas DEFENDANT GOOGLE was showing the website of the Denmark Law Firm. Again, while searching for Vodka in California PLAINTIFF couldn't find any vodka outside of California appearing in the Google Search. PLAINTIFF believes that DEFENDANT GOOGLE in the similar way as DEFENDANT YELP became a part of the Armenian Enterprise to deliberately damage her business and confuse her clients.

109.    On or around May 25, 2024, PLAINTIFF noticed that her GOOGLE business profile appears in the search results on the iPhone, but not on the computers. So, DEFENDANTS GOOGLE and SUNDAR PICHAI in order to confuse PLAINTIFF'S clients even more was showing them PLAINTIFF'S business page in GOOGLE search results on cellphones, while it was showing Denmark law firm's results for San Diego and Orange County areas on the computers. When she checked the status of her business profile, she discovered that it was verified. So, while PLAINTIFF'S business profile was verified for the unknown reasons DEFENDANTS GOOGLE and SUNDAR PICHAI continued showing to the people Denmark Law Firm in search results on the computer under her law firm's name!

110.    On or around May 30, 2024, PLAINTIFF again contacted DEFENDANT GOOGLE and asked immediately to correct situation with her business google profile. However, under various excuses DEFENDANT GOOGLE'S staff was doing everything to delay the process and to ensure that PLAINTIFF'S business gets damaged as much as possible. Also, while the status of PLAINTIFF'S business profile appeared as verified on the cellphone, it was unverified in search results on computers - PLAINTIFF does not believe that it was a technical problem, mostly it looked like a deliberate cyber-security crime with the purpose to make clients to doubt authenticity of her business, its real existence, and give them a message that the owner of the business is a fraudster - very much in the customs of the Armenian Enterprise.

111.    On or around July 30, 2024, PLAINTIFF started recording videos on Immigration Law in different languages and set up her Youtube channel for Accura Law. While her first video in

Russian got around 326 views within a day, the number of views suddenly stopped counting afterwards, which could only mean that DEFENDANT Youtube stopped showing her video to the public. All other videos of the PLAINTIFF stopped counting views as well. After doing google search for Youtube, PLAINTIFF realized that Youtube was purchased by DEFENDANT GOOGLE in 2006, and what PLAINTIFF experienced is nothing more than a common scheme and plan of the single big Enterprise to damage her business and punish her for her speech. All PLAINTIFF'S complaints to DEFENDANT Youtube were completely ignored.

112.    On or around June 22, 2024, after PLAINTIFF posted information about the fact that she filed a lawsuit against DEFENDANT ANCA and others in her personal Twitter account, her GOOGLE account was shelled with negative reviews of the people claiming that they were her clients, and that PLAINTIFF provided a horrible service to them. DEFENDANT GOOGLE refused to take those reviews down by deliberately keeping them in her account and kicked her GOOGLE account into unverified status again in less a month after verifying it.

113.    On or around June 25, 2024, when PLAINTIFF called to DEFENDANT GOOGLE and asked them to correct information about her account and stop constantly making it unverified, she was orally advised "to close her account".

114.    From June, 2024 till September 25, 2024 when PLAINTIFF tried to report fake reviews to DEFENDANT GOOGLE, she reported them as of topic meaning that the person who made a review was not her client, but received an email from DEFENDANT GOOGLE that those reviews were reported as spam - as a result they have never been addressed and taken down by DEFENDANTS GOOGLE and SUNDAR PICHAI. On some occasions, PLAINTIFF noticed that she reported fake reviews once but received 5-6 emails from DEFENDANT GOOGLE, from which PLAINTIFF made a conclusion that her activity and activity of her business in GOOGLE are under constant control and watch by the ENTERPRISE not to allow her business to grow.

115.    On or around September 25, 2024, when two clients of PLAINTIFF placed positive reviews about PLAINTIFF'S business in her GOOGLE account, she noticed how immediately Denmark law firm's website appeared in the GOOGLE search for her business for San Diego and Orange County areas. In fact, PLAINTIFF'S information about her business is mixed up so vigorously with Denmark law firm's information that it would be hard for any of her clients to find her, or would certainly mislead them as to her location and practice areas. PLAINTIFF didn't find

SECOND AMENDED COMPLAINT                                    24CV1077 RSH MMP

any other business in San Diego or Orange County area, which would be so much entangled and associated with a foreign business. This was done intentionally by DEFENDANTS GOOGLE and SUNDAR PICHAI.

116.    On June 24, 2024, after PLAINTIFF filed her complaint and published information about the lawsuit in her Twitter account, Armenian Weekly made another defamatory news about PLAINTIFF with the malicious intent to damage her reputation and business. According to PLAINTIFF'S research Armenian Weekly belongs to DEFENDANT HAIRENIK ASSOCIATION, which belongs to ARF - the parent organization of DEFENDANTS ANCA and ANCAWR, therefore this act of defamation shall be attributed to these DEFENDANTS as well. Article is defamatory because it has false facts - PLAINTIFF has never called for eradication of Armenians. DEFENDANTS also used her tweet and picture by placing PLAINTIFF into false light. Not surprisingly, these news accurately appear under the name of PLAINTIFF when someone GOOGLES it.

117.    On June 25, 2024, another DEFENDANT ZARTONK MEDIA made another defamatory publication about PLAINTIFF by taking her photo, manipulating it, adding to it YELP, GOOGLE and ANCA'S logos without PLAINTIFF'S consent and by putting PLAINTIFF into false light, falsely declared that PLAINTIFF is a "racist" who called for a new Armenian Genocide, which is factually wrong as PLAINTIFF has never called for any genocide of any ethnicity. This was done maliciously, with the intent to damage PLAINTIFF'S personality, relationship, business and reputation. And of course, this news appear in Google search under PLAINTIFF'S name right from the time when it was published.

118.    PLAINTIFF upon information and facts believes that DEFENDANT ANCA'S goal is to leave PLAINTIFF with no business and make her eventually leave the United States, because she does not recognize Armenian genocide and she dared to speak the truth about true colors and purpose of their organization. DEFENDANT ANCA is not interested at all whether PLAINTIFF'S tweets were true or not, all it is interested in - her complete destruction. PLAINTIFF believes that DEFENDANT ANCA lies to the public in the United States to manipulate public opinion and eventually use the system in the United States to achieve its strategic goal - genocide recognition, and ultimate partition and division of Turkey and Azerbaijan in order to create Great Armenia on

SECOND AMENDED COMPLAINT                                        24CV1077 RSH MMP

those lands. PLAINTIFF believes that, since her tweets started destroying those lies she became a target of DEFENDANT ANCA.

119.    PLAINTIFF upon information and facts believes that DEFENDANTS ANCA and ANCAWR do not mind corrupting U.S. system to achieve their goals. On or around September 23, 2023, Robert Menendez, a U.S. Senator, having good ties with DEFENDANTS ANCA and ANCAWR was indicted for bribery, corruption and later for obstruction of justice. Robert Menendez is accused in taking bribes through his wife of the Armenian origin - Nadine Aslanian, for years Robert Menendez was speaking in the Senate against Azerbaijan and Turkish interests, calling for sanctions against these states multiple times.

120.    PLAINTIFF upon information and facts alleges that DEFENDANT ANCA stalks all PLAINTIFF'S court cases in the State of California and uses its ties and connections to delay them and/or not to resolve them in PLAINTIFF'S favor.

121.    PLAINTIFF'S purpose to move to the United States was to establish here her business (her own law practice), but unfortunately right from the beginning she faced challenges first in her job place and afterwards with referral organizations.

122.    PLAINTIFF was employed by the Slate Law Group from May 14 till July, 21, 2021 and was forced to resign, because the Partner of the Law Firm sent her a fraudulent check as a paycheck. The partner of the law firm was so assured that she will not get punished for her behavior that she even confirmed it in writing that PLAINTIFF is good to cash out the check, knowing that it was fraudulent. Only later PLAINTIFF realized that this was not an accidental, random fake check sent to her, but an indication of more serious problem.

123.    PLAINTIFF's further attempts to serve her complaint on her former employer - Kelly Duford, turned into real nightmare - with the UPS store owner doing everything not to serve it properly and with San Diego Police Department and DA office refusing to add charges on her complaint to the ongoing criminal case against her former employer. PLAINTIFF revealed during the process that investigation on her former employer was conducted by San Diego DA office together with The State Bar of California.

124.    According to the Declaration in support of the arrest warrant of Steve Moe (Declaration), a District Attorney Investigator employed by the San Diego County district Attorney, the investigation against Kelly Duford started on June 16, 2020. The investigation revealed that

"Kelly Duford was retained on a contingency basis to represent clients in different civil matters. Kelly Duford secured settlement agreements, received and deposited the settlement checks into her client trust account or business checking account and spent the money without giving the clients their full share of the settlement funds. Additionally, it was revealed that Williams forged client signatures on settlement checks prior to depositing them. "

125.    According to the above mentioned Declaration the following clients of Slate Law did not receive their share of settlement funds: "Adam Babin - $ 98, 300; Rachel Harris - $ 73, 030; Sanae Horowitz - $ 10, 332; Anna Koparanova - $ 14, 910; Eric P. Miller - $ 22, 500; Kristen D. Quick - $ 21, 440; Fernando Rodriguez - $15, 550; kia M. Vaara - $ 15, 200…"

126.    PLAINTIFF'S complaints in court  about the actions of her former employer - Kelly Duford turned into another nightmare: one of the judges concealed from her administrative records asserting that she has never lodged them with the court (which was not true), opposing counsel submitted to the court a fraudulent answer, which was completely ignored by the judge, another judge was delaying the process for no apparent reason, her filings for the default judgment submitted to the court in 2023 were rejected only in May 2024, and her case management conference was also rescheduled from August 2023 to May 2024 for the reasons still unknown to the Plaintiff.

127.    PLAINTIFF'S own investigation into the matter of Kelly Duford made PLAINTIFF to believe that there is a co-operation between certain attorneys and banks in terms of issuing and giving fake checks, and this was probably a reason why PLAINTIFF had difficulties serving her papers. Moreover, PLAINTIFF'S investigation results also made her to believe that Kelly Duford most probably was allowed to leave the state and escape to another state, where she was apprehended completely accidentally.

128.    Before PLAINTIFF and her business were targeted, an investigation by Munger, Tolles & Olsen ("MTO") began in August 26, 2014, responding to a July 31, 2014 "Report of Improper Activity from the Bar's Chief Trial Counsel" who reported "concerns related to certain actions" of State Bar leaders "that demonstrate a disturbing lack of transparency at the highest levels within the organization". She claimed, "State Bar leadership is failing to adhere to basic principles of governance" and "five layer chess game" has "systematically fostered a culture of intimidation and isolation within the organization."

30

129.     Most notably, Thomas V. Girardi is named 18 times in the report, right alongside the State Bar of California's Thomas Layton who was later revealed to have been receiving bribes in exchange of protection. An entire report section is medicated to "Perceived Girardi Keese Influence at the Bar. "

130.     Hundreds of complaints were lodged against Girardi by unsuspecting members of public. Girardi's favorite scheme was using settlement monies from one case to pay plaintiffs in another case and then lying to the clients, when they called to find out the status of those settlement checks.

131.     On February 1, 2023, U.S. attorneys announced Thomas V. Girard and Girardi Keese colleagues David Lira and Christopher Kamon were indicted for wire fraud, allegedly embezzling more than $ 18 million from clients.

132.     Complaints were also lodged by unsuspecting members of public against attorney Kenneth Catanzarite. Catanzarite's favorite scheme involves using straws plaintiffs, engaging in non-judicial acts of fraud to build "fake" cases, and then filing sham court documents in pursuit of his own financial interests.

133.     Some facts about Catanzarite Law corporation suggest it put a lien on their own client's home for $ 120, 000 for legal services, and later allegedly stole the home valued at an estimated $ 1. 3 million. In one federal case, Catanzarite took his own client's home in bankruptcy to pay for legal fees, and he concealed it from the Court. He was sanctioned $ 30, 000 or forced to return home, also admonished by the Court. In another, the judge concluded "Catanzarite's case was a "sham", and he was sanctioned for "wasting everybody's time." In still another, Catanzarite started filing papers on behalf of a partnership, but the court disqualified him concluding he lacked any authority to do so.

134.     On March 10, 2023, the State Bar of California publicly admitted that it was compromised by corruption and bribery of its employees through private attorneys. The release of two heavily redacted reports "reveal systemic organizational dysfunction that persisted for many years and through many changes of leadership." This dysfunction persists today, as evidenced by the schemes targeting PLAINTIFF.

**SECOND AMENDED COMPLAINT**                                     24CV1077 RSH MMP

135.    State Auditor revealed in Report 2022-030 that there are 700+ State Bar attorneys who receive special treatment in California. Each of these actors' discipline or theft cases closed via at least four 'private letters" (2010-2022).

136.    On or around September, 2021 PLAINTIFF became a member of OCBA.

137.    As OCBA provided a mentorship program PLAINTIFF on May 30, 2022 applied to get a mentor in Immigration and Business Litigation.

138.    On or around June 1, 2022, an attorney John Pentecost was selected by the program to meet the Plaintiff. John Pentecost to the best knowledge of the PLAINTIFF practices Business litigation.

139.    PLAINTIFF during the meeting with attorney John Pentecost informed  the latter that she is interested in a mentor in Business Litigation, as she has a lot friends practicing Immigration Law, and she doesn't feel that she really needs a mentor in this area of Law.

140.    On or around June 27, 2022, PLAINTIFF unexpectedly for her was informed that her selected mentor is Christine Doyle, an immigration law attorney.

141.    In or around November 1, 2022, PLAINTIFF wrote to Rebecca Manara, a Membership Services Manager at OCBA, asking her whether OCBA can provide her with a mentor in Business Litigation. This email of the Plaintiff was not answered.

142.    On or around November 9, 2022, PLAINTIFF wrote another email to Rebecca Manara, inquiring her about PLAINTIFF'S request to change the mentor and asking her why the PLAINTIFF was provided with a mentor she didn't ask for.

143.    The second email of the PLAINTIFF was copied to multiple other attorneys, as PLAINTIFF believes practicing BUSINESS LITIGATION, and she was explained that she can't be guaranteed any mentorship, that she can't be given any mentor in the area she wants, and that OCBA does not have any mentor in Business Litigation for the PLAINTIFF. When PLAINTIFF asked to give her the list of the people who took a decision on her case as well as the list of attorneys in DEFENDANT OCBA'S Business Litigation panel, she was refused because "she was not entitled to this information", though nobody could explain what special privilege applies to this information if OCBA'S website specifically and openly announces that they provide mentorship program  and if it discloses that they have a panel of Business Litigation attorneys.

32

144.    On or around December 2022, PLAINTIFF started surfing DEFENDANT OCBA's website for the application guidelines to join their referral services. PLAINTIFF was explained that the subscription for the referral service is valid only for 1 calendar year and that in order to join the service PLAINTIFF has to have either Orange County residence or main business office in Orange County **as well as a phone number starting with the Orange County area code**. PLAINTIFF'S current phone number at that moment was with San Diego area code, and PLAINTIFF had to obtain and open a second phone line to join the referral service.

145.    After spending significant amount of time to obtain a second phone line PLAINTIFF applied on or around January 17, 2023 to join OCBA LRIS.

146.    One of the requirements to join the referral service was to submit a check with a payment for membership. PLAINTIFF called to OCBA on or around January 18, 2023, and spoke to Olivia Torres. Olivia Torres informed PLAINTIFF that she can make a payment electronically after she gets an invoice. In couple of days PLAINTIFF called again Olivia Torres as she got no invoice from her, after reaching out to her, PLAINTIFF was explained that Olivia Torress is busy and that PLAINTIFF will get an invoice as soon as possible. When after several more days PLAINTIFF got no invoice, she reviewed OCBA LRIS Rules and found out that the payment according to the Rules must be made by check, not electronically. Rules had no provisions that applicants can make membership payments electronically.

147.    On or around January 20, 2023 PLAINTIFF sent another email to OCBA LRIS asking to provide her with any update about her membership application and payment. Having heard nothing from OCBA on or around January 21, 2023, PLAINTIFF sent a letter to DEFENDANT OCBA Board and President that since PLAINTIFF didn't provide a check with her application PLAINTIFF was in fact in violation of DEFENDANT'S OCBA LRIS Rules. In response, almost immediately, PLAINTIFF received letters from Business Litigation and Immigration Law Panels that her membership applications are incomplete. When responding to PLAINTIFF these panels took away all PLAINTIFF'S international experience from her applications and sent them back to her. In response, PLAINTIFF sent an email to DEFENDANT OCBA that taking away PLAINTIFF'S international experience from the applications and sending them back is discriminatory, and in any case PLAINTIFF'S credentials, especially CLEs earned by the PLAINTIFF for Business Litigation and Immigration Law qualify her for those panels even

SECOND AMENDED COMPLAINT                                    24CV1077 RSH MMP

without going into her international credentials. At the same time PLAINTIFF requested for final decisions of the panels in accordance with OCBA LRIS rules, so that she can file for an appeal if necessary.

148.     On or around February 14, 2023, PLAINTIFF received a letter from DEFENDANT OCBA that she was accepted to OCBA LRIS' Business & Corporate panel, but she was denied in joining to Business Litigation, intellectual Property and Immigration Law panels, because PLAINTIFF does not satisfy minimum requirements for those panels. At the same time letter had no information on how PLAINTIFF does not satisfy those minimum requirements. As it became apparent later the DEFENDANT OCBA accepted PLAINTIFF's candidacy to Business & Corporate Panel only to defraud her, and to make sure that she gets no case at all out of around 12 referrals which were sent to her within 1 year of her membership (one per month).

149.     On or around February 17, 2023, PLAINTIFF received first referral for Business & Corporate Panel during almost 5 weeks of her membership. When PLAINTIFF asked a question why she is getting 1 referral per month, as she does not believe that the number of Business & Corporate cases in the Orange County are so limited, the response was very standard 'the call volumes in community differ and they can't guarantee any number of referrals in a given period of time", which PLAINTIFF believes based first of all on DEFENDANT OCBA'S audit reports, is untrue. DEFENDANT OCBA actually contradicted itself, because it sent PLAINTIFF exactly one referral per month, while it asserted that "the call volumes in community differ", and all those referrals ended up with returning no real case to the PLAINTIFF, moreover, majority of the applicants were verbally and emotionally abusive and clearly didn't have any intent to retain her.

150.     On or around March 21, 2023, PLAINTIFF sent a complaint about her experience with DEFENDANT OCBA to the State Bar of California, asking them to fix the problem. Immediately after she applied to the State Bar of California with this complaint she received a notice from California Franchise Tax Board, stating that they have information that she got her license in 2020 but she didn't pay taxes for 2020. PLAINTIFF felt confused and outraged at this fact, because PLAINTIFF was absent from the United States for the whole period of 2020 and came to the U.S. only to get her license and stayed in the country for a very short period of time, and PLAINTIFF didn't work in 2020. PLAINTIFF believes that the letter she received back in March, 2023, from Franchise Tax Board was not accidental.

**SECOND AMENDED COMPLAINT**                                   24CV1077 RSH MMP

151.    On or around May 30, 2023, State Bar of California responded to the PLAINTIFF'S complaint that they found no violation, that there were 25 Corporate & Business panel members, and at the time of PLAINTIFF'S complaint there were 14 panel members who had not yet received the referrals, and that between February 14, 2023 and March 21, 2023, DEFENDANT OCBA LRIS got only 11 referrals. These findings of the State Bar of California clearly contradicts audit reports and admission of the DEFENDANT OCBA itself. Thus, audit report of DEFENDANT OCBA for 2022 states that the total revenue for 2022 of this organization was $ 2,916,840, the revenue coming from OCBA LRIS was $ 465,673, and this is considering the fact that it was two years after pandemic, and that for 2023 DEFENDANT OCBA'S  revenue was for sure more than for the year of 2022, and considering the fact that DEFENDANT OCBA LRIS takes only 15 to 20 % out of the general earnings of the attorneys for each case ! This actually means, that DEFENDANTS OCBA and OCBA LRIS had enough cases both in 2022 and 2023, and their assertion that they didn't have enough cases to share with the PLAINTIFF is false. Moreover, PLAINTIFF requested all financial statements of the DEFENDANTS OCBA AND OCBA LRIS concerning the revenue organization got from each panel but was given the answer that they do not have this information, which PLAINTIFF believes can't be true.

152.    PLAINTIFF was subjected to the continuous harassment throughout her membership with DEFENDANT OCBA. Her electronic entrance to the system was blocked several times without any apparent reason, people referred to her were verbally and emotionally abusive and generally didn't have any desire to form any attorney-client relationship with her, out of roughly 12 referrals she got for the entire year she got no real client. On top of that, PLAINTIFF upon information and facts believes that DEFENDANT OCBA and OCBA LRIS employees continued harassing her through other referral organizations, where she was a member, she believes that they reached to DEFENDANT LACBA, and later DEFENDANT ASN and conspired with DEFENDANTS LACBA and ASN to damage her business.

153.    On or around November 15, 2023, DEFENDANT OCBA employee Teresa Vuki sent PLAINTIFF an email that till that day (November 15, 2023) LRIS referrals have generated over $2.3 million in attorney fees. At this time DEFENDANT OCBA LRIS was clearly aware that PLAINTIFF generated no revenue through the referrals she received from them, and this email was

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

sent to harass and frustrate her. In the same email PLAINTIFF was asked to renew her membership and pay membership fees for the next 2024 year, which sounded like a joke.

154.    In one of her emails PLAINTIFF sent to DEFENDANT OCBA after her application was rejected for Intellectual Property panel, PLAINTIFF expressed her general frustration with the decision and responded that she believes that she "has more experience in IP and more qualified for this panel than any other member of it, for exception of probably Patent Law".   Since that time PLAINTIFF was haunted with the referrals for Patent filings in other referral organizations, even though she has never been a member of IP panel in those organizations, and PLAINTIFF believes that other referral organizations acted in conspiracy with DEFENDANT OCBA and OCBA LRIS to harass and intimidate her by sending her referrals she didn't ask for and didn't expect. This was also obviously done by committing multiple wire fraud to leave PLAINTIFF with no business, or significantly lower her chances to get valuable business out of the referrals, which were sent to her.

155.    On or around September 12, 2022, PLAINTIFF's application was approved for LEGALSHIELD.

156.    PLAINTIFF provided services as a member of DEFENDANT LEGALSHIELD for only two weeks through DEFENDANT LEGALSHIELD'S partner DEFENDANT PARKER STANBURY LLP  - till September 26, 2022, when a person of Armenian ethnicity was referred to her.

157.    After September 26, 2022, PLAINTIFF stopped getting referrals from DEFENDANT PARKER STANBURY and the reasons were not explained to her. Her numerous attempts to talk to the management at PARKER STANBURY and then to DEFENDANT LEGALSHIELD didn't give any results.

158.    On or around November, 2022, PLAINTIFF joined DEFENDANT LACBA's Smart Law Referral Service (SLRS). PLAINTIFF became a member of Business Litigation and Immigration Law panels. Upon   PLAINTIFF'S joining to the DEFENDANT LACBA's SLRS, DEFENDANT LACBA with the intent to defraud charged PLAINTIFF'S credit card twice. Later PLAINTIFF also discovered that DEFENDANT'S system was not set up properly to send her emails about referrals. After PLAINTIFF'S complaints this situation was cured.

159.    Since the time PLAINTIFF joined the DEFENDANT LACBA's SLRS, DEFENDANT LACBA with intent to defraud and contrary to the State Bar's Rules for referral

services using wire started sending to PLAINTIFF referrals not in the area of practice of PLAINTIFF, for the people already represented, or for the clients speaking the languages PLAINTIFF didn't speak, or continuously asking for pro-bono services. Besides, PLAINTIFF based on information and facts believes that DEFENDANT LACBA with the intent to defraud and using wire was sending her fake Business Litigation referrals. It is necessary to mention that earlier PLAINTIFF was rejected in her request to join Business Litigation panel at DEFENDANT OCBA.

160.    On or around February 8, 2023, PLAINTIFF sent a complaint to Seth Chavez, who was a Director of Operations at DEFENDANT LACBA about her experience with referrals. However, nothing has changed since the time of her complaint and PLAINTIFF continued getting harassed by inadequate referrals. Besides her complaint to DEFENDANT Seth Chavez, PLAINTIFF made a lot of complaints to Luis Ramirez, who was an Administrative assistant at DEFENDANT LACBA with no positive result as well.

161.    On or around May 23, 2023, PLAINTIFF received a referral for Patent filing, though PLAINTIFF has never been a member of IP Panel. PLAINTIFF's questions to DEFENDANT Seth Chavez about why she is getting referrals for the panel she is not a member of was explained that their intake does not always "capture every details".

162.    After PLAINTIFF made her complaints to DEFENDANT LACBA she started getting referrals for Armenian clients.  PLAINTIFF informed DEFENDANT LACBA that she got a lot of threats from this community and she is scared to represent them. Immediately afterwards DEFENDANT LACBA remembered that there are rules of the State Bar of California and they have to follow them, before that for this DEFENDANT it was absolutely ok to send PLAINTIFF referrals not in her area of practice, clients speaking the languages she does not speak, fake referrals, pro-bono referrals, already represented clients and etc.

163.    On or around June 22, 2023, PLAINTIFF received an email from DEFENDANT LACBA that their advisory committee had a meeting concerning PLAINTIFF'S request not to send her referrals for Armenians, and decided that she has to either opt out from the online referrals or get suspended. It is interesting that Advisory Committee of the DEFENDANT LACBA decided that they can "suspend" PLAINTIFF without State Bar of California's investigation into the matter and without court's decision. PLAINTIFF suffered shock as a result of getting such decision, while none

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

of her prior concerns were properly addressed by this DEFENDANT, and DEFENDANT was absolutely ok violating State Bar rules.

164.    After PLAINTIFF decided to opt out from online referrals, the number of the referrals she got from DEFENDANT LACBA significantly decreased. DEFENDANT LACBA'S explanation on PLAINTIFF'S requests about what happened to the number of referrals and why after she chose to opt them out she got only one referral were explained by "low rotation in immigration and business litigation panels".

165.    At the same time PLAINTIFF was experiencing problems with getting her CLE certificates from DEFENDANT LACBA. At the beginning she had to write and call several times to DEFENDANT LACBA, an only after several calls and emails she could get her CLE certificate, but later all her calls and emails were ignored.  PLAINTIFF chose avoiding DEFENDANT LACBA'S CLE trainings as getting certificates became a significant problem for her.

166.    In August 8, 2023, one of  PLAINTIFF's client referred by DEFENDANT LACBA informed her that she wants to close her case.    Almost immediately afterwards PLAINTIFF received an email from DEFENDANT LACBA that they got information that one of her clients has reported additional fees and in fact blamed the PLAINTIFF in not paying the referral fee. On or around August 31, 2023, PLAINTIFF repeatedly sent emails to DEFENDANT LACBA that she continues not getting cases from them, and the last case she got from them was 2-3 months ago, she also asked to remove all restrictions from her account and to add her back to the web referral system.

167.    DEFENDANT LACBA immediately asked for the closing documents and placed a hold on PLAINTIFF's referral account, it also asked for all fees to be remitted immediately.

168.    On or around September 6, 2023, PLAINTIFF sent an email to DEFENDANT LACBA asking questions why her account was suspended and why she is required to give closing documents immediately after she closed her case, while according to the rules of DEFENDANT LACBA she had 60 days to report the closing documents after the case was closed. Also, PLAINTIFF requested to explain why contrary to DEFENDANT LACBA's  SLRS Rules she was required to pay the referral fees immediately, while she had 31 days under the Rules to do so. PLAINTIFF was sure at that moment that DEFENDANT LACBA became a part of Armenian Enterprise in trying to harm and damage her business.

SECOND AMENDED COMPLAINT                                    24CV1077 RSH MMP

169.    On or around September 26, 2023, after not getting the referrals from DEFENDANT LACBA despite the fact of how DEFENDANT LACBA asserted PLAINTIFF that they removed all holds on her account, she wrote another email to DEFENDANT LACBA requesting the answer. DEFENDANT LACBA's answer was that referrals are based "on many factors" and provided on a "rotation basis", she also received a threat that they will relay the issue to the Advisory Committee if PLAINTIFF continues asking questions. PLAINTIFF before the incident was getting referrals regularly from DEFENDANT LACBA on a weekly basis.

170.    On or around October 10, 2023, DEFENDANT LACBA sent PLAINTIFF  referral for the person, who later was fishing the PLAINTIFF to send her a fake check.  The "Client" refused to talk to her over the phone and wanted the contract from the PLAINTIFF immediately. PLAINTIFF's request addressed to the DEFENDANT LACBA about why she is getting such referrals was that "web referrals are minimally screened".

171.    On or around February 13, 2023, PLAINTIFF became a member of DEFENDANT ASN.

172.    On or around October 6, 2023, DEFENDANT ASN sent her a referral for someone who was looking for PATENT filing. As PLAINTIFF recalls it, a voice of the "client", who wanted the service was suspiciously similar to the voice of the person requesting for similar services on a referral from DEFENDANT LACBA sent to her on or around May 31, 2023. PLAINTIFF was not a member of IP Panel.

173.    For the period of September - October, 2023, PLAINTIFF was getting referrals from DEFENDANT ASN, which were not in her area of practice, clients whose cases demanded a lawsuit in another jurisdiction, or clients whose cases must be done by someone who has a license in a different state, clients, whose cases would demand PLAINTIFF to travel to North California and etc. Eventually, on or around October 6, 2023, PLAINTIFF requested DEFENDANT ASN to remove her from Business Litigation panel and leave her only on Immigration Law panel list.

174.    On or around October 12, 2023, after PLAINTIFF raised the issue with DEFENDANT ASN that she doesn't want to receive referrals for the litigation cases in Northern California, she received an email from DEFENDANT LACBA stating that "they have a new keyword for the attorneys to take cases in Sacramento County area." and if someone wants this keyword to be added to their profile they can contact DEFENDANT LACBA.

39

175.    On or around October 9, 2023, DEFENDANT ASN requested her to give them her new address in San Diego. PLAINTIFF sent them her new address (PLAINTIFF was temporary on that address). On the following day during a morning time PLAINTIFF heard unusual noise coming from the doorway. Later she was shocked noticing a cockroach that moved from the door right to the center of her apartment. The insect was however damaged (probably, while it was placed under the door), because it didn't live long and die shortly (in the same way as a rat she previously found in her garage in Irvine). Comparing Azerbaijanis to cockroaches in the most terrible racist way was very common for Armenians harassing PLAINTIFF in her Twitter account. One of them even sent her a picture of the cockroach with the heading - Where are you, we are coming… It was after PLAINTIFF moved away from her temporary apartment in San Diego. Before an enormous cockroach was found in one of the hotels where PLAINTIFF stayed for a short period of time, rights in her cosmetic bag! It is necessary to notice that PLAINTIFF has never stayed in cheap or dirty hotels. Later PLAINTIFF realized that the Executive Director of the DEFENDANT ASN is an Armenian.

176.    Shortly after PLAINTIFF found a cockroach in her apartment, she discovered her car in the garage of the same apartment with a flat tire. It was quite unusual, as the PLAINTIFF'S car was new. PLAINTIFF was forced to call to the service to come and to take care about her car, so that she can move it from the garage to the tire shop, and for this reason she incurred expenses.

177.    On or around October 24, 2023, PLAINTIFF sent another email to DEFENDANT ASN that she still continues getting referrals for the business litigation while she requested to remove her from this panel.

178.    On or around December 6, 2023, DEFENDANT ASN sent PLAINTIFF another referral requiring representation in another state. At this stage PLAINTIFF realized that DEFENDANT ASN was desperately trying to catch PLAINTIFF on malpractice. PLAINTIFF sent an email to DEFENDANT JAKE BALOIAN as to why she got the referral requiring a lawyer in another jurisdiction, on which she received an answer that "they were not sure about the jurisdiction and wanted to give PLAINTIFF the chance to decide it", which sounded like a joke.

179.    In January, 2024, DEFENDANT ASN sent a referral to the PLAINTIFF, where "client" actually wanted her to do the illegal transaction and later come to underground garage. PLAINTIFF, shocked and disgusted, refused.

**SECOND AMENDED COMPLAINT**                                  24CV1077 RSH MMP

180.    In May, 2024, PLAINTIFF paid DEFENDANT NOLO to get leads. Shortly after PLAINTIFF paid for the leads on or around May 25, 2024, she got a referral from the DEFENDANT NOLO, from someone concealing his real name and surname that he is looking for a lawyer, because he is concerned about Intellectual Property. Phone number left by the "client" was fake and unreachable, PLAINTIFF sent an email to the "client', and "client" in the email confirmed that he is a looking for a Patent lawyer. PLAINTIFF believes that it was another sign sent to her that the enterprise formed against her is not going to provide her with the real leads. Shortly, thereafter PLAINTIFF mailbox was flooded with fake leads, unresponsive phone numbers, people lying that they do not speak English (while they perfectly could), people requesting the contracts, but never even opening them, people promising to consider working with the PLAINTIFF but constantly keeping her on hold, people emotionally abusive and etc.

181.    On or around June 3, 2024, PLAINTIFF sent an mail to the DEFENDANT NOLO that she is getting strange business leads, on which her account manager agreed to replace them upon her complaint. However, the replaced leads were of no better quality. PLAINTIFF asked DEFENDANT NOLO to stop sending her any leads and to refund back her money, however DEFENDANT NOLO with intent to defraud refused from doing so and continued using wire sending to the PLAINTIFF fake leads with the purpose to ensure that she does not get a single client who will pay her.

182.    On or around  May 28, 2024, PLAINTIFF signed up for the referral services of DEFENDANT LEGAL MATCH. Shortly after she signed up for the services she received an email from her account manager about her LEGAL MATCH  profile. When PLAINTIFF  opened her profile she found out that DEFENDANT LEGAL MATCH showed as her address the address in Rancho Cucamonga. PLAINTIFF has never requested DEFENDANT LEGAL MATCH to put into her profile any Rancho Cucamonga address, her communications with Estrella Sanchez, her account manager suggest that PLAINTIFF informed her that her business is in San Diego. Only afterwards PLAINTIFF realized that it was a sign left by the Armenian Enterprise - when back in January 2024, after DEFENDANT ANCA and ANCAWR made defamatory statements about her in the social media, her phone number and mail addresses were flooded with threats, some or the threats suggested that her real address is well known. Afterwards, PLAINTIFF discovered numerous links in Google Search under her name to her previous addresses, including the address in Rancho

Cucamonga. The question was why DEFENDANT LEGAL MATCH decided to use a wrong address if it was provided with the PLAINTIFF's real address ?  Shortly after PLAINTIFF's request the address in the system has been changed, but Google Search under her name still associated with Rancho Cucamonga for LEGAL MATCH profile. PLAINTIFF also believes that it was done to confuse PLAINTIFF's potential clients and give them an impression that PLAINTIFF's business does not exist or the PLAINTIFF is a fraudster - another pattern very much exploited by DEFENDANT ANCA and ANCAWR against their opponents.

183.    DEFENDANT LEGAL MATCH with intent to defraud was continuously sending PLAINTIFF fake referrals, referrals where phone numbers were unreachable, referrals for the clients who didn't speak the languages she spoke as well as referrals for the clients who pretended that they couldn't speak English but they perfectly could, clients who asked for the contracts and kept her in a hold position (PLAINTIFF believes to harass her and to take as much of her time as possible while giving her hope), useless referrals, where she couldn't get any real client.

184.    PLAINTIFF sent numerous complaints about the quality of the referrals she was getting from DEFENDANT LEGAL MATCH to the account manager Estrella Sanchez with no avail. DEFENDANT LEGAL MATCH continued sending PLAINTIFF useless referrals. PLAINTIFF also believes that many of them were not from real clients but from the people specifically sent to harass, bully and defraud her.

185.    On or around June 13, 2024, PLAINTIFF sent another email to DEFENDANT LEGAL MATCH informing them that she does not handle cases of the people who have been already deported and who committed multiple felonies (these were the main cases PLAINTIFF continued receiving from DEFENDANT LEGAL MATCH despite her complaints), and any such case after this warning will be counted by PLAINTIFF as harassment. DEFENDANT LEGAL MATCH instead of curing the situation stopped sending PLAINTIFF any case at all. After some interval DEFENDANT LEGAL MATCH with intent to defraud and using wire continued sending to the PLAINTIFF fake referrals.

186.    Several tweets, which were sent to PLAINTIFF, when DEFENDANTS ANCA and ANCAWR continuously were harassing her with disbarment and placed defamatory statements about PLAINTIFF in social media, announced that they achieved the goal to leave the PLAINTIFF with no business in California, and they don't understand why she is still tweeting for the likes.

Other Armenian twitter accounts promised her that she will get evicted, she will not be able to find the employment, that she will stay without money and advise her not to break relationship with her own community as she will need their help very soon.

187.    Starting approximately from last year PLANTIFF'S credit card companies under various excuses started lowering her credit amounts, and the PLAINTIFF'S credit score went significantly down - PLAINTIFF believes that it was done with the purpose to leave her without any money to pursue this lawsuit and make her to leave the United States.

188.    As a result of DEFENDANTS' actions PLAINTIFF suffers financially, she does not get referrals from the companies, which are supposed to give them to her, attraction of the clients via her social media accounts became difficult as DEFENDANTS GOOGLE and SUNDAR PICHAI following orders from Armenian Enterprise placed defamatory content with DEFENDANTS ANCA, ANCAWR and other DEFENDANTS' statements all over the internet and made sure that those statements appear in Google Search under her name, her complaints are completely ignored by DEFENDANT GOOGLE, her business for a long time thanks to DEFENDANT GOOGLE'S efforts was confused with another, and generally all DEFENDANTS in their joint efforts act as a big Armenian Enterprise to do everything to ruin her life, her career and her income.

189.    PLAINTIFF upon information and facts alleges that DEFENDANTS ANCA and ANCAWR tracked her residential address and conspired with her landlord to harass, defraud and intimidate her. The principle, on which DEFENDANTS ANCA and ANCAWR acted was that if we can, we will evict her (PLAINTIFF received a lot of threats of eviction) and if we can't we will make sure that she is paying for being degraded, harassed and intimidated at her place of residence.

190.    PLAINTIFF upon information and facts also alleges that DEFENDANT GREYSTAR was transmitting to the DEFENDANTS ANCA and ANCAWR or any other members of the ENTERPRISE her videos taken in public places of the building as well as generally information about her.

191.    Approximately in January 11, 2024, PLAINTIFF was informed through her Twitter account that her address is found. One of the persons who informed her was, as PLAINTIFF  later identified - Vahram Terzikyan, an attorney who is barred in the state of Massachusetts and who was tweeting under account name Victor Terzikyan.

192.    On or around June 1, 2024, Plaintiff discovered that her car disappeared from the building's garage, where she parked it. When she asked her landlord where is her car, she was informed that her car was towed away because she parked it in someone else's spot. PLAINTIFF does not recall parking her car in someone else's place anytime in the past.

193.    On or around June 2, 2024, PLAINTIFF asked DEFENDANT GREYSTAR to show her a video footage on how she parked it in a wrong spot. When PLAINTIFF reviewed the footage, she couldn't see how she parked a car in a wrong spot, while it was perfectly visible how others were parking their cars. DEFENDANT GREYSTAR couldn't show her any image of her besides a photo of her car in a wrong parking spot or images of her when she parked the car in her own parking space.

194.    PLAINTIFF alleges based on the facts and information she has, that DEFENDANT GREYSTAR on the orders of the ENTERPRISE first placed her car in a wrong parking space and then towered it away.

195.    As it became obvious later, DEFENDANT KIA in conspiracy with DEFENDANT GREYSTAR repossessed her car for only two months of nonpayment (she paid the entire lease for 3 years), without giving her any notice, with malicious intent to ruin her credit story, put repossession into her records, so that she has troubles getting any other car in the future. They did it by breaking peace, by taking her car from her own spot.

196.    As a result of DEFENDANTS GREYSTAR and KIA's acts,    PLAINTIFF had difficulties in getting another car, and was only then informed that there is a repossession in her records. DEFENDANT KIA didn't give any notice to the PLAINTIFF that her car was repossessed and that they are going to put this information into her records. The purpose was obviously to leave her without a car.

197.    In or around middle of June, 2024, PLAINTIFF called DEFENDANT KIA and asked them to remove repossession from her records, she was asked to call to another line, which happened to be not working. When PLAINTIFF called again to DEFENDANT KIA the automatic voice over the phone responded to her that she has to call during working hours, working hours are from 9 a.m. till 5 p.m. - PLAINTIFF called at 2 p.m.

198.    PLAINTIFF also upon information and facts alleges that DEFENDANT KIA was defrauding her as to the amount of the car to purchase at the end of the lease, while the contract with

DEFENDANT KIA suggested that she can buy the car for around $ 15, 000 at the end of the lease, DEFENDANT'S representative asked for around $ 35, 000 to sell it to her, which was equivalent to the price of the new car.

199.    PLAINTIFF upon information and facts alleges that she was constantly harassed by DEFENDANT GREYSTAR without any reason. Once when she was a late on her payment for rent, she discovered upon arrival that the door to the hall leading to her apartment was locked and her key fobs didn't work. Before doing so, DEFENDANT GREYSTAR sent an email to the residents asking them not to help anyone without keys to enter the building. PLAINTIFF was forced to ask other residents to help her to get into her apartment.

200.    DEFENDANT GREYSTAR also disabled in her account the option allowing residents to make partial or any other payments, not exactly the precise payments for the rent. PLAINTIFF believes that this was planned and intentional act by the DEFENDANT GREYSTAR to defraud and harass her at the same time.

201.    In or around July 1st, 2024,  Bank of America unilaterally disabled PLAINTIFF'S debit card,  and PLAINTIFF was forced to apply for another. She ordered this card to be delivered to her virtual address in Laguna Beach. After she got a new card from the Bank, PLAINTIFF requested Laguna Beach address to mail it to her residential address. For unknown reasons, Laguna Beach address delayed the mailing - PLAINTIFF has never had this issue before.

202.    On or around July 4, 2024, PLAINTIFF tried to pay to DEFENDANT GREYSTAR by using her banking account, but the system asked for verification. PLAINTIFF informed DEFENDANT GREYSTAR that she is waiting for verification, and therefore she will be late in paying for the rent this time. However, despite her email she got a Notice to Pay Rent or Quit from DEFENDANT GREYSTAR on the following day. DEFENDANT GREYSTAR didn't stop on that, but sent her another email with subject line "notice of eviction" after she had already paid the rent.

203.    On or around July 8, 2024, upon checking her mailbox PLAINTIFF discovered a mail from San Diego Superior Court on eviction. The notice was sent to her address but had as a Defendant another person's name. PLAINTIFF was living alone at her address, she also didn't have any debt in rent payments, so she clearly didn't understand how this letter appeared in her mailbox.

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

204.    On or around July 8, 2024, PLAINTIFF checked Superior Court of San Diego website and didn't find any information about the case, then she called to the Court itself and was informed that the case exists and that she had to contact the attorneys on the case.

205.    On or around July 8, 2024, PLAINTIFF contacted DEFENDANT GREYSTAR and was informed that the lawsuit was brought by another landlord and that PLAINTIFF received the letter by mistake. PLAINTIFF is sure that the mail was sent purposefully to her to harass and intimidate her and was not accidental.

206.    On or around July 8, 2024, PLAINTIFF ordered groceries to be delivered to her apartment by Walmart, however the delivery person left groceries in the mail room, right next to the mailboxes. PLAINTIFF has never had any problem with the delivery of the groceries before and her application with Walmart was precise where they have to be delivered. The groceries were delivered to the mailbox room which is right below of the property management office, and the delivery person should actually pass by the property management office to go there.

207.    After PLAINTIFF picked up her groceries, in about a month PLAINTIFF discovered flies in her apartment, which she has never seen before.

208.    On or around July 18, 2024, PLAINTIFF requested the DEFENDANT GREYSTAR to send her pest control team to look and treat her apartment. DEFENDANT GREYSTAR with the intent to defraud and using wire sent her a form for cockroach treatment (the story with cockroaches thus continued). On the same day - July 18, 2024, PLAINTIFF informed DEFENDANT GREYSTAR that she does not have cockroaches, she has flies and she clearly does not understand why she was sent this form. The answer of the DEFENDANT GREYSTAR was that it is a regular form they send - though PLAINTIFF still does not understand why she had to sign the form for cockroach treatment while she had flies in her apartment, and not cockroaches.

209.    On or around July 19, 2024, her apartment was treated with no result, the number of flies only multiplied after the treatment.  PLAINTIFF was forced to treat her apartment herself and for 3 days couldn't walk in it because the floors were absolutely wet after spraying. For about a month PLAINTIFF was forced to wash and clean her apartment.

210.    On or around July 26, 2024, PLAINTIFF complained to DEFENDANT GREYSTAR again that problem with pests still exist. DEFENDANT GREYSTAR  blamed her in everything. At

the same time DEFENDANT GREYSTAR was keeping garbage chutes closed so that her apartments gets invaded with flies even more.

211.   On or around mid of August PLAINTIFF again asked DEFENDANT GREYSTAR to treat her apartment over the phone. DEFENDANT GREYSTAR promised to do it but failed.

212.   On or around September 2, 2024, PLAINTIFF again applied to DEFENDANT GREYSTAR  with the same request, the pest control again sprayed her sinks, but the flies didn't disappear.

213.   PLAINTIFF  further alleges that DEFENDANT GREYSTAR is determined to turn her life into hell, while expecting her to pay for the apartment with flies and constant noise next to the trolleys.

214.   On or around September 15, 2024, when the PLAINTIFF checked her online account information with DEFENDANT KIA she discovered that DEFENDANT KIA  put there a debt of $ 3, 000 for literally illegally stealing her car from her own parking spot in the garage in conspiracy with DEFENDANT GREYSTAR and others.

**FIRST CAUSE OF ACTION**

**RACKETEERING ACTIVITY IN VIOLATION OF SEC. 1962 (C) ET SEQ. OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (PLAINTIFF AGAINST ALL DEFENDANTS)**

215.   PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

216.   Racketeer Influenced and Corrupt Organization Act section 1962 (c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

217.   To recover under § 1962(c), a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation.

218.    DEFENDANTS are enterprises, whose/which activities affect interstate and foreign commerce. They also formed a common Enterprise with the purpose to damage PLAINTIFF'S reputation, to ruin her business and to intimidate and harass her on a constant basis.

219.    DEFENDANTS, excluding DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN, ZARTONK MEDIA, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, HAIRENIK, ANI TCHAGHLASIAN, GREYSTAR CALIFORNIA, KIA, GOOGLE were responsible for giving PLAINTIFF accurate and real referrals/leads, however instead they did everything to take her money and damage her business by defrauding her, and thus liable under Section 1343 of 18 U.S.C. for fraud by wire, radio or television, Section 1346 of 18 U.S.C. by engaging in a scheme to defraud the PLAINTIFF of the intangible right of honest services, Section 1349 of 18 U.S.C. - attempt and conspiracy .

220.    DEFENDANTS TERESA VUKI, JAKE BALOIAN, SETH CHAVEZ, COCO SU, ESTRELLA SANCHEZ, TRUDY LEVINDOFSKE with the intent to defraud participated directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity by sending her fake referrals, referrals to harass her, to leave her with no business and generally to affect her business and income;

221.    DEFENDANTS LEGALSHIELD and PARKER STANBURY stopped sending to PLAINTIFF any referrals after only two weeks of her membership, all her attempts to talk and resolve the problem with their management were futile.

222.    DEFENDANTS ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN, SUNDAR PICHAI, JEREMY STOPPELMAN, ANCA, ANCAWR, YELP, GOOGLE, HAIRENIK, ZARTONK MEDIA were directly or indirectly involved in spreading false and defamatory information to affect PLAINTIFF'S business and to leave her with no income, solicited or induced others to send to the PLAINTIFF violent threats, conspired against PLAINTIFF'S Constitutional Rights, placed or ordered to place PLAINTIFF under constant surveillance in order to intimidate or kill/injure her, and therefore is liable under Section 1343 of 18 U.S.C. for fraud by wire, radio or television, Section 1346 of 18 U.S.C. by engaging in a scheme to defraud the PLAINTIFF of the intangible right of honest services, Section 1349 of 18 U.S.C. - attempt and conspiracy, Section 247 -

SECOND AMENDED COMPLAINT                                          24CV1077 RSH MMP

Conspiracy against Rights, Section 2261A of 18 U.S.C. - Stalking; Section 1959 - Violent crimes in aid of racketeering activity.

223.    DEFENDANTS GREYSTAR and KIA stole her car in conspiracy with OTHER DEFENDANTS, stalked and transferred her information to other members of the Enterprise, manipulated her account by using wire and with the intent to defraud placing there fraudulent amounts PLAINTIFF  does not owe, harassed and intimidated her.

224.    DEFENDANTS were engaged in multiple acts of racketeering activity by committing wire and mail fraud, as it fully and in details described in General Allegations part of the present Complaint, additionally DEFENDANTS ANCA and ANCAWR through its members and/or leaders threatened to kill, rape and injure PLAINTIFF, placed her under total surveillance and stalked all her residential and business addresses as well as her bank and credit card information with the purpose to intimidate, threaten and damage her.

225.    DEFENDANTS' acts constitute a pattern of racketeering activity, as they committed the similar acts before and they continue their commission towards the PLAINTIFF for  more than 1 year now. DEFENDANTS ANCA and ANCAWR are also known as having rich history of persecution of people of PLAINTIFF's ethnicity, national origin, ancestry, religion in the past through their parent organization ARF.

226.    DEFENDANTS' acts are continuous and will continue unless it is stopped by this Court.

227.    PLAINTIFF is therefore entitled to the award of treble of damages against the DEFENDANTS according to the RICO Statute and the proof to be determined by the trier of fact but not for less than $ 500, 000, 000, PLAINTIFF is also entitled to permanent injunction against DEFENDANTS requiring them to stop their racketeering activity towards PLAINTIFF as well as to restraining orders against DEFENDANTS ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN and others as it will be identified by further investigation.

///

///

///

///

**SECOND AMENDED COMPLAINT**                              24CV1077 RSH MMP

**SECOND CAUSE OF ACTION**

**CONTROL OF THE ENTERPRISE IN VIOLATION OF SEC. 1962 (B) ET SEQ. OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT**

**(PLAINTIFF AGAINST ALL DEFENDANTS)**

228.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

229.    Racketeer Influenced and Corrupt Organization Act section 1962 (b) provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

230.    All DEFENDANTS through a pattern of racketeering activity by using wire and mail fraud acquired a control over PLAINTIFF's business and ruined it.

231.    DEFENDANTS JEREMY STOPPELMAN, TRUDY LEVINDOFSKE,  THERESA VUKI, SETH CHAVEZ, COCO SU, JAKE BALOIAN, ESTRELLA SANCHEZ, LEGALSHIELD, PARKER STANBURY, OCBA, LACBA, ASN  were responsible for fair distribution of the referrals they've received, and they did it with commission of multiple acts of wire & mail fraud and with the intent to acquire a control over PLAINTIFF's business and ruin it.

232.    DEFENDANTS GOOGLE, YELP, ANCA, ANCAWR, ZARTONK MEDIA, HAIRENIK, ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN, SUNDAR PICHAI by using wire placed false and misleading information about PLAINTIFF's business to acquire control over her business and ruin it, and in fact achieved it. PLAINTIFF lost a control over her business as she couldn't stop DEFENDANTS from spreading false information about her business and about herself.

233.    DEFENDANTS GREYSTAR and KIA deprived her a car with the intent to control her career, life, her business and ruin them.

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

234.    DEFENDANTS' actions caused significant loss to the PLAINTIFF, her business does not get referrals, her social media attempts are cut off by defamatory content placed there about the PLAINTIFF by the DEFENDANTS.

235.    PLAINTIFF is therefore entitled to the award of treble of damages against the DEFENDANTS according to RICO STATUTE and the proof to be determined by the trier of fact, PLAINTIFF is also entitled to permanent injunction against DEFENDANTS requiring them to stop their racketeering activity towards PLAINTIFF.

### THIRD CAUSE OF ACTION

**CONSPIRACY IN VIOLATION OF SECTION 1962 (D) ET SEQ. OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

**(PLAINTIFF AGAINTS ALL DEFENDANTS)**

236**.**    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

237.    Racketeer Influenced and Corrupt Organization Act section 1962 (b) provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

238.    As pattern of the racketeering activity outlined in General Allegations part of the present complaint suggests, DEFENDANTS conspired with each other to damage PLAINTIFF's business.

239.    DEFENDANTS used the similar or pretty similar methods by committing multiple wire fraud to send to the PLAINTIFF fake referrals, referrals not in her area of practice, referrals for the people, whose cases must be considered in another jurisdiction, or even tried to engage her into criminal activity with malicious intent to destroy her reputation and career.

240.    PLAINTIFF's attempt to change one referral organization to another, or even buy leads didn't give any result, because she faced absolutely same problems in other referral organizations, acting under the same pattern to defraud her and leave her with no business.

241.    As facts and circumstances outlined in the General Allegations part of the present complaint suggest, DEFENDANTS treated the PLAINTIFF in the similar way as Armenian

51

Enterprise  treated her, using pretty much similar methods and tactics, which by itself proves conspiracy.

242.    DEFENDANTS ARAM HAMPARIAN, ARMEN SAHAKYAN, JEREMY STOPPELMAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN, SUNDAR PICHAI, GOOGLE, YELP, HAIRENIK, ZARTONK MEDIA intentionally placed false and defamatory content about PLAINTIFF and her business in social media and/or in GOOGLE search results under her name to ruin and damage PLAINTIFF'S reputations and business, which by itself (conduct through the pattern of racketeering activity) confirms conspiracy between them.

243.    DEFENDANTS GREYSTAR and KIA stole her car in conspiracy with the Enterprise to affect her life, her finances and her business.

244.    As a result PLAINTIFF suffered serious financial losses, which PLAINTIFF asks to compensate her in the treble amount according to RICO and other applicable Laws and Statutes in the amount to be determined by the trier of fact. PLAINTIFF is also entitled to permanent injunction against DEFENDANTS requiring them to stop their racketeering activity towards PLAINTIFF.

### FOURTH CAUSE OF ACTION

**CONSPIRACY IN RESTRAINT OF TRADE OR COMMERCE IN VIOLATION OF SECTION 1 ET SEQ. OF THE SHERMAN & CLAYTON ACT 15 U.S.C.**
**(PLAINTIFF AGAINST ALL DEFENDANTS)**

245.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

246.    Sherman Act, codified as *Title 15 of the United States Code*,  prohibits "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize."

247.    Section 7 of the Clayton Act, codified as *Title 15 of the United States Code*, prohibits mergers and acquisitions where the effect "may be substantially to lessen competition, or

to tend to create a monopoly." Clayton Act also bans certain discriminatory prices, services, and allowances in dealings between merchants.

248.    DEFENDANTS OCBA violated Sherman & Clayton Act by establishing the rules requiring the lawyers to have Orange County residence or to have a main business office in the Orange County to become a member of the referral service. Rules established by this DEFENDANT monopolize the legal market in the hands of the Orange County lawyers by restricting the lawyers from other counties to have access to the market. Besides, DEFENDANT'S RULES favor big businesses and discriminate against solo practitioners and small law firms by restricting their access to the market, and thus promote inequality in the legal profession.

249.    Conspiracy among DEFENDANTS to exclude PLAINTIFF from the market is clearly a restraint on trade. Excluding PLAINTIFF from the market, and giving the referrals she had to receive to other businesses contradict the spirit of the Sherman & Clayton Act, restraint the trade and affect interstate commerce.

250.    DEFENDANTS' actions caused significant damage to the PLAINTIFF'S business and shall be compensated according to this Act in the amount of the treble of the PLAINTIFF'S damages, but not for the less than $ 500, 000, 000.

**FIFTH CAUSE OF ACTION**

**DENIAL OF PUBLIC ACCOMMODATION IN VIOLATION OF SECTION 2000A ET SEQ. OF CIVIL RIGHTS ACT 42 U.S.C.**

**(PLAINTIFF AGAINST ALL DEFENDANTS EXCEPT DEFENDANTS ANCA, ANCAWR, ZARTONK MEDIA, HAIRENIK, ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN)**

251.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

252.    Section 2000a of Civil Rights Act, *codified under Title 42* of the Unites States Code provides:

> All persons shall be entitled to the full and equal enjoyment
> of the goods, services, facilities, privileges, advantages, and
> accommodations of any place of public accommodation, as

53

defined in this section, without discrimination or segregation
on the ground of race, color, religion, or national origin.

253.    Section 2000b of Civil Rights Act, *codified under Title 42* of the United States Code defines the places of public accommodation  as "establishments affecting interstate commerce or supported in their activities by the State action as places of public accommodation; lodgings; facilities principally engaged in selling food for consumption on the premises ….other covered establishments. "

254.    All DEFENDANTS, except DEFENDANT ANCA, ANCAWR, ZARTONK MEDIA, HAIRENIK, ARAM HAMPARIAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN were the places of the public accommodation or employees of the places of public accommodation responsible to accommodate PLAINTIFF accordingly, but they failed to do so.

255.    All DEFENDANTS' activity affect interstate commerce, all DEFENDANTS, except DEFENDANTS ANCA, ANCAWR, ZARTONK MEDIA, HAIRENIK, ARAM HAMPARIAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN open to public or are employees of the places of public accommodation open to public, specifically DEFENDANT GOOGLE AND YELP are open to the businesses to register and get reviews from their clients in order to let the public to chose the best businesses. Even if DEFENDANTS ANCA, ANCAWR, ZARTONK MEDIA, HAIRENIK are places of public accommodation, PLAINTIFF didn't seek any accommodation with them, and therefore exclude them. DEFENDANTS OCBA, LACBA, ASN, NOLO, LEGAL MATCH, LEGALSHIELD, PARKER STANBURY are open to the lawyers to provide them with the referrals/leads if they satisfy certain standards.

256.    Moreover, DEFENDANTS OCBA, LACBA, ASN, LEGAL MATCH are certified by the State Bar of California as referral services, and as such they have to follow State Bar standards.

257.    DEFENDANTS instead of acting as places of public accommodation open to all California licensed lawyers, acted as private clubs, because they became arms and ears of the DEFENDANTS ANCA and ANCAWR. DEFENDANTS joined DEFENDANTS ANCA and ANCAWR in their persecution of the PLAINTIFF because of her ethnicity, national origin, religion, political views and etc.

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

258.    DEFENDANTS were so consumed in going after the PLAINTIFF on the orders of the Armenian Enterprise that they forgot that by doing so, they actually lost their public status and turned into a private club.

259.    PLAINTIFF as it was indicated above is from Azerbaijan, which has a longstanding conflict with Armenia.

260.    In 1992-1995 Armenia with Russia's help occupied 20 % of PLAINTIFF'S homeland, which resulted in heavy casualties, multiple acts of genocide committed by Armenian terror groups, around 1 million refugees.

261.    Azerbaijani witnesses who lived in Karabakh confirm that long before the conflict started Armenian leadership of Karabakh fired them from all key positions or was offering them low pay and dirty jobs. They also confirm that they were getting a lot of threats, and some of them were even beaten and asked to leave their homes immediately.

262.    Armenia's official ideology is built on Tsegakron, the nationalistic (fascist) ideology established by former Nazi collaborator G. Njdeh, whose enormous monuments are erected everywhere in Armenia. Thanks to this ideology many Armenians are intolerant to other nations or even to Armenians from other regions/countries.

263.    Albert Isakov, a blogger, who is half Armenian and Jewish, talks on his Youtube channel how horribly he was treated in Armenia after he left Azerbaijan for being not a full blood Armenian, and because he didn't speak Armenian.

264.    As it was indicated above DEFENDANTS ANCA and ANCAWR represent interests of the most radical Armenians and their persecution of the PLAINTIFF is dictated by their agenda, and PLAINTIFF is sure that in order to reach this agenda they are capable not only to deprive her of her business. PLAINTIFF'S own great grand dad was killed by dashnaks back in 1918 in Baku (dashnaks belong to ARF party, which is a parent organization for DEFENDANTS ANCA and ANCAWR).

264.    One of the reason why Armenian Enterprise was not sued till this day for their outrageous acts of discrimination, stalking and persecution is that many are afraid of the consequences. As one lawyer explained to the PLAINTIFF - "because they bomb people".

**SECOND AMENDED COMPLAINT**                                      24CV1077 RSH MMP

265.    PLAINTIFF believes that it is unacceptable to allow a certain group of people to act as they are the God, the Law and the Constitution in this country, this outrageous behavior must be stopped.

266.    Since DEFENDANTS acted together with DEFENDANTS ANCA and ANCAWR in persecuting PLAINTIFF, they are in the similar way liable for discrimination against the PLAINTIFF.

267.    Therefore, PLAINTIFF is entitled to damages as a result of being denied public accommodation because of her race, color, national origin, religion and etc. because the places of public accommodation in her case (bar associations and referral organizations) joined DEFENDANTS ANCA and ANCAWR in persecuting her, in the amount according to the proof by the trier of fact.


**SIXTH CAUSE OF ACTION**

**PROHIBITED RESTRAINTS ON COMPETITION IN VIOLATION OF SECTION 16720 ET SEQ. OF CALIFORNIA BUSINESS & PROFESSIONAL CODE**

**(BY PLAINTIFF AGAINST ALL DEFENDANTS)**


268.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

269.    Section 16721(a) of the California Business & Professional Code prohibits exclusion of the person "from business transaction on the basis of a policy expressed in any document or writing and imposed by a third party where that policy requires discrimination  against that person on the basis of any characteristics listed or defined in subdivision (b) or (e) of Section 51 of the Civil Code or on the basis that the person conducts or has conducted business in a particular location. "

270.    Section 16721 (b) of the California Business & Professional Code states that "No person with the jurisdiction of this State shall require another person to be excluded, or be required to exclude another person, from a business transaction on the basis of the policy expressed in any document or writing that requires discrimination that other person…"

271.    Section 16721 (c) of the California Business & Professional Code declares that any violation of any of provision of this Section is a conspiracy against trade.

272.    Section 16727 of the California Business & Professional Code prohibits any contract or price fixture where the effect of this will be "to lessen the competition or tend to create the monopoly…"

273.    Section 5.1. of DEFENDANT OCBA'S Lawyer Referral & Information Service Rules requires an attorneys in order to become a member of the service either to be a resident of OCBA or have their main business office in Orange County. It also requires the business to have a telephone number starting with Orange County area code. Further the same Section of the Rules requires anybody working from home to disclose this fact to the Service. This Section of the Rules further states 'If a member works from a home office, this fact shall be disclosed to the Client by the Service. It is the responsibility of the member to provide professional services whether from a business or home office. "

274.    DEFENDANT OCBA'S Lawyer Referral & Information Service Rules openly discriminative and is designed to monopolize the trade. Requiring the attorney to have his main business office in Orange County, and further demanding from him that he has to have a phone number with Orange County area code to join the Service is openly designed to restrict and monopolize the trade.

275.    Moreover, DEFENDANTS OCBA is openly favoring large law firms and business owners, because their Rules openly declares that potential clients will be discouraged to work with small law firms and solo practitioners. The ultimate result of this Rules will be to promote inequality in the legal profession.

276.    PLAINTIFF believes that Section 5.1 of OCBA Rules is a prohibited restraint on competition and such it must be removed from the Rules to allow all attorneys equal access to practice law.

277.    All other DEFENDANTS violated Section 1672 et seq. of California Business & Professional Code by conspiring against the PLAINTIFF to destroy her business and by excluding her from normal flow of referrals or creating problems for the PLAINTIFF'S business online.

278.    Therefore, PLAINTIFF is entitled to declaratory relief from Rule 5.1. of DEFENDANT OCBA'S Lawyer Referral & Information Service Rules. PLAINTIFF is also entitled

**SECOND AMENDED COMPLAINT**                                              24CV1077 RSH MMP

to restitutionary and any other damages she sustained as a result of operation of Rule 5.1. as well as other restitutionary damages from all other DEFENDANTS, where applicable.

**SEVENTH CAUSE OF ACTION**

**UNFAIR COMPETITION IN VIOLATION OF SECTION 17200 ET SEQ. OF CALIFORNIA BUSINESS AND PROFESSIONAL CODE**

**(BY PLAINTIFF AGAINST ALL DEFENDANTS)**

279.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

280.    Section 17200 et seq. of California Business and Professional Code defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising …"

281.    DEFENDANTS are engaged or control businesses, which are engaged in unfair competition and fraudulent business practices. By conspiring with each other to destroy PLAINTIFF'S business and by committing multiple acts of mail & wire fraud DEFENDANTS in fact promote unfair competition.

282.    DEFENDANTS OCBA, LACBA, ASN, NOLO, LEGAL MATCH, YELP, LEGALSHIELD, PARKER STANBURY and individual DEFENDANTS working for these companies by sending PLAINTIFF fake referrals, referrals in violation of the Rules of the State Bar of California, their own rules and Terms & Conditions promoted and were engaged in unfair competition.

283.    DEFENDANTS GOOGLE, YELP, ANCA, ANCAWR, HAIRENIK, ZARTONK MEDIA and individual DEFENDANTS working for these companies were engaged in wire & mail fraud to deceive public about PLAINTIFF'S services with the intent to ruin and damage her business and reputation;

284.    DEFENDANTS GREYSTAR and KIA defrauded PLAINTIFF regarding their services, the real rent and car prices, fraudulently refused from implementing agreements with her and stole her car from her own parking spot in conspiracy with other DEFENDANTS.

285.    Therefore, PLAINTIFF is entitled to restitutionary and any other damages as a result of the DEFENDANTS' unfair competition in the amount to be determined according to the proof by the trier of fact.

## EIGHTH CAUSE OF ACTION

**DENIAL OF PUBLIC ACCOMMODATION IN VIOLATION OF SECTION 51 ET SEQ. OF CALIFORNIA CIVIL CODE (UNRUH CIVIL RIGHTS ACT)**

**(BY PLAINTIFF AGAINST ALL DEFENDANTS ANCA, ANCAWR, ZARTONK MEDIA, HAIRENIK,  ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN)**

286.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

287.    Section 51(b) et seq. of  California Civil Code (Unruh Civil Rights Act) provides:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

288.    PLAINTIFF was targeted by DEFENDANTS ANCA and ANCAWR because of her sex, race, color, religion, ancestry, national origin, citizenship. In the similar way all other DEFENDANTS targeted PLAINTIFF because of her sex, race, color, religion, ancestry, national origin, citizenship as they joined DEFENDANTS ANCA and ANCAWR in persecuting PLAINTIFF and her business, and used pretty much similar tactics and methods.

289.    DEFENDANTS knew that PLAINTIFF was an immigrant from Azerbaijan, DEFENDANTS LACBA knew that PLAINTIFF is persecuted by Armenian Enterprise, but chose to join to their efforts in damaging her business by deliberately sending her fake and useless referrals with the intent to defraud and leave her with no business.

290.    DEFENDANT YELP knew that PLAINTIFF was persecuted by Armenian Enterprise because of her national origin and citizenship, but chose keeping fraudulent reviews on

59

its Platform despite her numerous complaints with the intent to defraud the public about PLAINTIFF's personality and quality of her services and defame her in her business capacity.

291.    DEFENDANTS GOOGLE and SUNDAR PICHAI knew that PLAINTIFF was persecuted by Armenian Enterprise but chose to join this Enterprise in damaging her business and reputation despite her numerous complaints.

292.    All DEFENDANTS violated Unruh Act and will have to remove all inappropriate content from their Platforms and pay damages to the PLAINTIFF in the amount not less than $ 500, 000, 000 according to the proof by the trier of fact.

## NINTH CAUSE OF ACTION

## HARASSMENT IN VIOLATION OF SECTION 527.6 OF THE CODE OF CIVIL PROCEDURE

## (BY PLAINTIFF AGAINST ALL DEFENDANTS)

293.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

294.    Section 527.6 (b) (3) of the Code of Civil Procedure defines harassment as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."

295.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN for about 2 months (January - February, 2024) continuously in their social media accounts and via their different agents placed defamatory content about the PLAINTIFF with the purpose to harass, intimidate and cause her substantial emotional distress. DEFENDANTS ANCA and ANCAWR didn't even stop on that but called for her disbarment in all those platforms, tagged different people, encouraged their community to attack her.

296.    After DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN harassed PLAINTIFF in her Twitter account, PLAINTIFF's phone number, YELP

business page, email addresses were flooded with messages from the people she didn't know promising to kill her, to harm her, to evict her, to rape her. PLAINTIFF'S phone number was ringing nonstop for about 2-3 months after the incident from unidentified numbers calling her names, threatening violence on her, promising her death.

297.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN and ARMEN SAHAKYAN didn't stop on that - they continued harassing PLAINTIFF by placing or ordering the Armenian Enterprise working for DEFENDANT GOOGLE to place their messages, tweets, instagram publications, other materials to appear under her name in Google Search in order to damage her reputation, to deprive her the business and to cause her substantial emotional distress.

298.    PLAINTIFF upon information and facts believes that DEFENDANTS ANCA and ANCAWR continuously stalk her address, her business location, her bank information, her social media accounts, and even her court cases in oder to keep harassing and intimidating her.

299.    PLAINTIFF is sure that the amount of the harassment PLAINTIFF endures in this State from DEFENDANTS ANCA and ANCAWR and all other DEFENDANTS entitles her to the protection not only under civil harassment, but also under criminal harassment laws of the State of California.

300.    PLAINTIFF believes that the evidence she has entitles her to get a restraining order against DEFENDANTS ANCA; ANCAWR, their executive directors and or founders ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN, all other respective members of DEFENDANTS ANCA and ANCAWR in order to stop them from stalking  and harassing her.

301.    All other DEFENDANTS were engaged in the similar course of harassment by sending her referrals  she continuously asked not to send her, sending her the referrals not in the area of her practice, illegally and discriminatively suspending her membership while she was an active member of the Bar.

302.    PLAINTIFF believes that a permanent injunction shall be issue with regards to all other DEFENDANTS requiring them to send to the PLAINTIFF referrals in the regular course of business and in accordance with the Rules of the State Bar of California.

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

## **TENTH CAUSE OF ACTION**

### **DEFAMATION**

**(BY PLAINTIFF AGAINST DEFENDANTS ANCA, ANCAWR, YELP, GOOGLE, HAIRENIK, ZARTONK MEDIA, ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN, DOES 1-289)**

303.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

304.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN for about two months  (January - February, 2024) made multiple false statements in their instagram and other accounts as well as through their agents about the PLAINTIFF that she called for the genocide of the Armenians, that she is a racist and many other claims and accusations. While doing so, DEFENDANTS ANCA and ANCAWR manipulated her tweets, isolated them from all other her tweets, took them out of context and placed them under their news.

305.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN targeted PLAINTIFF'S US license and her business when they placed this information, tagged State Bar of California and demanded her disbarment, thus DEFENDANTS made a false statement about the PLAINTIFF in her professional capacity.

306.    Numerous statements made by DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN were published to third parties, DEFENDANTS ANCA and ANCAWR agents were disseminating the same news all over the internet.

307.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN also made sure that this information appears under her name in Google Search results after nearly 10 months from the incident, therefore DEFENDANT ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN had an intent to damage PLAINTIFF'S reputation in her professional capacity and did it purposefully and maliciously.

308.    DEFENDANTS' statements caused PLAINTIFF significant emotional distress, shock, humiliation, and financial damage. PLAINTIFF was put in the position to explain her tweets and to answer to many questions, besides of that she gets embarrassed every time when her

1  potential clients go to Google Search and find all defamatory content under her name, and refuse or

2  decline her services.

3      309.    Moreover, DEFENDANTS ANCA, ANCAWR, ARMEN SAHAKYAN, ARAM

4  HAMPARIAN'S statements themselves were a call for imminent attack and violence.

   DEFENDANTS knew that PLAINTIFF is a single lawyer from Azerbaijan living in the area heavily

5  populated by Armenians and that such statements may and will cause violent attacks on her.

6      310.    As a result of the horrible harassment after DEFENDANTS ANCA, ANCAWR,

7  ARAM HAMPARIAN, ARMEN SAHAKYAN'S statements PLAINTIFF suffered significant

8  emotional distress, couldn't go out, was concerned for her life and couldn't work, incurred

9  significant financial losses.

10     311.    DEFENDANT YELP allowed defamatory content to appear on PLAINTIFF'S

11 business profile knowing that it was shelled by multiple people at the same time and many of them

12 were not her clients.

13     312.    DEFENDANT YELP was aware that according to its own rules they had to remove

14 any content coming from non-customers, but continued keeping fake and damaging reviews on its

15 platform about PLAINTIFF'S business while deleting all positive ones coming from the real clients

   of the PLAINTIFF.

16
       313.    DEFENDANT GOOGLE and SUNDAR PICHAI following instructions from
17
   Armenian Enterprise, published and republished defamatory content about PLAINTIFF multiple
18
   times and ensured that they all come under her name in Google Search.
19
       314.    DEFENDANT GOOGLE refused to delete defamatory content about PLAINTIFF
20
   from their platform despite numerous complaints of PLAINTIFF.
21
       315.    DEFENDANTS HAIRENIK, ZARTONK MEDIA, ARAM HAMPARIAN, ARMEN
22
   SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN
23
   manipulated PLAINTIFF'S business photos they took without her permission from her social media
24
   accounts, falsely and maliciously accused her in calling "for the genocide of the Armenians" and in
25
   being "a racist lawyer", attacked her reputation, career and license by placing her in false light.
26
       316.    ALL DEFENDANTS acted in conspiracy with each other to destroy and ruin
27
   PLAINTIFF'S business and life by using illegal and outrageous criminal tactics.
28

                                            63
   **SECOND AMENDED COMPLAINT**                              24CV1077 RSH MMP

317.    Therefore, PLAINTIFF is entitled to damages for Defamation according to the proof by the trier of fact.

**ELEVENTH CAUSE OF ACTION**

**MALICIOUS PROSECUTION**

**(BY PLAINTIFF AGAINST DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN AND DOES 1-289)**

318.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

319.    Armenian Enterprise targeted PLAINTIFF'S license in the State of California multiple times by filing frivolous complaints against her in the State Bar of California, as in the similar way they targeted other representatives of Azerbaijani and Turkic ethnicities by writing multiple defamatory complaints to their work places to ensure that they are all get fired.

320.    Writing and shelling someone's work place or business pages with frivolous complaints and defamatory letters is a well known pattern of Armenian Enterprise throughout the globe. DEFENDANT ANCA is present in many countries and is the main leader in orchestrating those campaigns - it is a modern type of terrorism DEFENDANT ANCA worldwide applies to achieve its strategic goals. Many journalists, political activists, bloggers, even international organizations, politicians have become a victim of such masterfully plotted smear campaigns, and the evidence is overwhelming.

321.    Both in 2023, and in 2024 people of the presumably Armenian descent threatened PLAINTIFF that they will disbar her and wrote multiple frivolous complaints about her to the Bar.

322.    On or around February, 2024, DEFENDANT ANCA made another statement in its account complaining that there is a "black day for the State Bar of California" as their complaint to the Bar on PLAINTIFF got dismissed. DEFENDANT ANCA placed also the denied complaint first in its account and then under PLAINTIFF'S name in Google Search.

323.    After DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN couldn't disbar PLAINTIFF they engaged in unlawful, criminal tactics first to destroy

**SECOND AMENDED COMPLAINT**                                      24CV1077 RSH MMP

her reputation, hoping that after achieving this goal they will be able to deprive her the opportunity to practice Law.

324.    At the time when DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN made a complaint on the PLAINTIFF to the Bar they knew that it was frivolous, their only purpose was to damage PLAINTIFF'S reputation, to defame, to harass and intimidate her. Therefore, DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN as well as other people making complaint on the PLAINTIFF to the BAR on their orders were maliciously prosecuting PLAINTIFF.

325.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN shall compensate PLAINTIFF for all emotional distress she endured as a result of such malicious prosecution, as well as repay all monetary damages in the amount to be set at trial.

## TWELFTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (BY PLAINTIFF AGAINST ALL DEFENDANTS)

326.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

327.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN for about two months continuously harassed PLAINTIFF with disbarment, they continuously placed defamatory content about the PLAINTIFF in the social media in their own accounts in Twitter, in Instagram, in Facebook, in Reddit. Various people were calling to her phone number with threats, someone called and informed her that "We will not leave you in peace. We have placed all your information on Instagram with thousands of subscribers - you became famous." People were sending her death threats, her business email for immigration services got spammed with thousands messages from different platforms to which she didn't subscribe and didn't ask anyone to sign her up.

328.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN didn't stop on that - they made statements publicly that PLAINTIFF'S actions constitute "moral

turpitude" and therefore PLAINTIFF must be disbarred, some Congressmen of the Armenian nationality joined to the "disbar her" campaign.

329.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN continued their outrageous conduct when they or people on their order complained on her to the Bar, the complaint was placed in the social media under the heading "Dark day for the State Bar of California" because our complaint got dismissed.

330.    PLAINTIFF as a result of such horrible conduct suffered enormous emotional distress, was very scared for her life, was afraid to go out, couldn't work for about three months, and suffered significant financial losses, which she believes have to be compensated to her in the amount to be set at the trial.

331.    DEFENDANTS KIA and GREYSTAR stole her car, sent her information to the Enterprise, continuously harassed her with eviction, placed unconscious and false debt amounts in her online accounts, defrauded her as to the nature and amount of their services.

332.    Other DEFENDANTS in the similar way didn't provide her with referrals as they had to do according to the Rules of the State Bar of California, intentionally were sending to her fake leads, abusive clients with no intent to form with her any relationship, intentionally harassed her with Patent filing cases while she wasn't even a member of Intellectual Property Panel, sent her referrals not in the area of her practice, tried to entangle her into illegal activity to damage her reputation and to disbar her eventually, placed false information about her in social media, allowed gang of the people to place fake reviews on her business page with full conspiracy with those people, acting as a real organized criminal enterprise.

333.    PLAINTIFF as a result of DEFENDANTS' outrageous conduct suffered enormous stress and financial losses, which have to be compensated to her in the amount to be set at the trial.

## THIRTEENTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (BY PLAINTIFF AGAINST ALL DEFENDANTS)

334.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

**SECOND AMENDED COMPLAINT**                                        24CV1077 RSH MMP

335.    At the time when DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN made defamatory statements about PLAINTIFF they knew that it could impact their community and they can put PLAINTIFF'S life in danger. Though PLAINTIFF believes that all people who harassed her with rape, death, disbarment and etc, did that on the orders and with conspiracy with DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN, she admits that some of them could approach her independently.

336.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN and ARMEN SAHAKYAN owed the duty of care to the reasonable person and could act with tact not to endanger the life and mental condition of the PLAINTIFF, but they went forward with absolutely outrageous conduct of harassment for about two months on a daily basis.

337.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN and ARMEN SAHAKYAN breached their duty of care to the PLAINTIFF, and subjected her to significant emotional distress, anxiety, shock and panic. DEFENDANTS ANCA, ANCAWR, ARAM HAMPARIAN and ARMEN SAHAKYAN are liable for damages to PLAINTIFF in the amount to be set at trial.

338.    All other DEFENDANTS in the similar way breached their duty of care towards PLAINTIFF when kept sending her inadequate referrals, placed false and fake information about her and her business on their online platforms, for months refused to correct the information she wanted to be corrected in the internet and in terms of the referrals which were sent to her.

339.    DEFENDANTS KIA and GREYSTAR continuously harassed her by stealing her car, by placing outrageous amounts in her online account, by restricting her online account, by sending her multiple notices of eviction without any reason, by doing nothing with the issue of pests in her apartment.

340.    All DEFENDANTS are liable for the damages caused to the Plaintiff in the amount to be set at trial.

///
///
///
///
///

67

**FOURTEENTH CAUSE OF ACTION**

**INVASION OF PRIVACY BY PLACING IN FALSE LIGHT**

**(BY PLAINTIFF AGAINST DEFENDANTS ANCA, ANCAWR, HAIRENIK, ZARTONK MEDIA, YELP, ARAM HAMPARIAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN AND DOES 1-289)**

341.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

342.    All DEFENDANTS ANCA, ANCAWR, HAIRENIK, ZARTONK MEDIA, YELP, ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN used PLAINTIFF'S business photos they took from her social media and websites without her permission, manipulated, distorted them and placed under false, defamatory news by placing PLAINTIFF in false light.

343.    DEFENDANTS ANCA and ANCAWR used PLAINTIFF'S photos multiple times without her permission when they made news about her, falsely declaring that she called for the genocide of Armenians while she didn't.

344.    DEFENDANT YELP didn't take down her offensive manipulated and distorted photo in her YELP account for significantly long period time, according to her estimate for about 2 months, PLAINTIFF was also deprived an opportunity to change her profile picture herself.

345.    DEFENDANTS HAIRENIK, ZARTONK MEDIA, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN used manipulated PLAINTIFF'S photo projecting her as a racist California attorney calling for the genocide of Armenians, which was absolutely false.

346.    The manner and way how all DEFENDANTS did it was highly offensive for a reasonable person, as placing someone under false news as a racist by attacking her professional career and license is highly offensive.

347.    PLAINTIFF hereby is entitled to damages she sustained as a result of DEFENDANTS' action in the amount to be proved by the trier of fact.

**REQUEST FOR INVESTIGATION**

348.    PLAINTIFF hereby incorporates by reference each and every paragraph, as if fully set forth herein.

349.    PLAINTIFF hereby requests for racketeering investigation by the Federal Government through FBI, CIA and other relevant bodies.

350.    PLAINTIFF based on the facts and information alleged in the present Complaint as well as other evidence she has, believes that the magnitude of the conspiracy and corruption in the legal profession is overwhelming.

351.    PLAINTIFF upon information and facts believes that there are certain group of attorneys, who work in a close cooperation with banks to launder the money. PLAINTIFF received a fraudulent check from the attorney back in 2021, and thereafter despite her complaints no charges were added to this attorney's criminal case by San Diego DA and Police Department. In October, 2023, DEFENDANT LACBA referred to the PLAINTIFF a "client" fishing to send her another fraudulent check. On or around December, 2023, DEFENDANT ASN with the intent to defraud referred to the PLAINTIFF a person wanting to do an illegal transaction. All these suggest that referral organizations are engaged in the pattern of racketeering activity as described under Sections 1341 (mail fraud); 1343 (wire fraud); 1344 (financial institutions fraud); 1956 (Laundering the monetary instruments), 1960 (Prohibition of unlicensed money transmitting businesses) and others.

352.    DEFENDANTS ANCA, ANCAWR, ARAM HAMPARAN, ARMEN SAHAKYAN do not even conceal the fact of their close interactions with terrorist organizations, prior ATF and other investigations link these organizations to terror groups. There are also certain concerns as to the sources of these organization's financing. Many of them suggest that they may have foreign financing, especially from Russian government, which is currently under heavy sanctions. For more than one year PLAINTIFF is persecuted by the group of people who are members of these organizations or hold there key positions. PLAINTIFF gets death threats, rape threats, she is sure that her residential address, business pages, bank and credit card information are under constant surveillance by this Enterprise.    DEFENDANT ANCA, ANCAWR, ARAM HAMPARIAN, ARMEN SAHAKYAN, their members and employees are liable under Section 1343 of 18 U.S.C. for fraud by wire, radio or television, Section 1346 of 18 U.S.C. by engaging in a scheme to defraud

SECOND AMENDED COMPLAINT                                        24CV1077 RSH MMP

the PLAINTIFF of the intangible right of honest services, Section 1349 of 18 U.S.C. - attempt and conspiracy, Section 247 - Conspiracy against Rights, Section 2261A of 18 U.S.C. - Stalking; Section 1959 - Violent crimes in aid of racketeering activity and other applicable Sections.

353.    PLAINTIFF upon information and facts believes that Armenian Enterprise employed by DEFENDANTS and by the State Bar of California by using access to her confidential files, to the referred clients, to her IOLTA and checking accounts, by managing/ or working for those DEFENDANTS, by using illegal methods and connections does everything to ruin her business, to harass her, to entangle her into crime, to stalk and threaten her. PLAINTIFF hereby requests investigation in all those organizations under Section 1343 of 18 U.S.C. for fraud by wire, radio or television, Section 1346 of 18 U.S.C. by engaging in a scheme to defraud the PLAINTIFF of the intangible right of honest services, Section 1349 of 18 U.S.C. - attempt and conspiracy, Section 247 - Conspiracy against Rights, Section 2261A of 18 U.S.C. - Stalking; Section 1959 - Violent crimes in aid of racketeering activity and other applicable Sections.

In 2023, PLAINTIFF sent a complaint about her experience with the banks in California as well as her experience with referral organizations   (including strange fishing referrals). Complaints were sent to FBI and Attorney General Office with no avail.

354.    In 2023, PLAINTIFF also sent complaints to FBI   regarding her experience with cyber-security crimes of Armenian Enterprise, ongoing experience of horrible harassment and smear campaigns. PLAINTIFF didn't get any answer on her complaint to this date.

355.    Therefore, PLAINTIFF requests this Court to enter order requiring FBI and U.S. Attorney General Office to conduct racketeering investigations of 1) all DEFENDANTS 2) DEFENDANTS ANCA'S and ANCAWR'S ties to terror organizations; 3) DEFENDANTS ANCA'S and ANCAWR'S financial sources; 3) DEFENDANT ANCA'S and ANCAWR'S ties, relationship, cooperation and communications with all other DEFENDANTS against PLAINTIFF 4) relationship between Armenian Enterprise employed by the State Bar of California and DEFENDANTS ANCA and ANCAWR as well as their ties to terror organizations; 5) complaints against 700+ attorneys identified by State Auditor in Report 2022 - 030, including their relationship to State Bar employees or leaders and banking activities; 6) complaints against 700+ attorneys identified by State Auditor in Report 2022-030, and their relationship with referral organizations; 7) State Bar's "Leadership Bank Program and their ties and impact on referral organizations, as well as transactions between the

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

member banks and managers of the referral organizations; 5) Other investigation as may be necessary.

## **PRAYER FOR RELIEF**

**WHEREFORE, PLAINTIFF respectfully respects the following relief:**

1. For an award of general damages for not less than $ 500, 000, 000;

2. For an award of treble of damages under RICO and antitrust Laws;

3. For an award of special damages;

4. For an award of punitive damages as allowed by Law;

5. For mandatory injunction requiring all DEFENDANTS to stop racketeering activity towards PLAINTIFF and refrain from such activity in the future;

6. For declaratory relief from Section 5.1. of the Rules of DEFENDANT OCBA;

7. For mandatory injunction requiring DEFENDANT OCBA to remove Section 5.1. of OCBA LRIS Rules as violating antitrust Laws;

8. `For mandatory injunction requiring DEFENDANTS OCBA; LACBA; ASN; NOLO; LEGAL MATCH; LEGALSHIELD; PARKER STANBURY to provide public accommodation to PLAINTIFF on equal terms;

9. For mandatory injunction requiring DEFENDANTS OCBA; LACBA; ASN; LEGAL MATCH to provide PLAINTIFF with referrals in compliance with the Rules of the State Bar of California;

10. For permanent injunction against DEFENDANTS OCBA; LACBA; ASN; LEGAL MATCH; LEGALSHIELD; PARKER STANBURY to stop using the referral system to harass PLAINTIFF and leave her with no business;

11. For permanent injunction against DEFENDANTS ANCA, ANCAWR, HAIRENIK, ZARTONK MEDIA, ARAM HAMPARIAN, ARMEN

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP

SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN to stop any harassment and stalking of PLAINTIFF;

12.    For permanent injunction against Armenian Enterprise employed by all DEFENDANTS banning their access to PLAINTIFF'S files, referrals going to the PLAINTIFF; management of the staff sending referrals to the PLAINTIFF;

13.    For restraining orders against INDIVIDUAL DEFENDANTS ARAM HAMPARIAN, ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN and others as will be identified by further investigation to ban them from harassing, stalking and contacting the PLAINTIFF;

14.    For mandatory injunction requiring DEFENDANTS ANCA, ANCAWR, HAIRENIK, ZARTONK MEDIA, ARAM HAMPARIAN,  ARMEN SAHAKYAN, ZAVEN KOUROGHLIAN, VAN DER MEGERDICHIAN, ANI TCHAGHLASIAN, their agents, representatives and others as will be identified by future investigation to remove all defamatory content about PLAINTIFF from all  social media and other platforms, to apologize and to refrain from similar acts in the future;

15.    For mandatory injunction requiring DEFENDANTS GOOGLE, YELP, SUNDAR PICHAI, JEREMY STOPPELMAN to remove all defamatory content about PLAINTIFF from all their platforms and refrain from similar acts in the future;

16.    For mandatory injunction requiring DEFENDANTS GOOGLE and SUNDAR PICHAI to place proper information about PLAINTIFF'S business on its platform in a way not to confuse public;

17.    For mandatory injunction requiring DEFENDANTS YOUTUBE, GOOGLE and SUNDAR PICHAI to show PLAINTIFF'S videos placed in her business video channel to the public and refrain from any interference to their performance;

72

18.    For mandatory injunction requiring DEFENDANTS GOOGLE and SUNDAR PICHAI to remove any verification bans it places on PLAINTIFF'S account regularly to interfere with her GOOGLE business page visibility to the public;

19.    For mandatory injunction requiring DEFENDANT KIA to return to PLAINTIFF stolen car and remove any repossession information from PLAINTIFF's records;

20.    For permanent injunction against DEFENDANTS KIA and GREYSTAR requiring them to stop harassing PLAINTIFF;

21.    For mandatory injunction against DEFENDANTS KIA and GREYSTAR requiring them to delete unreasonable charges they placed into PLAINTIFF's online accounts.

22.    For costs of suit incurred herein;

23.    Reasonable attorney's fees according to proof;

24.    For such other and further relief as this Court deems just and proper;

25.    For interest at the legal rate according to proof.

DATED: October 2, 2024

BY: *Aynur Baghirzade*

AYNUR BAGHIRZADE

IN PRO SE

**SECOND AMENDED COMPLAINT**                                24CV1077 RSH MMP

1

## **DEMAND FOR JURY TRIAL**

2

3          Plaintiffs hereby request a jury trial on all claims so triable.

4

DATED: June 21, 2024

5

6

7

8                                                              BY: *Aynur Baghirzade*
                                                                   _____

9                                                                  AYNUR BAGHIRZADE

10                                                                 IN PRO SE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED COMPLAINT**                                    24CV1077 RSH MMP