AYNUR BAGHIRZADE
1968 S. Coast Highway #2429
Laguna Beach, CA 92651
Phone: 619-630-6646
Email: contact@aynurlawyers.com

*AYNUR BAGHIRZADE, IN PRO SE*

FILED

DEC 2 4 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

## UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF CALIFORNIA

AYNUR BAGHIRZADE,

Plaintiff,

vs.

ARMENIAN NATIONAL
COMMITTEE OF AMERICA, A
NON-PROFIT CORPORATION, et
al.

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 24CV1077 RSH MMP

**EXHIBITS IN SUPPORT OF
OPPOSITION TO DEFENDANTS
YELP INC. AND JEREMY
STOPPELMAN'S MOTION FOR
DISMISSAL PURSUANT TO
F.C.R.P. RULE 12 (B)(6)**

Presiding Judge: Hon. Robert Huie

Magistrate Judge : Hon. Michelle M.
Petit

i

EXHIBITS IN SUPPORT OF OPPOSITION TO DEFENDANTS YELP INC. AND JEREMY STOPPELMAN'S
MOTION FOR DISMISSAL PURSUANT TO F.R.C.P. RULE 12(B)(6)

24CV1077 RSH MMP

1.    **EXHIBIT A** - GLOBAL TERRORISM: THE JUSTICE COMMANDOS OF THE ARMENIAN GENOCIDE, A RESEARCH PAPER - PAGES: 1-22 (A1 -A22)

2.    **EXHIBIT B -** LETTER OF CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON - PAGES: 23 - 30 (B1 - B8)

3.    **EXHIBIT C -**  INSTAGRAM SCREENSHOTS OF THE ENTERPRISE TARGETING SACRAMENTO BUSINESS TO SUPPRESS BUSINESS OWNER'S SPEECH AND EXTORT MONEY - PAGES: 31- 37 (C1 - C7)

4.    **EXHIBIT D -** JUDGMENT KHURAMAN ARMSTRONG V. YULIA ASSATRYAN, ET AL., BY COURT IN AUSTRALIA, MELBOURNE (CASE: CI-21-01623) - PAGES: 38 - 82 (D1 - D45)

5.    **EXHIBIT E -** ARTICLE AND POST OF DEFENDANT ANCA ON ORGANIZATION CAMPAIGN AGAINST DR. OZ'S ELECTION TO SENATE - PAGES: 83 - 88 (E1 - E6)

6.    **EXHIBIT F -** COMMUNICATION WITH ACCOUNT @MELMOUTH1 IN TWITTER - PAGES: 89- 91 (F1 -F3)

7.    **EXHIBIT G -** COMMUNICATION WITH ACCOUNT @ RAYDAR07 IN TWITTER - PAGES: 92 - 99 (G1-G8)

EXHIBITS IN SUPPORT OF OPPOSITION TO DEFENDANTS YELP INC. AND JEREMY STOPPELMAN'S MOTION FOR DISMISSAL PURSUANT TO F.R.C.P. RULE 12(B)(6)

24CV1077 RSH MMP

**8.**    **EXHIBIT H -** REVIEW LEFT BY RAY D. IN PLAINTIFF'S YELP ACCOUNT - PAGES: 100 - 101 (H1 - H2)

**9.**    **EXHIBIT I -** MANIPULATED PROFILE PICTURE OF PLAINTIFF PLACED IN HER YELP ACCOUNT - PAGES: 102 - 104 (I1 - I3)

**10.**    **EXHIBIT J -** FORMERLY REMOVED REVIEWS WHICH APPEARED BACK IN PLAINTIFF'S ACCOUNT WITH HER PAST DATED COMMENTS UNDER THEM - PAGES: 105 - 109 (J1 - J5)

**11.**    **EXHIBIT K:** REVIEW OF SOMEONE UNDER NAME ALEX K., LEFT IN PLAINTIFF'S YELP ACCOUNT - PAGES: 110 - 111 (K1-K2)

**12.**    **EXHIBIT L:** REVIEW OF SOMEONE UNDER NAME E. KERIMLI, LEFT IN PLAINTIFF'S YELP ACCOUNT AND EMAIL COMMUNICATIONS WITH YELP INC. AND OTHER PLATFORMS REGARDING THIS REVIEW - PAGES: 112 - 123 (L1 - L12)

**13.**    **EXHIBIT M:** EMAIL COMMUNICATIONS WITH YELP INC. REGARDING THE POSITIVE REVIEWS REMOVED FROM PLAINTIFF'S ACCOUNT - PAGES: 124 - 133 (M1 - M10)

**14.**    **EXHIBIT N:** EMAIL COMMUNICATIONS WITH YELP INC. ASKING THEM TO CLOSE PLAINTIFF'S ACCOUNT - PAGES: 134 - 141 (N1 - N12).

EXHIBITS IN SUPPORT OF OPPOSITION TO DEFENDANTS YELP INC. AND JEREMY STOPPELMAN'S
MOTION FOR DISMISSAL PURSUANT TO F.R.C.P. RULE 12(B)(6)

24CV1077 RSH MMP

# EXHIBIT A

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Directorate of
Intelligence

Secret

25X1

MASTER

DO NOT GIVE OUT
GE USED GI

# Global Terrorism:
# The Justice Commandos of the
# Armenian Genocide

25X1

A Research Paper

FBI Review Completed

Secret

GI 84-10148
September 1984

Copy **408**

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3



Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Directorate of
Intelligence

**Secret**

25X1

# Global Terrorism:
# The Justice Commandos of the
# Armenian Genocide

25X1

**A Research Paper**

This paper was prepared by the Terrorism Analysis
Branch, Instability and Insurgency Center, Office of
Global Issues. Information about the United States
was provided by and coordinated with the Federal
Bureau of Investigation. The paper was also
coordinated with the Directorate of Operations.
Comments and queries are welcome and may be
directed to the Chief, Terrorism Analysis Branch,
OGI,

25X1

**Secret**
*GI 84-10148*
*September 1984*

Exh. A 4

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

25X1

Secret

**Global Terrorism:**
**The Justice Commandos of the**
**Armenian Genocide**                    25X1

**Summary**
*Information available*
*as of 24 August 1984*
*was used in this report.*

The Justice Commandos of the Armenian Genocide (JCAG) is a very efficient terrorist organization whose meticulous planning has allowed it to attack Turkish interests worldwide with virtual impunity. From its inception in 1975, JCAG has shunned connections to other terrorist groups or patron states, preferring to view itself as an elite cadre of freedom fighters, "un-uniformed soldiers," engaged in a war with Turkey for recognition of the Armenian genocide. JCAG's terrorist attacks are designed to force Turkey to admit responsibility for the deaths of about 1.5 million Armenians in 1915.                    25X1

The Justice Commandos' parent organization, the Armenian Revolutionary Federation (ARF), is in competition with the other major Armenian terrorist group, the Marxist Armenian Secret Army for the Liberation of Armenia (ASALA), for control of the Armenian revolutionary movement. The escalation of terrorist violence by ASALA since 1979 has convinced the ARF that it *must* step up terrorist activities to retain the membership of the young radicals who demand action against Turkey.                    25X1

JCAG and the ARF have the support of a segment of the worldwide Armenian community, which views the Justice Commandos as freedom fighters, not terrorists. Recent large-scale Armenian immigration to the United States has resulted in the development of a well-organized JCAG infrastructure in Los Angeles and the radicalization of portions of the Armenian community in California. Although JCAG has heretofore avoided and criticized attacks on non-Turkish targets, Armenian community perceptions that the United States is bowing to Turkish pressure to 25X1 halt international investigation or recognition of the Armenian genocide may trigger JCAG terrorist violence against US interests.

We believe the spiral of Armenian and anti-Armenian attacks began with the 1982 slaying of the JCAG leader
Pressure to retaliate against Armenian terrorists may result in more attacks against Armenian communities worldwide.

25X1

25X1

Secret
*GI 84-10148*
*September 1984*

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Secret

25X1

# Global Terrorism:
# The Justice Commandos of the
# Armenian Genocide

25X1

## Background to Armenian Terrorism

The Armenian terrorist group, the Justice Comman-dos of the Armenian Genocide (JCAG), first appeared in 1975, but terrorism has intermittently held an important position in the cause of Armenian national-ism for nearly 100 years. The Armenian revolutionary movement and the terrorism it inspired grew out of the late-19th-century self-defense organizations de-veloped by Armenians to protect themselves against victimization by Turks, Kurds, and Azeris. Modeled on Russian nihilist organizations—which advocated the use of intimidation, terror, and assassination—these paramilitary groups evolved into well-trained soldiery, influenced strongly by the revolutionary ideals promulgated by Russian social democrats.

The Armenian Revolutionary Federation (ARF) was one of the early nationalist revolutionary organiza-tions. Founded in 1890, the ARF quickly developed a strong sense of national identity and fostered early dreams of an Armenian homeland—nonexistent since Armenia was conquered by the Ottoman Turks in the mid-13th century. The ARF produced the first real fighting units—*fedayihs*—volunteers who left home, lived off the land, and defended Armenian land and rights. The heroism, valor, and sacrifice of the early fighters provided a nucleus of values important to contemporary Armenian history. The ARF also pro-vided a hero hierarchy around which the Armenian national consciousness was awakened and with which modern day Armenian terrorists have identified their exploits. Indeed, the *fedayih* oath to "kill the enemy or die trying" has served as a model for at least one recent suicide attack by Armenian terrorists in their attempts to gain international recognition of the genocide of 1915.

Terrorism has been an important tactic of the ARF since its inception. The ARF's first success in gaining West European attention for the plight of Armenians massacred under the Ottoman Sultan Abdul Hamid resulted from a terrorist act. On 26 August 1896, ARF terrorists seized the Ottoman bank in Istanbul and held it for 18 hours, thereby gaining guarantees from Russia to press Turkey to promulgate reforms that favored the Armenians. The subsequent release of the terrorists and their safe conduct out of the Ottoman Empire provided a psychological victory for the ARF and a stimulant for the continued use of terrorist tactics.

25X1

Nemesis, the shadowy predecessor of JCAG, was created by the ARF in 1921 to assassinate former Ottoman government officials it believed responsible for the massacre of 600,000 to 1.5 million Armenians in 1915—an event that has become known as the Armenian genocide. While officially sanctioned by the ARF, these attacks were blood-feud killings car-ried out by Armenian assassins whose family mem-bers had been killed in the forced relocation march in 1915. Between 15 March 1921 and 25 July 1922, four principal figures in the defunct Ottoman govern-ment—including Minister of Interior Talaat Pasha—were slain by Armenians believed linked to Nemesis. ARF-sponsored attacks on Turkish Government offi-cials ceased after the deaths of the officials most prominently linked to the genocide. The dispersion and subsequent assimilation of the Armenians after the massacres seemed to presage an end to terrorism.

25X1

An isolated event in 1973 triggered the return to terrorism by Armenians. The revenge slaying of two Turkish diplomats in 1973 by an aged Armenian whose entire family had been slaughtered in 1915 captured widespread media attention (see inset) and provided inspiration to many young Armenians who were frustrated by the inability of the Armenian community to gain an international investigation of their claims against Turkey.

25X1

This act of vengeance and the subsequent publicity surrounding a campaign to obtain his parole became the springboard for Armenian terrorism throughout

25X1

1                    Secret

Exh. A6

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

*Gourgen Yanikian*

*On 28 January 1973, Gourgen Yanikian, a retired Armenian engineer haunted by memories of having watched while most of his family was slaughtered in Turkey almost 6 decades earlier, lured the Turkish Consul in Los Angeles and his aide to the Biltmore Hotel in Santa Barbara and shot them. At his trial Yanikian refused to acknowledge that his act had been criminal, claiming to have killed the diplomats in just retaliation for the deaths in 1915 of 24 of his family members. He also used the occasion to draw world attention to the Turkish massacre of 1.5 million Armenians and the dispersal of thousands of other Armenians throughout the world.*



Figure 1. Gourgen Yanikian.

25X1

25X1

25X1

the world. Between October 1973 and February 1975, Armenian terrorists claimed responsibility for three bomb attacks against Turkish facilities in the United States and the Middle East. They used a variety of names—the Yanikian Commandos, the Yanikian Group, and the Prisoner Yanikian Group—linked to the "martyr" Yanikian. The Armenian Secret Army for the Liberation of Armenia (ASALA)—in a communique announcing its creation in Beirut in 1975—acknowledged its debt to Yanikian, calling him the godfather of modern Armenian terrorism. It pledged to lead the struggle to gain an Armenian homeland and to retaliate against Turkey for the Armenian genocide (see inset).

**The Justice Commandos of the Armenian Genocide**
The rightwing Armenian terrorist group, the Justice Commandos of the Armenian Genocide, began its campaign of assassinations and bombings against Turkish diplomats in 1975. Stressing the narrow limits of its fight, JCAG has operated only against Turkish targets—usually diplomatic personnel and facilities.

The ethnic cohesiveness of the Armenian community and its inherent distrust of non-Armenians provide a distinct advantage for Armenian terrorists. In addition to a reluctance by most Armenians to talk to police, some segments of the community have rallied around arrested Armenian terrorists, providing financial and moral assistance. We suspect that a small portion of the Armenian community may also be involved in peripheral support to terrorist actions—including preoperational casing, weapons procurement, escape arrangements, and propaganda distribution.

25X1

25X1

25X1

*Organizational Structure.* Worldwide investigations of acts committed by JCAG since 1975 have determined that JCAG is a component of the ARF. The ARF political structure resembles a pyramid with individual chapters throughout the world forming its

25X1

Secret

2

Exh. A7

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Secret

25X1

Figure 2. Flyer of political rally.



Exh. A8

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

25X1

base. A small intellectual elite makes up the central committee, which has strict authority over the rank-and-file members. Central committee members' names, activities, and missions are kept secret to thwart Turkish retaliation. The central committee members, in turn, are subordinate to a geographic bureau composed of five of the most important ARF figures. Party dues and solicitations at public meetings appear to provide the main source of funds for the ARF to conduct its political, social, and educational activities, including the clandestine operation of its military wing, the Justice Commandos.

Every four years the ARF holds a world congress at a secret location to elect a new ARF bureau, which is the supreme ruling body for all ARF members. Delegates to this congress are drawn from a worldwide network of central committees and are elected every two years by delegates—one for every 15 members—from individual local chapters. Central committees assure implementation of ARF bureau decisions and are responsible for maintaining a strong membership.

**Figure 3**
**Typical Armenian Assassination Attempt**



A car with driver and diplomat is held up in traffic

Diplomat

Driver

Two men fire into rear window

Then run to sides to fire into side windows

Assassination teams
· 1-3 members
· 9 mm automatics

303504 9-84

25X1

25X1

25X1

25X1

25X1

*Modus Operandi of Attacks.* JCAG assassinations—15 have been successful since 1974—are meticulously designed to maximize the chance of success. Preliminary planning includes extensive surveillance of the target's movements and identification of an area where the victim is most exposed and vulnerable. It focuses on frequently used routes and aims to pinpoint a location where the victim is forced to stop or slow

**Secret**                                4

Exh, A9

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

for turns or traffic signals (see diagram). At least 12 JCAG assassination attempts have taken place when the victim was in a slowed or stopped automobile or when he was entering or leaving his home or office.

All sites chosen for assassinations have included carefully chosen escape routes. The effectiveness of this meticulous planning has been reflected in the failure of police to capture JCAG terrorists at the scene or identify them through police investigation. Only the actions of bystanders on the scene resulted in the capture of one JCAG assassin—Haroution Levonian, arrested in Belgrade immediately after the slaying of the Turkish Ambassador in 1983. To date only three JCAG assassins have been arrested and stood trial. All three have been convicted.

The analysis of eyewitness accounts of several JCAG assassinations reveals a uniformity in the techniques and type of perpetrator. The attackers are described as two or three men in their late teens or early twenties, often wearing jogging outfits to allay suspicion and frequently carrying two weapons to ensure the success of their mission. One or more of the attackers approaches the victim, fires several shots at the target, then steps in close to administer the coup de grace if necessary. Analysis of autopsy reports and forensic evidence indicates these attackers are skilled and practiced marksmen who are able to fire rapidly into small areas with remarkable precision. The weapons—untraceable in most instances—are left at the scene by the assassins, who flee to waiting escape vehicles, frequently driven by local supporters.

Immediately after an attack, telephone calls to press agencies in cities throughout the world claim the attack for JCAG, frequently emphasizing the distinction between the Justice Commandos and their rival group, ASALA. Written communiques—usually forwarded to news agencies and wire services—provide elaboration on the attacks and reiterate Armenian demands.

*JCAG Versus ASALA: A Deadly Rivalry.* The rivalry between the ARF and ASALA has existed since the creation of ASALA in 1975. ASALA's emphasis on terrorism to further the Armenian cause found a ready audience with young ARF members who could see no results from the ARF's political activities.

ASALA's propaganda organ, *Armenia*, fueled the rivalry by publishing interviews with ex-ARF youths who had been involved in ASALA operations as well as criticisms of ARF refugee programs that helped Armenians to relocate rather than attempt to return to an Armenian homeland. Claims by ASALA to terrorist attacks conducted by JCAG have further heated the enmity between the two groups. Successful attacks by one group often have prompted attacks by the other.

ASALA's taunting criticism of JCAG's terrorist tactics—"cowardly hit-and-run assassinations with little fear of capture"—which began appearing in the Armenian press in 1982 and 1983, may have stung the ARF to vary its tactics. On 27 July 1983 a group of Armenian terrorists, identifying themselves as members of the Armenian Revolutionary Army (ARA), attempted to take over the Turkish Embassy in Lisbon. Circumstantial evidence indicates that the ARF probably ordered the attack. We suspect the Embassy seizure, which resulted in the deaths of two Turks and five terrorists, was intended to be a lengthy hostage situation aimed at garnering extensive publicity. It followed by less than two weeks a spectacular ASALA bombing at Orly Airport in Paris—which killed nine and injured 60 and received considerable publicity in the world press.

We doubt this rivalry between the ARF and ASALA will abate, and it may even increase in intensity. In a letter to the *Armenian Reporter* in December 1983, ASALA cited recent ARF criticisms of ASALA as a tactic to gain control of the Armenian community and threatened violent retaliation against the ARF. This struggle for control of the Armenian revolutionary movement may prompt further changes in tactics by both groups and could trigger more indiscriminate violence.

25X1

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

### The Armenian Secret Army for the Liberation of Armenia

*The second prominent Armenian terrorist organization, the Armenian Secret Army for the Liberation of Armenia (ASALA), is a Marxist group with links to Palestinian terrorist groups and Middle Eastern patron states. Like JCAG, ASALA demands an Armenian homeland and official Turkish recognition of the 1915 genocide.*

*ASALA was formed in January 1975, advocating an armed struggle to achieve the liberation of Armenia and to improve the lot of the "exploited classes." ASALA sharply criticized the ARF for its lack of progress in furthering Armenian goals and provided an alternative to radical young Armenians who embraced ASALA's terrorist ideology.*

*ASALA initially conducted attacks, mainly bombings and assassinations, solely against Turkish targets. After the capture of three of its members in 1980 in Switzerland and France, however, ASALA—using covernames such as Orly Group and 3 October Organization—began retaliatory attacks against other countries who held ASALA militants.*

*ASALA terrorist attacks in 1983—the June machine-gun attack in the Istanbul bazaar and the July bombing of the Turkish Airlines counter at Orly Airport in Paris—indicated a growing pattern of indiscriminate violence aimed at garnering maximum publicity. This trend has provoked fragmentation within ASALA; one splinter group, the ASALA Revolutionary Movement, insists on limiting its attacks to its traditional enemy, the Turks.*

25X1

25X1

25X1

25X1

25X1

25X1

Exh. A11

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Secret

25X1

Figure 4. *Armenian commem-
orative service.*



## "A Moment to Reflect"

### A commemorative service for The Lisbon Five

#### Hosted by the following AYF-YOARF chapters:

**Chicago Ararat Chapter**
January 21 at 7:30 p.m.
Armenian All Saints Apostolic Church
Shahnazarian Hall
1701 North Greenwood Avenue
Glenview, Illinois

**Detroit Kopernik Tandourjian Chapter**
January 28 at 8:00 p.m.
Armenian Community Center
of Greater Detroit
19310 Ford Road
Dearborn, Michigan

**Washington Sevan Chapter**
January 15 at 8:00 p.m.
Soorp Khatch Church
4906 Flint Drive
Chevy Chase, Maryland

**Providence Varantian Chapter**
January 22 at 12:30 p.m.
Sts. Vartanantz Church Hall
402 Broadway
Providence, Rhode Island

**New York Hyortik and
New Jersey Arsen Chapters**
January 29 at 3:00 p.m.
Sts. Vartanantz Church Hall
461 Bergen Boulevard
Ridgefield, New Jersey

7

Secret

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

***The Turkish Response.*** The fanaticism of Armenian terrorism has strengthened the Turkish Government's public refusals to make concessions or political gestures to Armenian nationalists. Turkey has consistently denied any responsibility for the massacre of the Armenians in 1915. While admitting that deaths occurred, Turks cite attacks by bandits and the ravages of economic deprivation as the cause.

Turkish Government efforts to underscore the plight of Turkish victims of Armenian terrorism and generate support for Turkey's position have largely failed. The European press has tended to side with the Armenians in the matter of the genocide and has not focused attention on the Turkish victims of Armenian terrorist attacks. Media campaigns—particularly in France—that sympathetically depict the Armenian claims have hurt relations between Turkey and its European allies.

Turkey's frustration over Armenian terrorism has led to intensified diplomatic efforts to obtain international assistance against Armenian terrorism.

Public expressions of sympathy by several West European governments for the Armenian cause and the perceived reluctance of them to provoke retaliation from Armenian terrorists have apparently fueled Turkish suspicions that the West Europeans are doing far less than they could to thwart Armenian violence against Turks.

The continuation of Armenian terrorist violence has resulted in increasing domestic political pressure on the Turkish Government to deal more effectively with the terrorist threat.

25X1

25X1

Retaliatory attacks against Armenians may also have convinced the Turkish Government that violence would hurt more than help the Turkish case. Recent press reports have linked the bombing of the newly unveiled Armenian Genocide Memorial in Alfortville, France, on 3 May to the Turkish Government, which has been harshly critical of the French Government's recognition of the Armenian genocide. A previously unknown terrorist group, the Anti-Armenian Organization, claimed credit for the bombing and threatened more attacks in retaliation for Armenian attacks against Turkish targets

25X1

25X1

25X1

25X1

25X1

25X1

25X1

25X1

***Armenian Terrorism in the United States.*** Armenian terrorism is not confined to Europe and the Middle East, but has become an increasing problem in the United States in the past two years. Most Armenian terrorism in the United States since 1980 can be linked to the Armenian community in southern California. Analysis of evidence gathered by the Federal Bureau of Investigation (FBI) indicates that the US

25X1

25X1

Exh. A13

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Secret

25X1



*Figure 5. Armenian demon-
strators, May 1982*

*Washington Post ©*

leadership of JCAG is in Los Angeles. FBI investiga-
tions also indicate that suspected JCAG members in
Los Angeles have been informed of JCAG attacks
conducted elsewhere. Forensic evidence has linked the
Los Angeles organization to JCAG bombings in New
York. FBI investigation has also determined that the
attempted bombing of the honorary Turkish consul in
Philadelphia on 22 October 1982 was planned by
JCAG members in Los Angeles. Six of the eight
JCAG members arrested worldwide have been appre-
hended in California.

*Political Initiatives.* The success of Armenian terror-
ism can be measured in the resurgence of expatriate
community efforts to redress their grievances. Public
terrorist trials, particularly in Los Angeles and Paris,
have repeatedly focused attention on Armenian griev-
ances and provided public forums for Armenian ef-
forts to publicize the genocide. Concern is growing
within the Armenian communities that the impact of
these trials—and the sacrifices of the "freedom fight-
ers"—will be lost if the momentum of the new wave
of nationalism cannot be translated into political
gains.

Worldwide political organizations—linked to both
JCAG and ASALA—are also attempting to exploit
for political ends the extensive publicity generated by

terrorist actions. The ARF has created its own politi-
cal action committee, the Armenian National Con-
gress, to orchestrate political initiatives regarding the
Armenian cause. The ARF is attempting to return to
the Socialist International and establish closer rela-
tions with socialist parties to elicit support for the
Armenian cause. ASALA, too, was active behind the
scenes in organizing the Second International Arme-
nian Congress in July 1983, which drafted a constitu-
tion for a permanent organization to lead the Arme-
nian Diaspora.

25X1

25X1

Armenian communities in North America and West-
ern Europe now appear to be turning to political
organizations in individual countries to push for rec-
ognition; in the United States they have organized
direct mailing campaigns to stimulate pressure for
Congressional resolutions to acknowledge the geno-
cide and to cancel US aid to Turkey. Armenian
communities worldwide are exploring international
avenues, such as asking the European Community
Court of Justice for reparations for losses stemming
from the Diaspora and successfully petitioning the
United Nations to reopen deliberations on Paragraph
30 of the Human Rights Commission on the Preven-
tion of Genocide.

25X1

25X1

Secret

Exh. A14

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Other grassroots organizations have appeared in the past 10 years to assist these political initiatives. Groups such as the Society for the Recognition of the Genocide Committed Against the Armenians have embarked on a wide range of activities—including development of a film series documenting testimony from genocide survivors and publication of a series of historical books explaining the genocide—to aid the campaign for international recognition of the genocide. These groups help organize and participate in worldwide demonstrations and rallies on 24 April every year to commemorate the genocide and to encourage the Armenian community to rededicate itself to the struggle.

These international political initiatives are beginning to show concrete gains. At least in part as a result of these efforts, the United Nations has scheduled deliberations during the summer of 1984 on Paragraph 30—referring to the existence of the Armenian genocide—for possible inclusion in the United Nations Human Rights Commission report on preventing genocide. Armenian groups have been successful in having candidates for office in the United States sponsor several resolutions before the US Congress concerning the genocide and Armenian grievances against Turkey, including one that would curtail US aid to Turkey.

## Outlook

We anticipate no early end to Armenian terrorism. We doubt that any of the Armenian political initiatives being undertaken—even if successful—will have a long-term ameliorating effect on the violence. Armenian terrorism is rooted in the frustrations of an ethnic group that feels terrorism offers it the best chance of ultimately achieving its goals. The refusal of the Turkish Government to acknowledge the genocide will continue to antagonize the worldwide Armenian community and may provide impetus for even more terrorism within the Armenian Diaspora.

Although the Justice Commandos have suffered some serious setbacks in the past two years—the arrests of eight of their members, the deaths of the Lisbon Five and the disappearance of their leader—

### The California Connection

*California's large Armenian population has been largely responsible for making it the focal point for Armenian terrorism in the United States. Following the genocide, thousands of Armenians settled in the San Joaquin Valley of California and quickly became assimilated. A second wave of Armenian immigrants, who arrived from the Middle East over the past 10 years, have proved, however, to be a destabilizing force. According to numerous open-source articles*
25X1

*these immigrants have been radicalized by the violent political instability of Turkey in the 1970s and the Middle East—following the Lebanese civil war and the Israeli invasion of Beirut—as well as exposure to the Palestinian model of politics and terrorism.*
25X1

25X1

*Fired by a resurgent Armenian nationalism and an enhanced sense of identity, these newer immigrants attempted, at first unsuccessfully, to spur the older, politically passive Armenian community into action. According to academic and press articles, both cultural and economic differences—between a disproportionately wealthy group of third-generation Armenians and newly arrived, destitute immigrants—hindered unified political action by the California Armenian community.*
25X1
25X1

*The killing of the Turkish Consul General in Los Angeles in January 1982 proved to be the catalyst that unified both segments of the Armenian community. Extensive publicity surrounding that assassination focused US attention on Armenian grievances against Turkey but, more importantly, directed Armenian attention to its neglected cultural heritage. Numerous press sources have reported that, in the eyes of the older generation of Armenians, the assassination demonstrated that terrorism obtained results whereas the peaceable efforts of 69 years had failed. To the young, third-generation Armenian-Americans, the terrorists represented romantic figures who did more than merely talk about the genocide. Various open sources note that, while most Armenians recognize that terrorism alone can never solve the Armenian questions and gain justice for the Armenian cause, many Armenians have become convinced that, if it had not been for the use of violence, no one would be aware of Armenian grievances.*
25X1

25X1

25X1

25X1

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Secret



*Figure 6. Armenian memorial service.*

25X

we do not believe these reversals will curtail JCAG terrorist activities.

25X1

To date, the Justice Commandos have not attacked US interests despite the arrests of six JCAG members in the United States. We note that ASALA's targeting of only Turkish diplomats changed radically to include retaliatory attacks against other governments when they began arresting ASALA members. According to FBI analysis, JCAG may conduct retaliatory attacks against US targets if it comes to feel that the United States is restricting JCAG's activities as a result of Turkish political pressure.

25X

11

Secret

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Secret

# Appendix A

## Modern Armenian Terrorism:
## The Historical Background

The intense passion that inspires modern Armenian
terrorism is rooted deeply in centuries of conflict
between Armenians and Turks. Armenia has not
existed as an independent state since the mid-13th
century, when the Ottoman Turks conquered the area
which now comprises parts of Turkey, Iran, and the
Soviet Union. Although given some measure of auton-
omy—in exchange for passive political loyalty—the
Armenians were always considered by the Turks as
*zimmi*, a Turkish term meaning tolerated infidels.
The delicate balance of interests between the Muslim
Turks and the Christian Armenians was shattered by
the rapidly escalating decay of the Ottoman Empire
at the end of the 19th century.

The collapse of the Ottoman Empire played a key role
in creating the conditions that resulted in large-scale
massacres of Armenians by Turks in the late 19th and
early 20th centuries—and which, in turn, spawned the
current blood feud being waged by some Armenians.
The decline of the Ottoman Empire had encouraged
European involvement in Turkish affairs. Simmering
discontent by minorities throughout the empire
proved a readily exploitable avenue for foreign inter-
vention. This foreign involvement, coupled with reli-
gious antagonism and deep-seated economic jealousy
of minorities, including the Armenians, focused Turk-
ish anger and repression on the Ottoman minorities,
particularly the Armenians. Moreover, Armenians—
who had frequently looked to Russia for guarantees of
protection under the umbrella of Christianity—be-
came convenient scapegoats. The oppression came to
a head during the years 1890 to 1915 under the
Young Turk regime, which blamed Armenians for the
inevitable disorders and upheavals that were resulting
from centuries of Ottoman decline.

The date of 24 April 1915—when the leaders of the
Constantinople Armenian community were rounded
up by the Turks and sent away to their deaths—is
commemorated annually by Armenians worldwide in
remembrance of the Armenian genocide. This date
marked the beginning of mass deportations to the
desolate Syrian wilderness of Deir al-Zor (Dayr az
Zawr), which stripped central Turkey of its Armenian

population and resulted in the deaths of tens of
thousands of Armenian men, women, and children.
Estimates from foreign observers of the death toll
range from 600,000 to 1.5 million Armenians, who
died as a result of Turkish and Kurdish attacks,
starvation, and privation.                                    25X1

Death statistics alone fail to illustrate both the magni-
tude of the loss and the effect on the survivors.
Armenian scholars claim that nearly every Armenian
household lost relatives in the massacres. The disrupt-
ed existence of the survivors in the years immediately
after the massacres forced the internalization of the
pain and suffering. Few Armenians forgot, however,   25X1
and, as the immigrant press began to develop in
countries where the survivors had fled, the genocide
became the primary topic. Sixty-nine years after the
event, the genocide is still referred to in the Armenian
press, along with demands for international recogni-
tion of Turkey's role in the slaughter.                 25X1

Turkish historians have routinely dismissed Armenian
accounts of the atrocities of 1915 as propaganda.
They cite the anger of local Ottoman bureaucrats over
alleged Armenian treason in aiding Russia during the
First World War as the reason for any excesses which
occurred during the deportations. Moreover, Turkey
disavows all responsibility for the policies of the
Ottoman regime.                                          25X1

Testimony and evidence from numerous international
sources—missionary, press, and diplomatic, especially
the reports of the US Ambassador to Turkey, Henry
Morgenthau—have influenced historians that the
massacres occurred. The point of contention has been
whether it was an organized, government-directed   25X1
genocide or a series of spontaneous outbreaks of racial
violence. International attempts to investigate Arme-
nian allegations of genocide have been consistently
thwarted by the Turkish Government.                    25X1

Secret

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

The denial of the genocide by Turkey has provided a powerful stimulus for modern Armenian terrorism. The ARF has been uniquely qualified to lead Armenian efforts to gain international recognition of the Armenian genocide. Efforts of the ARF in 1915 to organize and direct the few pockets of resistance against the Turks have become imprinted in the Armenian psyche through literature, art, and music, providing the ARF with powerful emotional leverage over the Armenian Diaspora today.

The dispersion of Armenians following the massacres of 1915, however, spawned a generation free from Armenian violence against Turkey. The survivors' struggle to relocate, rebuild their lives, and overcome economic deprivation supplanted the desire for revenge. Traumatized by the massacres and frequently discriminated against by the communities where they settled, Armenian immigrants hastened to lose all traces of their Armenian background. This assimilation resulted in a temporary rejection by many Armenians of Armenian culture, language, and politics.

A series of events in the period after World War II spurred the Armenian Diaspora to a recovered sense of national identity. The appearance of the term "genocide" during the Nuremberg war trials in 1946 awoke bitter memories within the victims who had survived the events of 1915. The United Nations General Assembly Resolution 96 on 11 December 1946—identifying and condemning genocide as a crime under international law—and the demand of the Convention on Genocide in 1948 that states punish those responsible for committing genocide provided an international basis for Armenian claims against Turkey. These milestones, combined with changing international political attitudes toward ethnic and minority movements and their problems of identity, stirred Armenian hopes for legal redress of their grievances against the Turks.

Armenian political activism received its first important stimulus from events surrounding the publication of the United Nations Human Rights Commission Report on Preventing Genocide. Paragraph 30, referring to the Armenian genocide, [1] was removed at the insistence of the Turkish Government. A statement of the Special Rapporteur claimed that no proof existed that the genocide of Armenians occurred. Despite intervention by the United States, the USSR, France, and others, subsequent attempts to restore Paragraph 30 have been unsuccessful to date.

25X1

25X1

This denial of the massacres without a hearing in any international forum sharply radicalized the diaspora. Lacking a state to present its case to international organizations, Armenian communities tried to create media interest in their cause. They had little success, however, until Armenian terrorist activities began to garner publicity.

25X1

[1] "Passing to the modern era, one may note the existence of relatively full documentations dealing with the massacre of Armenians, which has been described as "the first genocide of the 20th century."

25X1

25X1

25X1

Exh. A18

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Secret

## Appendix B

### A Chronology of Armenian Terrorism, October 1973–June 1984

| Date | Location of Attack | Group/Name Used | Incident Description |
|---|---|---|---|
| **1973** | | | |
| 26 October | New York City, United States | Yanikian Commandos | Smoke bomb sent to Turkish Consulate |
| **1974** | | | |
| 26 October | New York City, United States | Yanikian Commandos | Bomb sent to Turkish Consulate |
| **1975** | | | |
| 20 January | Beirut, Lebanon | Prisoner Karekin (Gourgen) Yanikian Group | Bomb discovered at World Council of Churches office |
| 20 February | Beirut, Lebanon | Yanikian Group | Bombing of Turkish Airlines office |
| 22 October | Vienna, Austria | ASALA and JCAG | Assassination of Turkish Ambassador and driver |
| 24 October | Paris, France | ASALA and JCAG | Assassination of Turkish Ambassador |
| **1976** | | | |
| 28 May | Zurich, Switzerland | JCAG | Bombing of Turkish Consulate and a Turkish bank |
| **1977** | | | |
| 14 May | Paris, France | New American Resistance (NAR) | Bombing of Turkish tourism office |
| 9 June | Rome, Italy | JCAG | Assassination of Turkish Ambassador to the Vatican |
| **1978** | | | |
| 3 January | London, England | NAR | Bombing of Turkish bank |
| | Brussels, Belgium | NAR | Bombing of apartment of a Turkish Embassy counselor |
| 2 June | Madrid, Spain | ASALA and JCAG | Assassination of brother, wife, and chauffeur of Turkish Ambassador to Spain |
| 6 December | Geneva, Switzerland | NAR | Bombing of Turkish Consulate |
| 17 December | Geneva, Switzerland | NAR | Bombing of Turkish Consulate |
| **1979** | | | |
| January | Madrid, Spain | JCAG | Bombing of British Airways and TWA offices |
| 8 July | Paris, France | JCAG | Bombing of Turkish tourism office and Turkish labor attache's office |
| 12 October | The Hague, Netherlands | JCAG | Assassination of son of Turkish Ambassador |
| 9 December | Rome, Italy | NAR | Bombing of El Al and British Airways offices, injuring nine |
| 22 December | Amsterdam, Netherlands | JCAG | Bombing of Turkish Airlines office |
| | Paris, France | Commandos of Armenian Avengers (probably JCAG) | Assassination of Turkish press attache |
| **1980** | | | |
| 19 January | Spain | JCAG | Bombing of British Airways, TWA, Swissair, and Sabena Airlines offices (JCAG later denied responsibility) |

Secret

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

**A Chronology of Armenian Terrorism,**
**October 1973–June 1984 (continued)**

| Date | Location of Attack | Group/Name Used | Incident Description |
|---|---|---|---|
| 1 February | Brussels, Belgium | NAR | Bombing of Aeroflot and Turkish Airlines offices |
| | Paris, France | NAR | Bombing of Soviet information office |
| 6 February | Bern, Switzerland | JCAG | Attempted assassination of Turkish Ambassador |
| 17 April | Rome, Italy | JCAG | Attempted assassination of Turkish Ambassador to the Vatican |
| 6 October | Beverly Hills, United States | JCAG | Firebombing of Turkish Consul General's residence |
| 12 October | Los Angeles, United States | JCAG | Bombing of Music City Tours |
| | New York City, United States | JCAG | Bombing of Turkish mission to the United Nations |
| 1 December | Paris, France | JCAG | Bombing of British Airways, Lufthansa, and Sebena Airlines offices |
| 17 December | Sidney, Australia | JCAG | Assassination of Turkish General Consul and bodyguard |
| **1981** | | | |
| 2 April | Copenhagen, Denmark | JCAG | Attempted assassination of Turkish labor counselor |
| 13 June | Anaheim, United States | JCAG | Bombing of Anaheim convention center |
| 20 November | Los Angeles, United States | JCAG | Bombing of Turkish Consulate |
| **1982** | | | |
| 28 January | Los Angeles, United States | JCAG | Assassination of Turkish Consul General |
| 22 March | Cambridge, United States | JCAG | Bombing of Turkish Consulate |
| 8 April | Ottawa, Canada | ASALA and Armenian Liberation Front (probably linked to JCAG) | Attempted assassination of Turkish Commercial Counselor |
| 24 April | Cologne, West Germany | NAR | Attempted bombing of Turkish bank |
| | Dortmund, West Germany | NAR | Bombing of Turkish bank |
| 4 May | Boston, United States | JCAG | Assassination of the honorary Turkish consul |
| 27 May | Ottawa, Canada | JCAG | Assassination of Turkish military attache |
| 7 June | Lisbon, Portugal | JCAG | Assassination of Turkish attache and wounding of wife, who later died |
| 9 September | Burgas, Bulgaria | Combat Units of Justice Against Armenian Genocide (probably JCAG) | Assassination of Turkish administrative attache |
| 22 October | Boston, United States | JCAG | Attempted bombing of honorary Turkish Counsel (alleged member of JCAG arrested aboard aircraft in Boston) |
| **1983** | | | |
| 9 March | Belgrade, Yugoslavia | JCAG | Assassination of Turkish Ambassador to Yugoslavia |
| 14 July | Brussels, Belgium | ASALA, JCAG, and ARA | Assassination of Turkish administrative attache |
| 27 July | Lisbon, Portugal | ARA | Takeover of Turkish Embassy, which resulted in killing of hostages and deaths of five terrorists |
| **1984** | | | |
| 20 June | Vienna, Austria | ARA | Car bomb assassination of Turkish labor attache |

ª Analysis of the types and nationalities of targets, locations, and
forensic evidence indicates the NAR may also be a cover name used
by the ARF in claiming attacks against Turkish targets.

25X1

Exh. A20

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

**Figure 7**

## Attacks Linked to the Armenian Revolutionary Federation

Secret



Exh. A21

17

Secret     25X1

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

**Secret**

**Secret**

Approved For Release 2009/04/22 : CIA-RDP85S00315R000200060002-3

# EXHIBIT B

# CREW | citizens for responsibility and ethics in washington

February 18, 2009

Honorable Eric Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Honorable Douglas Shulman
Commissioner of Internal Revenue
Internal Revenue Service
U.S. Department of Treasury
1111 Constitution Ave., N.W.
Washington, D.C. 20224

Honorable Nancy Erickson
Secretary of the Senate
United States Senate
S-312
Washington, D.C. 20510

Honorable Lorraine C. Miller
Clerk of the House
U.S. House of Representatives
H-154
Washington, D.C. 20515

RE:    Prohibited Political Activity by § 501(c)(3) Organizations the Armenian National
       Committee of America-Western Region and the Armenian National Committee
       Endowment Fund; Violations of the Foreign Agents Registration Act by the
       Armenian National Committee of America and the Armenian Revolutionary
       Federation; and Violations of the Lobbying Disclosure Act by the Armenian
       National Committee of America

Dear Attorney General Holder, Commissioner Shulman, Ms. Erickson, and Ms. Miller:

Citizens for Responsibility and Ethics in Washington ("CREW") urges you to investigate the
Armenian National Committee of America-Western Region ("ANCA-WR"), and the Armenian
National Committee of America ("ANCA") Endowment Fund for violating section 501(c)(3) of
the Internal Revenue Code.  CREW further asks that you investigate ANCA and the Armenian
Revolutionary Federation ("ARF") for violating the Foreign Agents Registration Act, and
investigate ANCA for violating the Lobbying Disclosure Act.

Exh. B2

I.    Prohibited Political Activity by IRC § 501(c)(3) Tax-Exempt Organizations

Both ANCA-WR and the ANCA Endowment Fund are organized pursuant to § 501(c)(3) of the
Internal Revenue Code. Because both organizations have violated the restrictions on such
charitable organizations by "participat[ing] in, or intervene[ing] in (including the publishing or
distribution of statements), in any political campaign on behalf of (or in opposition to) any
candidate for public office," the IRS should consider whether their § 501(c)(3) tax exemption
statuses should be revoked.

As stated in IRS Newswire release IR-2008-61 of April 17, 2008, "By law, organizations exempt
from tax under Internal Revenue Code § 501(c)(3) may not "participate in, or intervene in
(including the publishing or distributing of statements), any political campaign on behalf of (or
in opposition to) any candidate for public office." According to guidance provided in IRS fact
sheet FS-2006-17, "Political campaign intervention includes any and all activities that favor or
oppose one or more candidates for public office."

ANCA-WR, based in Glendale, California, is a regional office of the ANCA, which is based in
Washington, D.C. Among other connections, the two organizations share a common director:
Steven J. Dadaian. ANC IRS Form 990 for 2006, Part V-A, March 19, 2008 (Exhibit 1). They
also share a common website: www.anca.org. According to the website, ANCA works in
coordination with a network of regional offices or chapters to advance its goals, which include
endorsing candidates for public office. http://www.anca.org/ancaprofile.php.

As a § 501(c)(3) organization, ANCA-WR is prohibited from participating in political campaign
activities and, therefore, may not endorse candidates for public office. Nevertheless, on October
24, 2008, ANCA announced its endorsements of 15 candidates for the United States Senate and
211 candidates for the United States House of Representatives. ANCA Press Release, ANCA
Announces 2008 Congressional Endorsements, October 24, 2008 (Exhibit 2). These
endorsements were published on its shared website with ANCA-WR: www.anca.org, suggesting
that ANCA was speaking for its regional offices, including ANCA-WR. Indeed, ANCA
explained in the press release that its report cards on candidates served as the foundation of its
endorsements and were "prepared in consultation with local ANCA chapters." Id. ANCA also
endorsed the Obama-Biden ticket for the presidency in a press release. ANCA Press Release,
ANCA: Obama-Biden The Right Choice for Armenian Americans, October 24, 2008 (Exhibit 3).
See e.g., http://www.youtube.com/watch?y=GC27769C17g. A Google search of the phrase,
"ANCA endorses" returns numerous additional candidate endorsements.

Thus, the public record indicates that ANCA-WR illegally "participated" with ANCA in the
endorsements of Barack Obama for President of the United States, Joseph Biden for Vice
President of the United States, 15 U.S. Senate candidates, and 211 U.S. House candidates. These
endorsements collectively constitute violations of ANCA-WR's § 501(c)(3) restrictions.

Accordingly, the IRS should investigate whether ANCA-WR improperly used tax-exempt funds to influence the outcome of federal elections in violation of its § 501(c)(3) status.

The ANCA Endowment Fund, another § 501(c)(3) organization, indirectly participated in the countless candidate endorsements of the ANCA by dint of the close financial and organizational ties between the two. The Endowment Fund and ANCA occupy the same address: 1711 N Street, N.W., Washington, D.C. 20036. See ANCA Endowment Fund IRS Form 990 for 2006, filed November 15, 2007 (Exhibit 4) and www.anca.org. The president of ANCA Endowment Fund, Keneth V. Hachikian, is also the chairman of the board of ANCA. See ANCA Endowment Fund IRS Form 990 for 2006 and ANCA website, http://www.anca.org/contact/contact_headquarters.php. The other two directors of the ANCA Endowment Fund, Secretary Aram Hamparian and Treasurer Christopher Hekimian serve respectively as executive director and chief financial officer of ANCA. Id.

Notably, in 2005 and 2006 the ANCA Endowment Fund made a $200,000 contribution to ANCA. ANCA Endowment Fund IRS Form 990 for 2005, Statement 2, filed August 29, 2008 (Exhibit 5); ANCA Endowment Fund IRS Form 990, Statement 2 (Exhibit 4). Those contributions may well have been used by ANCA in connection with the numerous candidate endorsements enumerated above. In any event, the circumstances are sufficiently troubling to justify the opening of an IRS inquiry as to whether the ANCA Endowment Fund improperly collaborated with ANCA to endorse hundreds of candidates for public office in violation of its § 501(c)(3) status.

II.    Violations of the Foreign Agents Registration Act by ANCA and ARF

The Foreign Agents Registration Act ("FARA") requires agents of foreign political parties to register with the Department of Justice and periodically report and describe their activities aimed at influencing policies of the United States. 22 U.S.C. § 611 et seq. FARA also requires certain disclosures by foreign agents in conjunction with the dissemination of information, including testimony before Congress. Id. at § 614.

The Armenian Revolutionary Federation ("ARF") is a foreign political party. See http://www.arf1890.com/A.R.F.%20Wikipedia.htm. ARF describes itself as a political party, and is registered as such in the Republic of Armenia. Id. According to its website, ARF is part of the ruling coalition government in the Republic of Armenia, holding 16 seats in the National Assembly. http://www.arf1890.com/ARF%20Members%20National%20Assembly.htm. According to the CIA, two ARF members also sit in the Lebanese National Assembly. See https://www.cia.gov/library/publications/the-world-factbook/geos/le.html#Intro.

Evidence suggests that ANCA is an agent, indeed an inseparable part, of ARF, yet it has failed to register under FARA or to make required disclosures in disseminating information. For example, in the October 22, 2005 issue of *The Armenian Weekly*, Hayg Oshagan, then-Chairman

3

of the Central Committee of the ARF for the Eastern Region of the United States, elaborated on the ANCA agency relationship:

> There are two aspects to the work that the ARF does -- political and community…In the diaspora, the effort is aimed towards Genocide recognition efforts. … Our political work is pursued by every member of the ARF, and is organized at the local level by our Gomidehs and Armenian National Committee (ANC) chapters. At the regional and national levels, these efforts are conducted through the ANC Eastern Region based in New York, and by the **ANCA offices based in Washington, D.C.** [emphasis added].

Hayg Oshagan, The Role of the ARF in the Diaspora, *Armenian Weekly*, October 22, 2005 (attached as Exhibit 6).

Mr. Oshagan, continued:

> As an example, over the last two months, we have held a protest in front of the Azerbaijan Embassy [in Washington, DC], demonstrating against warmongering by Azerbaijan's government; we have worked to bring two Genocide resolutions to the house floor for a vote; we organized a rally in front of Speaker of the House Dennis Hastert's office in Illinois, with the participation of System of a Down. We also organized and promoted a talk at Harvard University on the issue of the Genocide.

Id.

Mr. Oshagan further declared, "And so we have the Hairenik Building, the Hairenik newspaper, the Armenian Weekly, **the Armenian National Committee of America**, the local Armenian National Committee chapters, the local Armenian Revolutionary Federation chapters, the Armenian Youth Federation, the Armenian Relief Society, the Hamazkayin, the Homenetmen …." Id. [emphasis added]

The commonality amongst all is that each is an arm of the ARF.

In 2006, the *AZG Armenian Daily* published a story quoting from a purported internal study on the Armenian-American community, prepared by the U.S. Embassy in Yerevan: "The ARF's U.S.-based political advocacy arm is the Armenian National Committee of America (ANCA). ANCA is the principal political spokesperson for ARF policies in the United States." Harut Sassounian, U.S. Embassy Releases Study on Armenian-Americans, *AZG Armenian Daily*, December 23, 2006 (Exhibit 7).

Author Heather Gregg, a professor at the Naval Postgraduate School, noted the direct tie between ANCA and the ARF in her paper, *Divided They Conquer: The Success of Armenian Ethnic Lobbies in the United States* (2002). Professor Gregg explained, "The ARF cites the American

4

Committee for the Independence of Armenia (ACIA), formed in 1918, as their first lobby group. [footnote omitted]  Their current lobby organization, the Armenian National Committee of America (ANCA), evolved from the ACIA." (See http://web.mit.edu/cis/www/migration/pubs/rrwp/13_divided.html.) (Exhibit 8).

ANCA, however, has never registered under FARA.  Neither Ken Hachikian, ANCA's chairman of the board, Aram Hamparian, ANCA's executive director, Kate Nahapetian, ANCA's government affairs director, nor Raffi N. Karakashian, ANCA's legislative affairs director, (see http://www.anca.org/contact/contact_headquarters.php) have ever registered as foreign agents. Neither has ANCA filed or labeled information it disseminates in conformity with 22 U.S.C. § 614.  Nor has it complied with the required FARA disclosures under § 614(f), including instances where ANCA testified before Congress yet failed to present its required FARA filing. On July 21, 2004, for example, ANCA's Abraham Niziblian testified before the U.S. Helsinki Commission on religious freedom in the Caucuses.  According to the hearing transcript, he introduced himself without presenting the required FARA filing by ANCA: "My name is Abraham Niziblian.  I am with the Armenian National Committee of America here in Washington, D.C." http://www.csce.gov/index.cfm?FuseAction=ContentRecords.ViewTranscript&ContentRecord_i d=284&ContentType=H,B&ContentRecordType=B&CFID=3339763&CFTOKEN=92104053. ANCA's website reveals ten other occasions on which ANCA officers or employees testified without the required FARA disclosure.  http://www.anca.org/hill_staff/anca_testimony.php.

The ARF's governing body is the ARF Bureau, which is composed of 11 members, elected at the ARF World Congress, the most recent of which was held May 21-26, 2008 in Yerevan. See http://www.armenians.gr/english/index1024_en.html (Exhibit 9).  Several individuals in the U.S. represent ARF, but have failed to file as foreign agents in contravention of FARA.  Viken Hovsepian, for example, once convicted of conspiring to destroy a Turkish consulate in Philadelphia, but now a U.S. citizen (U.S. v. Hovsepian, 422 F.3d 883 (9th Cir. 2005)), is a member of the ARF Bureau, the highest executive body of the party. See http://www.armenians.gr/english/index1024_en.html (Exhibit 9).  Similarly, Hayg Oshagan, quoted above, is a professor at Wayne State University in Detroit, and also acts as a lobbying voice in the U.S. for the ARF political party.  See http://comm.wayne.edu/profile.php?id=81.

In sum, the Department of Justice should open a criminal inquiry into the failure of ANCA and its individual employees' persistent evasion of FARA compliance.  This investigation must also inquire into the failure of ARF representatives in the United States who promote the ARF's political agenda to comply with FARA.

    III.    Violations of the Lobbying Disclosure Act by ANCA

The Lobbying Disclosure Act, 2 U.S.C. § 1601 et seq., requires lobbyists to file disclosure reports with the Secretary of the Senate and the Clerk of the House.  As defined in § 1602(10),

5

"lobbyist" generally includes persons employed by clients to influence Congress or the executive branch on legislation, regulations, or nominations.

Circumstantial evidence indicates that ANCA and its current or former executive directors, government affairs directors, and legislative directors, including Executive Director Aram Hamparian, Government Affairs Director Kate Nahapetian, Legislative Affairs Director Raffi Karakashian, Abraham Niziblian, Christopher Hekimian, and other ANCA employees, have lobbied Congress and the executive branch heavily with regard to perennial congressional Armenian genocide resolutions and other legislation bearing on U.S.-Armenia, U.S.-Turkey, or U.S.-Azerbaijan relations without ever registering with the Secretary of the Senate or Clerk of the House.

In fact, ANCA has admitted to lobbying on several occasions. One article, for example, describes the numerous legislative successes of the ANCA and the Armenian Assembly of America. The two groups were responsible for: persuading nine members of the Senate Foreign Relations Committee to push the nominee for ambassador to Armenia to clarify U.S. policy on the Armenian genocide debate; persuading lawmakers to block U.S. financing for a railway that would have linked Turkey, Georgia and Azerbaijan, but not Armenia; and passage of 1992 legislation excluding Azerbaijan from a list of former Soviet republics available for U.S. aid. Julie Corwin, U.S.: Confirmation Row Shows Power of Diaspora Lobbies, *Radio Free Europe/Radio Liberty*, August 2, 2006 (http://www.rferl.org/articleprintview/1070276.html) (Exhibit 10). ANCA Executive Director Aram Hamparian specifically claimed his lobbying efforts helped lead to the removal of Armenia from a U.S. list of countries considered sources of potential terrorists, which would have required Armenians in the U.S to be photographed and fingerprinted. Id.

Similarly, in a press release, ANCA reported meeting with representatives of Sen. Bill Nelson's (D-FL) office urging his support of several specific pieces of legislation regarding reaffirmation of the Armenian genocide resolution, stronger U.S. Armenian bilateral economic and political relations, and permanent normal trade relations between the U.S. and Armenia. ANC of Florida Press Release, South Florida ANC Activists Reach Out to Elected Officials, August 17, 2004 (Exhibit 11).

A knowing violation of the registration requirement is a felony under § 1606 of the Act. In contrast, the Armenian Assembly of America, an organization that shares many of the same advocacy issues with ANCA, appears to file assiduously under the LDA.

Based on this information, CREW urges the Department of Justice to open a grand jury investigation of ANCA and its individual representatives for violations of the LDA. We similarly urge the Secretary of the Senate and the Clerk of the House to open companion inquiries.

IV.    Conclusion

The public policy issues addressed by ARF/ANCA and its related entities carry high stakes and regularly intersect with the public policy agendas of other organizations who champion different views.  While ARF and ANCA have legitimate interests in U.S. policies, they may not violate federal law in pursuit of those interests.  All public advocates must be held to the same standards and must abide by relevant disclosure requirements.  The evidence suggests, however, that ARF/ANCA-related organizations repeatedly have violated disclosure and candidate endorsement rules.  Therefore, CREW urges the Department of Justice, the Internal Revenue Service, the Secretary of the Senate, and the Clerk of the House to open investigations into possible wrongdoing by ANCA and its related entities and seek all appropriate remedies.

Thank you for your attention to this matter.

Sincerely,

Melanie Sloan
Executive Director
Citizens for Responsibility
 and Ethics in Washington

Encls.

7

31

# EXHIBIT C



goliath.the.great  5h  ···  ✕

11:25

‹  executioners_tats  ···

chris hampton

I'm 5'8" but 6'11" if I stand on my bricks
Picture maker
Relentless Tattoo
Sacramento, CA
Wednesday – Friday & Sunday
916 452 2000
relentlesstattoogallery.com
1422 28th street suite c, Sacramento, California

Follow          Message          Email          ⌄

## Let's do a favor and leave him some great reviews!



goliath.the.great  12m     •••     ✕

# An apology from the the guy that liked favors

 executioners_tats

**executioners_tats** recently on
Instagram I made an incredibly... more

  

# Photo



            

**111 likes**

**executioners_tats** recently on Instagram I made an incredibly stupid, insensitive and hurtful "joke" about the Armenian genocide. It was completely moronic and a terrible lapse in judgement on my part. I want to expressly apologize to anyone I might have offended and say I am very sorry for making a joke out of something that is most definitely NOT a joke. I truly do not believe in hate towards any culture of this world, everyone deserves to be loved equally. The comment I made (which as since been removed) did not reflect the views of anyone I work with or associate with nor does it even reflect my own views.

goliath.the.great   2h   · · ·   ✕

# @EXECUTIONERS.TAT

**We see your apology and really want to believe you. If you really want to show your sincerity please make a donation to armeniafund.org and post your receipt.**

**Armenians are very loving and forgiving people. I'm sure a kind generous gesture would receive an equally loving response.**



executioners_tats recently on Instagram I made an incredibly



goliath.the.great   2h
Donation Page
armeniafund.ejoinme.org

Thank you for your contribution to Armenia
Fund!

Armenia Fund, Inc. declares under penalty of
perjury under the laws of the United States of
America that there were no goods or services
provided as part of this donation.

@EXECUTIONERS_

regulations of the Internal Revenue Service
(IRS).

Transaction Receipt

**Donation Form**

**Donation
Amount:**          $250.00

I would like        Yes

**Thank you for being a responsible
human being and owning up to
your mistakes. We all make
mistakes, it's how we respond that
defines our character. Wish you the
best.**

**Payment Information**



## Comments

**sevook13** @orn_sogmmemvar?Bkirds

**sapphojene** Is there any fund to support the owners??

**danielbulls23** @sapicata

**armo_bountyhunters** If you have any information on any Azeris living in California, please DM us!!

**kimnazar_** Imagine how awkward it is for people who are half Turkish & half Armenian or half Azerbaijani & half Armenian

**sal_titude** And WE'RE allegedly the aggressors?? 🤦 🤦 🤦

---

## armo_bountyhunters

| 1 | 9 | 102 |
| Post | Followers | Following |

This is a page specifically made for locating any Turkish or Azeri Californians. If you know any, please feel free to DM us. You will remain anonymous

**Follow**      **Message**

# EXHIBIT D

IN THE COUNTY COURT OF VICTORIA
AT MELBOURNE
COMMON LAW DIVISION
DEFAMATION LIST

| | |
|---|---|
| Revised |
| Not Restricted |
| Suitable for Publication |

Case No. CI-21-01623

KHURAMAN ARMSTRONG                                    Plaintiff

v

YULIA ASSATRYAN                                    First Defendant

and

ANNA GABRIELYAN                                    Second Defendant

and

KATYA KAHRAMANIAN                                    Fifth Defendant

---

| | |
|---|---|
| JUDGE: | HER HONOUR JUDGE CLAYTON |
| WHERE HELD: | Melbourne |
| DATE OF HEARING: | 8, 9 and 10 November 2022 |
| DATE OF JUDGMENT: | 30 March 2023 |
| CASE MAY BE CITED AS: | Armstrong v Assatryan & Ors |
| MEDIUM NEUTRAL CITATION: | [2023] VCC 7 |

**REASONS FOR JUDGMENT**
---

| | |
|---|---|
| Subject: | DEFAMATION |
| Catchwords: | Defamation – Injurious falsehood – Publications on Facebook – Conflict between Armenia and Azerbaijan – Grapevine effect – Defence of truth – Offer to make amends – Defence of fair comment and honest opinion – Defence of qualified privilege – Defence of reply to attack – Defence of triviality – Damages – Non-pecuniary loss – Medical expenses – Business losses – Mitigation – Apology – Settlement of other claims – Republication by plaintiff – Aggravation |
| Legislation Cited: | *Defamation Act* 2005, s18, s25, s30, s31, s38 |
| Cases Cited: | *Lange v Australian Broadcasting Corporation* (1997) 189 CLR 520; *Hockey v Fairfax Media Publications Pty Ltd* (2015) 237 FCR 33; *Morgan v Odhams Press Ltd* [1971] 1 WLR 1239; *Charan v Nationwide News Pty Ltd* [2018] VSC 3; *Charan v Nationwide News Pty Ltd* [2019] VSCA 36; *Zoef v Nationwide News Pty Ltd* [2016] NSWCA 283; *Wilson* |

*v Bauer Media Pty Ltd* [2017] VSC 521; *Belbin & Ors v Lower Murray Urban and Rural Water Corporation* [2012] VSC 535; *Lower Murray Urban and Rural Water Corporation v Di Masi; Lower Murray Urban and Rural Water Corporation v Belbin; Lower Murray Urban and Rural Water Corporation v Marciano* (2014) 43 VR 348; *Carson v John Fairfax & Sons Ltd* (1993) 178 CLR 34; *Uren v John Fairfax & Sons Pty Ltd* (1965) 66 SR (NSW) 223; *Thompson v Australian Capital Television Pty Ltd & Ors* (1997) 129 ACTR 14; *Wagner & Ors v Harbour Radio Pty Ltd & Ors* [2018] QSC 201; *Praed v Graham* (1889) 24 QBD 53; *Broome v Cassell & Co Ltd* [1972] AC 1027; *Cerutti & Anor v Crestside Pty Ltd & Anor* [2014] QCA 33; *Triggell v Pheeney* (1951) 82 CLR 497; *Polias v Ryall* [2014] NSWSC 1692; *Sierocki v Klerck (No 2)* [2015] QSC 92; *Graham v Powell (No 4)* [2014] NSWSC 1319

| | |
|---|---|
| Judgment: | Judgment for the plaintiff against the first, second and fifth defendants. |

---

| APPEARANCES: | Counsel | Solicitors |
|---|---|---|
| For the Plaintiff | Ms P Wakhlu | Australian Law Partners |
| For the First Defendant | The first defendant appeared in person | - |
| For the Second Defendant | No appearance | - |
| For the Fifth Defendant | No appearance | - |

HER HONOUR:

### Introduction

1    Mrs Armstrong sells chocolate online through her business 'Enjoy Dark Chocolate'.
She promotes her business through her 'Khuraman Armstrong' Facebook page
("plaintiff's business page") and 'Kay Abdullayeva' Facebook page ("plaintiff's
personal Facebook page").

2    She sues the defendant, Mrs Assatryan, for defamation and injurious falsehood
over six posts in July and October 2020 on those Facebook pages, and one on
another site "Russian Women's Network Facebook Page".

3    Mrs Armstrong says Mrs Assatryan has never been a customer of her chocolate
business and made the comments maliciously and to cause damage, and as a
result she has suffered harm to her reputation, psychological injury, and significant
financial loss.

4    Mrs Assatryan denies the comments carry the imputations pleaded, but says if
they do, she has available a number of defences:

    (a)    offer to make amends;

    (b)    truth or contextual truth;

    (c)    fair comment and honest opinion;

    (d)    qualified privilege (*Lange* defence[1] and reply-to-attack);

    (e)    triviality.

5    She also says Mrs Armstrong has failed to mitigate her own loss.

6    The issues in this case are:

Exh. D4

---

[1]    *Lange v Australian Broadcasting Corporation* (1997) 189 CLR 520

(a)  whether the posts carry the pleaded imputations;

(b)  whether, in the particular context in which they were published, the imputations would lower Mrs Armstrong's reputation amongst reasonable members of the community;

(c)  whether Mrs Assatryan can make out any defence;

(d)  whether, if the publications are defamatory, they have caused the business loss and other pecuniary loss claimed, or, in the alternative, whether Mrs Armstrong has made out a claim in injurious falsehood arising from false statements by Mrs Assatryan;

(e)  in what sum should damages be assessed.

7    For the reasons that follow I am satisfied:

(a)  the posts carry the pleaded imputations and are defamatory of Mrs Armstrong.

(b)  Mrs Assatryan has not made out any defence.

(c)  Mrs Armstrong has not made out her claim in injurious falsehood.

(d)  Mrs Armstrong has not established that Mrs Assatryan's posts caused her business loss or other pecuniary loss, and has not established the posts were the cause of her psychiatric condition.

(e)  Mrs Assatryan must pay Mrs Armstrong damages for defamation in the sum of $70,000 which includes aggravated damages.

8    Mrs Armstrong also sued a number of other people, and settled some of those claims.

9    Judgment was entered against the second defendant, Ms Anna Gabrielyan, on 18 October 2022, with damages to be assessed.  Judgment was entered against the

fifth defendant, Ms Katya Kahramanian, on 18 October 2022, with damages to be assessed.

10    For the reasons that follow, Ms Gabrielyan is ordered to pay Mrs Armstrong the sum of $25,000 and Ms Kahramanian is ordered to pay Mrs Armstrong the sum of $30,000.

## Background

11    Mrs Armstrong was born in Azerbaijan, a former republic of the Soviet Union.

12    Mrs Armstrong met her first husband, an Australian, in 2003. She moved with him to Brisbane in 2005 and became an Australian citizen in 2009.

13    Mrs Armstrong worked in various occupations and moved to Melbourne in 2013, where she registered "Enjoy Dark Chocolate" in 2015.

14    In 2017, she left her job to work full time in her chocolate business. She was not a chocolatier herself and relied on hiring professional chocolatiers to make her product. She concentrated on product development, marketing and distribution.

15    Mrs Armstrong's businesses and marketing are primarily targeted at the Russian-speaking community.

16    Mrs Armstrong had an active social media presence on the "Russian Women's Network Melbourne" Facebook group.

17    She also created and managed a Facebook group titled "Global Storytellers Meetup Group" in August 2020. She says the goal of the group was "online networking and business promotion, and also supporting people from different cultural backgrounds".[2]

18    Mrs Assatryan is from an Armenian background. She represented herself at trial, with her daughter acting as a McKenzie friend.

---

[2]    Joint Court Book ("JCB") 113

Exh. D6

19    In October 2018, Mrs Armstrong began selling a chocolate she had created which she named "Echoes of Shusha". Her grandfather was from the city of Shusha, in the Nagorno-Karabakh region. The Nagorno-Karabakh region has been disputed territory between Azerbaijan and Armenia for many hundreds of years. On occasion that dispute has given rise to war between those countries. In mid-2020 the dispute once again escalated to armed conflict between Azerbaijan and Armenia. Both sides suffered military and civilian casualties. Parts of the region which had been under Armenian control since the 1990s came under the control of Azerbaijan as a result of this conflict. It was in the context of this armed conflict that most of the posts were published.

20    Mrs Armstrong says she decided to call her chocolate "Echoes of Shusha":

> "... not as a political statement about the continuing occupation of the region, but based on my own childhood memories of the stunning landscapes of this region, where my family was from, and which combined rolling green hills and terracotta rooftops, reflecting the colours of my new chocolate creation."[3]

21    Mrs Armstrong was featured on an episode of an online television program "Russian Influence" (now known as "Foreign Influence"), where she says she discussed Azerbaijani cooking and culture and her chocolate business.

22    On 23 July 2020, Ms Elina Reddy, the producer of the television program, posted a trailer promoting the upcoming episode on the "Russian Women's Network Melbourne" Facebook group. The episode was aired on Russian Influence's YouTube Channel and on Channel 31 in Melbourne and Geelong on 27 July 2020, and on Foxtel Aurora on 26 August 2020.

**The publications**

23    In July 2020, Mrs Assatryan posted a comment in response to Ms Reddy's post on the Russian Women's Network Facebook page, saying that Mrs Armstrong's chocolates are "full of poison and crime".[4]

---

3    JCB 114
4    JCB 47, FASOC 3(a)                          Exh. D7

24    In October 2020, Mrs Assatryan published four comments in reply to posts on the plaintiff's personal Facebook page.  These included the following statements:

(a)    Mrs Armstrong should "stop mediating and supporting international terrorism" and "be in jail for inciting ethnic hatred and nationalist attacks!";[5]

(b)    Mrs Armstrong "is an open criminal person", and "poisons our Australian citizens with expired products which causes allergy and indigestion" and "deliberately makes these chocolates to harm our beautiful Australia!";[6]

(c)    Mrs Armstrong "poison[s] people" and is a "criminal and international terrorist!";[7] and

(d)    Mrs Armstrong's intentions are "nationalism and international terrorrise!" [sic], and that "chocolate has nothing to do with her source of living!".[8]

25    Ms Assatryan posted two comments in response to recommendations made on the plaintiff's business page.  In response to the recommendation of Elena Sperring posted on 7 October 2020, Mrs Assatryan posted that Mrs Armstrong "uses her chocolate for political reasons" and "poisons people" with "awful", "expired" and poisonous chocolates.[9]  In response to a review of Alexia Beau posted in October 2020, Mrs Assatryan posted that Mrs Armstrong is a "terrible person" and "will be jailed as an international terrorist!".[10]

**Are the pleaded imputations conveyed by the publications?**

26    Mrs Armstrong pleads the publications conveyed that she:

(a)    is a terrible person;

(b)    is a criminal;

---

5    JCB 41, FASOC 2(b)
6    JCB 42, FASOC 2(e)
7    JCB 43, FASOC 2(f)
8    JCB 44, FASOC 2(g)
9    JCB 45, FASOC 3(a)
10   JCB 46, FASOC 3(b)                                    Exh. D8

(c)    is an international terrorist;

(d)    sells chocolates as a front for international terrorism;

(e)    is a liar;

(f)    sells poisonous chocolates;

(g)    sells chocolates that cause allergies and indigestion;

(h)    sells her chocolates for the purpose of poisoning people; and/or

(i)    sells expired products.

27    The principles in relation to whether the imputations are conveyed are well settled.
The question is whether an ordinary reasonable reader would understand the
matters complained of in the defamatory sense pleaded.[11] An ordinary reasonable
reader is one who draws inferences and conclusions and may engage in a certain
amount of 'loose thinking'.[12] They are not lawyers and do not look for hidden
meanings, or adopt a strained interpretation.  They have ordinary intelligence,
experience and education and are not suspicious or avid for scandal.  The ordinary
reader does not look at the matter complained of in isolation but considers the
whole context.

28    I must consider the sting of the publication in the eye of the reasonable reader of
the publications and avoid the "trap of parsing and analysing each sentence or
paragraph"[13] to see whether the publication as a whole conveyed the alleged
imputations.

29    Ms Assatryan denies that any of the imputations were conveyed, apart from the
imputation that Mrs Armstrong is a liar.

Exh. D9

---

11    *Hockey v Fairfax Media Publications Pty Ltd* (2015) 237 FCR 33 at 49-50, paragraphs [63]-[65]
12    *Morgan v Odhams Press Ltd* [1971] 1 WLR 1239 at 1245
13    *Charan v Nationwide News Pty Ltd* [2018] VSC 3 at paragraph [35]

30    In her posts Mrs Assatryan says that Mrs Armstrong is an "open criminal person".
I take this to mean Mrs Armstrong is 'openly' criminal . Mrs Assatryan says Mrs
Armstrong is an international terrorist who incites ethnic hatred and nationalist
attacks. Both those statements would, in the eyes of an ordinary reasonable
reader, convey an imputation that Mrs Armstrong is a terrible person.

31    The words "chocolate has nothing to do with her source of living" carry an
implication that she has some other source of income. It comes after a statement
that her real intention is nationalism and international terrorism. Viewed in the
context of the publication as a whole with the comments that Mrs Armstrong is a
criminal and an international terrorist and followed by a comment that Mrs
Armstrong uses her chocolate for political purposes, a reasonable reader would
infer that the chocolate business is a front for international terrorism.

32    The imputation that Mrs Armstrong is a liar is not in dispute. The other imputations
which disparage her chocolates are clearly made out on the face of the words
published.

33    Therefore, I am satisfied that the imputations as pleaded arising from the first
defendant's publications are conveyed.

**Are the meanings conveyed defamatory?**

34    The next question is whether any of those imputations are defamatory. Words are
defamatory when the imputation lowers the person's reputation in the eyes of
reasonable members of the community, or causes the person to be ridiculed,
shunned or avoided by members of the general public.[14]

35    Ms Assatryan admitted that, other than the imputation that Mrs Armstrong is a liar,
the imputations were untrue. She did not submit that the imputations were not
defamatory, and it is plain that the imputations are defamatory, in that they would

---

14    *Charan v Nationwide News Pty Ltd* [2018] VSC 3 (upheld on appeal in *Charan v Nationwide News Pty
Ltd* [2019] VSCA 36)

tend to hold up the plaintiff to hatred and ridicule and lower her reputation in the eyes of her peers.

**Has Mrs Assatryan made out any defence?**

**Truth**

36    The first defendant relies on a defence of justification pursuant to s25 of the *Defamation Act* 2005 and at common law.

### *Was the imputation that Mrs Armstrong is a liar true?*

37    Mrs Assatryan says the imputation that Mrs Armstrong is a liar is true because Mrs Armstrong says she is not political, but her posts were, in fact, political. She points to the following:

(a)    In a post on her Enjoy Dark Chocolate Facebook page on 17 October 2020, Mrs Armstrong refers to her "peaceful and non-political personal and business Facebook pages".

(b)    Her post on 10 October 2020 on the Enjoy Dark Chocolate Facebook page says:

> "At the time I launched my chocolate I avoided any direct reference to the fact that Shusha, along with 20% of Azerbaijan, has been under illegal occupation of Armenia for almost 30 years.
>
> ....
>
> ... the dedication of my chocolate reflected the deep connection Azerbaijanis still feel for their lands and the collective hurt that this unresolved occupation causes our country.
>
> I share this today, not to comment directly on the current war to liberate Azerbaijani lands, but rather to acknowledge the hurt that all unresolved occupation causes the rightful traditional owners of all occupied lands."[15]

(c)    Mrs Armstrong included hashtags at the bottom of her post:

> "#Shusha #KarabakhisAzerbaijan #enjoydarkchocolate #azerbaijan."

---

38    Mrs Assatryan says references to "occupation" and the hashtag "#KarabakhisAzerbaijan" are inherently political statements in the context of an ongoing dispute between Armenia and Azerbaijan.

39    Mrs Assatryan says the hashtags used by Mrs Armstrong would, if clicked on by a reader, lead to anti-Armenian websites. These hashtags show that Mrs Armstrong "entered the fray" and she cannot maintain a claim that her pages are non-political and peaceful. To say she is non-political and peaceful is false and renders Mrs Armstrong a liar.

40    Mrs Armstrong disputed, at trial, that the statement "Karabakh is Azerbaijan" is a political statement, because, she said, Karabakh *is* Azerbaijan. Mrs Armstrong pointed to United Nations' declarations in relation to the region to support her position. She said her comments were both diplomatic and non-confrontational.

41    Mrs Assatryan says this demonstrates the political nature of Mrs Armstrong's statements, as the region is hotly contested and has been hotly contested for hundreds of years. Any assertion of sovereignty is an inherently political statement and cannot be considered simply a statement of fact.

42    Mrs Assatryan also relied on the content of the television program featuring Mrs Armstrong. In that program, Mrs Armstrong spoke about the food and culture of Azerbaijan. During that program, a map of Azerbaijan was shown which showed the disputed Nagorno-Karabakh region labelled "occupied territory". Mrs Assatryan says this is a political statement. Mrs Armstrong says the map was a United Nations' map.

43    It is common ground between the parties that the issue of Nagorno-Karabakh is sensitive. It is not difficult to understand why saying "Karabakh is Azerbaijan" would be considered by Mrs Assatryan to be a political statement or why Mrs Armstrong's reference to "their lands" when promoting her Echoes of Shusha chocolate would be considered inflammatory by some.

44    It is also not difficult to understand why Mrs Armstrong would consider those statements to be factual and uncontroversial.   One can think of numerous examples where one person's statement of "simple fact" is another person's hotly contested and controversial view.

45    I do not accept that a person who holds a controversial opinion, or expresses a political view, but denies that such an opinion is controversial, or such view is political, is necessarily a liar.   A liar must be someone who does more than say something with which other people do not agree or which others consider to be false.

46    A liar is more, even, than someone who is found to have spoken a mistruth.   There must be an intent to mislead or deceive.   Inadvertent mistruths or differing ideas about what words mean does not amount to lying.

47    Mrs Armstrong may have been naive in thinking her views about Nagorno-Karabakh were simple statements of fact.   Mrs Armstrong may even be disingenuous in maintaining that her position is not in any way political.   Possibly the echo chambers in which we all now tend to operate, particularly online, caused her to genuinely believe that, in the period immediately before and during an armed conflict, such views were not political statements.   Likely her belief that she was non-political and peaceful represented wishful thinking.

48    However, naivety, disingenuousness or wishful thinking are not the same as deception, or intent to mislead.

49    There is nothing in the evidence that leads me to conclude that Mrs Armstrong is a liar.

50    Therefore, the defence of truth in relation to the imputation that Mrs Armstrong is a liar is not made out.

**_Did the posts carry a contextual imputation which was substantially true?_**

51    It is a defence to the publication of defamatory matter if the defendant proves that
      the matter carried one or more imputations that are substantially true (the
      contextual imputations) and the defamatory imputations of which the plaintiff
      complains do no further harm to the plaintiff's reputation because of the substantial
      truth of the contextual imputations.

52    Mrs Assatryan says her comments carried the contextual implication that the
      plaintiff was promoting an aggressor country, Azerbaijan, and that contextual
      imputation was substantially true.   By reason of the substantial truth of the
      contextual imputation, each of the imputations pleaded by the plaintiff and found
      to be defamatory do not further harm her reputation.

53    Mrs Assatryan says that Mrs Armstrong posted comments and a video after 27
      September 2020 which were all "strongly supportive of and promoting the position
      of Azerbaijan which, on 27 September 2020 had launched an aggressive military
      offensive into Armenian occupied territory".   She pleads that reports at the time
      included "fears that … Azerbaijan would attempt to ethnically cleanse the Nagorno-
      Karabakh of ethnic Armenians, thus increasing the seriousness of the contextual
      imputation".

54    No submissions were advanced in support of this pleading.  It is not apparent how
      Mrs Assatryan argues that the comments carried the contextual imputations
      pleaded.

55    Doing the best I can, I understand the defence to be that, by saying "Karabakh is
      Azerbaijan", and by using the words "occupied" in relation to Armenian control of
      the region, Mrs Armstrong was supporting Azerbaijan in the conflict.  From Mrs
      Assatryan's perspective, Azerbaijan was the "aggressor" in the 2020 conflict and
      therefore Mrs Armstrong was promoting an aggressor country.

56    To find that the imputations were substantially true, it would be necessary to:

    (a)   accept that Azerbaijan was an aggressor country; and

    (b)   Mrs Armstrong's statements were promoting an aggressor country; and

    (c)   the comments posted by Mrs Assatryan carried imputations that Mrs Armstrong was promoting an aggressor country.

57    It is not necessary to make these findings because, even if it is correct that the imputations conveyed a meaning that Mrs Armstrong promoted an aggressor country, this cannot be said to do no further harm to her reputation.

58    Imputations that she is a criminal, a terrorist and sells poisonous chocolate are clearly more serious than an imputation that she "promotes an aggressor country" which is vague, ill-defined and would not necessarily carry a defamatory meaning.

59    In any event, I do not accept that the imputations pleaded carry a contextual imputation that Mrs Armstrong promotes an aggressor country. Four of the posts relate to the chocolate Mrs Armstrong sells. Two of the posts relate to personal characteristics (that she is a terrible person and a liar) and two relate to terrorist activity. None of these imputations could be said to carry the contextual meaning pleaded.

60    Therefore, the defence of contextual truth is not made out.

### Was the offer of amends reasonable in all the circumstances?

61    Section 18 of the *Defamation Act*, at the relevant time provided:[16]

> "Effect of failure to accept reasonable offer to make amends
>
> (1)   If an offer to make amends is made in relation to the matter in question but is not accepted, it is a defence to an action for defamation against the publisher in relation to the matter if—
>
>     (a)   the publisher made the offer as soon as practicable after becoming aware that the matter is or may be defamatory; and

Exh. D15

---

[16]   This section has subsequently been amended

(b)   at any time before the trial the publisher was ready and willing, on acceptance of the offer by the aggrieved person, to carry out the terms of the offer; and

(c)   in all the circumstances the offer was reasonable.

(2)   In determining whether an offer to make amends is reasonable, a court—

   (a)   must have regard to any correction or apology published before any trial arising out of the matter in question, including the extent to which the correction or apology is brought to the attention of the audience of the matter in question taking into account—

      (i)   the prominence given to the correction or apology as published in comparison to the prominence given to the matter in question as published; and

      (ii)   the period that elapses between publication of the matter in question and publication of the correction or apology; and

   (b)   may have regard to—

      (i)   whether the aggrieved person refused to accept an offer that was limited to any particular defamatory imputations because the aggrieved person did not agree with the publisher about the imputations that the matter in question carried; and

      (ii)   any other matter that the court considers relevant."

62    Ms Assatryan says she first became aware of the proceeding when served with the writ on 23 April 2021. She was not provided with a concerns notice. She made an offer of amends on 8 June 2021, and further offers on 2 August 2021 and 30 May 2022. She filed her defence on 9 June 2021 and therefore the first offer on 8 June 2021 is the only offer relevant to the defence.

63    The offer of amends on 8 June 2021 was to publish a correction, an apology and pay "expenses reasonably incurred" relating only to the claim against Mrs Assatryan. No sum of money for expenses was specified.

64    Ms Assatryan says the offer was a reasonable offer in all the circumstances, which include:

(a)   that her comments were directed at political comments by Mrs Armstrong, and plainly related to her political position, not to her chocolate;

(b)   that the comments were published on Facebook pages primarily frequented by Russian speakers who would have familiarity with the issues as between Armenia and Azerbaijan and would likely have entrenched views about the issue;

(c)   that Mrs Armstrong made comments and used hashtags that were inflammatory to Armenian people, and linked to anti-Armenian pages, at a very sensitive time; and

(d)   the fact that Mrs Assatryan had a number of defences available to her including honest opinion and privilege defences.

65   Mrs Assatryan also says the offer was reasonable, having regard to her own circumstances as a pensioner with no income or assets. The financial component of the offer was to be paid by her daughters who are young women of limited means, and she had no capacity to make a higher offer.

66   Mrs Armstrong says this offer was not reasonable. The offer did not include compensation for any loss she had suffered. In any event, the amount offered was inadequate.

67   *Zoef Nationwide News Pty Ltd*[17] establishes that the adequacy of the monetary offer is not to be judged by reference to the range of damages that the plaintiff would receive at trial but is to be informed by the seriousness of the defamation and the other components of the offer, including any apology, and the fact that acceptance of it would have made amends and obviated the need for a trial, and the risks of the proceeding being successful, taking into account the defences raised by the defendant.

Exh. D17

---

[17]   [2016] NSWCA 283 at paragraph [74]

68    The imputations conveyed were of serious criminal conduct. The financial component of the offer did not include any offer of compensation. Had the offer made any provision for compensation it may have amounted to a reasonable offer which might then have given rise to a defence. However the absence of any compensatory element to the offer means it falls short of being a reasonable offer in all the circumstances.

69    It therefore it does not constitute a defence.

**Fair comment and honest opinion**

70    The elements of the defence of fair comment are:

   (a)    that the comment must be recognisable as an expression of comment and not a statement of fact;

   (b)    the comment must be based on fact, truly stated or referred to in the matter complained of or in other proper material;

   (c)    the comment must relate to a matter of public interest; and

   (d)    the comment must satisfy the test that a fair-minded person could honestly express that opinion on the proved facts.[18]

71    Ms Assatryan says her comments were an expression of opinion which related to a matter of public interest, and she is entitled to a defence of fair comment at common law and honest opinion pursuant to s31 of the *Defamation Act*.

72    In support of her defence, Mrs Assatryan pleads that Mrs Armstrong had made political comments that contained lies. In the television program, she lied about the origins of Gata Karabakh Kata, which Mrs Assatryan pleads is an Armenian dish. This amounts to stealing Armenian recipes which is both a political act and a matter of public interest.

Exh. D18

---

[18]    *Defamation Law in Australia* (3rd edition), Patrick George, page 506

73    However, the comment or opinion must be based on facts truly stated and must satisfy the objective test.

74    Ms Assatryan's publications do not satisfy either of these requirements. The facts do not support her forming the opinion that Mrs Armstrong is a criminal, an international terrorist or runs her business as a front for international terrorism. Mrs Assatryan has never been a customer of Mrs Armstrong's and there is no basis upon which she could form an honest opinion about the quality of chocolates Mrs Armstrong sells.

75    The cases recognise that an opinion may be exaggerated, biased, prejudiced or wrong.

76    However, the evidence in this case does not support a finding that Mrs Assatryan held an honest opinion that Mrs Armstrong was a criminal or a terrorist. Mrs Assatryan conceded that she did not consider Mrs Armstrong was a criminal or terrorist. Mrs Assatryan says her comments were clearly aimed at Mrs Armstrong's political opinions and not her chocolates, but she directed comments specifically to the quality of Mrs Armstrong's chocolate. A fair-minded person could not honestly express the opinions in the publications.

77    The defences of fair comment or honest opinion fail.

**Privilege**

78    Ms Assatryan also pleads defences of qualified privilege. She says her publications were of and concerning government and political matters and were reasonable in the circumstances. In her defence she pleads that the fact that the subject concerned government and political matters relevant to Australians can be inferred from speeches of Australian politicians Paul Fletcher and Trent Zimmerman at the time.

79    Ms Assatryan says, in the alternative, they were published on an occasion of privilege as a reply-to-attack as Mrs Armstrong was attacking Armenia and Armenians such as herself.

80    Finally, she pleads defences of common law and statutory qualified privilege under s30 of the *Defamation Act*.

81    Ms Assatryan made no submissions and put no evidence in relation to any of these defences.

### Were the matters complained of comments in relation to a government or political matter?

82    It is not clear how Mrs Assatryan says her comments were in the furtherance of a government or political matter.  The fact that people within Australia, including politicians, have an interest in Nagorno-Karabakh does not mean comments about Mrs Armstrong's personal characteristics, chocolate or supposed terrorist links become matters that would attract this privilege.

83    Even if I were to accept that the publications were political comments, Mrs Assatryan's conduct in publishing the publications was not reasonable.  The defence fails.

### Were the matters complained of published as a reply to attack?

84    There was no evidence of an attack on Mrs Assatryan.  Mrs Assatryan pleads that Mrs Armstrong had generally attacked Armenians in her posts.  Even if that is true, that is not an attack that would enliven the defence, which requires the individual to have been attacked.

85    However, I do not accept that Mrs Armstrong's posts constituted an attack on Armenia or Armenians.

***Were the matters complained of published on an occasion of qualified privilege?***

86    Ms Assatryan did not adduce evidence to establish who the recipients of the publications were or why they had an interest in having the information. The publications were on public Facebook pages to the world at large. The recipients of the publications may have included those with an interest in Azerbaijan, Armenia, chocolate, Russia, skincare, Mrs Armstrong's friends and family, and others.

87    It is not clear why any of these people would have an interest in the information. However even if I accepted that some of these people would have the requisite interest, I cannot be satisfied that all of the people who received the information would have such an interest.

88    The common law defence of qualified privilege fails as Mrs Assatryan has not established the privileged occasion.

89    The statutory defence of qualified privilege requires, in addition to demonstrating that the recipients had an interest in having the information and that the information was published in the course of providing that information, that Mrs Assatryan behaved reasonably in all the circumstances.[19] She must prove her conduct was reasonable in all the circumstances. She has not done so. The defence fails.

**Triviality**

90    Ms Assatryan says the publications were:

    (a)    uploaded among a flurry of other serious comments and posts made by others;

    (b)    posted in the context of a war;

    (c)    in response to obviously controversial posts of the plaintiff supporting the other country in that war;

---

[19]    *Defamation Act* 2005 (Vic), s30                Exh. D21

(d)    able to be easily and quickly removed by Mrs Armstrong;

(e)    likely only seen by a few people who were likely to already have strong views themselves;

(f)    likely to be seen by people who understand the emotional and partisan nature of the points of views expressed;

(g)    unlikely to have changed anyone's perception of the plaintiff.

91    The onus rests on a defendant to prove that the circumstances of publication mean a plaintiff would be unlikely to sustain any harm.

92    The Court must consider the circumstances of the publication, not just the likelihood that the words themselves could cause harm. Serious imputations might not cause harm if publication of those imputations is to a small group of people who all know the plaintiff well and do not believe the allegations.

93    Mrs Assatryan made submissions but did not put on any evidence to support her claim that the circumstances of the publication mean it is unlikely Mrs Armstrong would sustain *any* harm.

94    There is no evidence that publication was confined to those who were aware of the Armenian and Azerbaijan conflict.

95    The assertion that Mrs Armstrong could have quickly removed the posts is refuted by Mrs Armstrong, who says on Facebook business pages she does not have the capacity to remove publications expressed as "reviews". She gave evidence that this limitation was known by Mrs Assatryan, who encouraged others to leave "reviews" rather than "comments" so as to avoid Mrs Armstrong deleting posts.

96    I accept Mrs Armstrong's evidence that reviews cannot be removed by the operator of the page.

97   Mrs Assatryan has not established the publications were unlikely to cause any harm and, accordingly, the defence fails.

**Injurious falsehood**

98   Mrs Armstrong makes a claim in injurious falsehood for losses sustained to her business.

99   Mrs Armstrong must prove:

(a)   Mrs Assatryan made false statements of or concerning the plaintiff's business or goods; and

(b)   published those statements to a third person; and

(c)   was motivated by malice which can include an intention to cause harm of the kind suffered; and

(d)   as a result, she has suffered actual loss caused by false statements.

100   In this case, Mrs Armstrong would need to prove that the financial loss she sustained to her business, Enjoy Dark Chocolate, was caused by the falsehoods contained in the publications.

101   Mrs Armstrong has established that the statements were false. The statements that her business was a front for international terrorism, and that her chocolates are poison, cause allergies and indigestion and are expired are self-evidently statements concerning Mrs Armstrong's goods or business.

102   I am satisfied on the evidence that Mrs Assatryan was motivated by malice, in that she intended to cause harm to Mrs Armstrong in order to ensure her views about the conflict in Nagorno-Karabakh were "shouted down" or punished.

103   However, Mrs Armstrong must also prove that the actual loss she claims arose from the particular false statements of Mrs Assatryan, and not from the social media attack more generally.

Exh. D23

104   This would require evidence that:

    (a)   The business lost sales or customers because the false statements caused people to be so concerned by allegations of terrorism or the quality of Mrs Armstrong's chocolate that they declined to buy chocolate from her; or

    (b)   the false statements caused potential customers to be so concerned about the quality of her chocolate or her customer service that they declined to buy chocolate from her; or

    (c)   her inability to retain a chocolatier was a direct result of the false statements; or

    (d)   Mrs Armstrong was unable to continue running her business because of the false statements concerning her goods and business.

105   The raw data provided by Mrs Armstrong and the evidence of Mr Armstrong demonstrates the decline in sales to the business.

106   It is apparent that there were a number of factors that caused Mrs Armstrong's business loss:

- the COVID-19 pandemic,

- the difficulty obtaining the services of a chocolatier

- her belief that she was facing an overwhelming social media attack

- her mental health and her capacity to run the business.

***Did Mrs Armstrong have difficulty sourcing a chocolatier because of the false statements?***

107   I cannot be satisfied that the inability to source a chocolatier was caused by the false statements.

108    Mrs Armstrong said that after the COVID lockdowns ended in September 2020
       she had secured the services of a chocolatier.  She says what she describes as
       "the trolling attack" caused her to cease production while she dealt with the attacks
       and the effects they were having on her.

109    Mrs Armstrong relied on a chain of email correspondence with Melbourne Bush
       Foods, with whom Enjoy Dark Chocolate had been having discussions about
       outsourcing chocolate production.  The documents do not support a claim that the
       social media attacks generally, or any false statements by Mrs Assatryan, had any
       impact on Melbourne Bush Foods' decision not to partner with Enjoy Dark
       Chocolate.  It appears from the documents that Melbourne Bush Foods did not
       commit to production with Enjoy Dark Chocolate.

110    Later, in July 2021, Enjoy Dark Chocolate entered into discussions with another
       chocolatier 'Arno'.  These discussions did not result in Arno working with Enjoy
       Dark Chocolate, but again, there is no evidence that this was a result of any
       statements by Mrs Assatryan, nor a consequence of the social media attack more
       generally.  Instead, it appears Arno did not agree to the terms proposed by Mr
       Armstrong and both parties decided not to go into partnership.

111    Mrs Armstrong relied on various other email exchanges with chocolatiers, and
       various advertisements in relation to her attempts to secure a chocolatier.  None
       of that assists her in establishing that any potential chocolatier knew about the
       false and misleading statements of Mrs Assatryan, or the social media attack more
       generally, let alone establishes that either of those things was the reason for her
       difficulty in securing a chocolatier.

112    It appears, rather, that the terms of the arrangement offered by the business were
       not satisfactory to the potential chocolatiers.

113    I am not satisfied that the false statements caused Enjoy Dark Chocolate to be
       unable to engage a chocolatier.

*Did customers stop ordering from Enjoy Dark Chocolate because of the false statements?*

114   There is no evidence that customers stopped ordering chocolates because of the false statements.

115   Mrs Armstrong gave evidence that she was questioned about why Mrs Assatryan had made those comments and even years after they were posted people still raised them with her.  That is not the same as people indicating they no longer purchased chocolates because of the statements.

116   There is no evidence from which I can draw an inference that the statements caused people to stop ordering chocolates.

117   In fact, the evidence demonstrates that the chocolates were not available for order, and this was a cause of disappointment.

118   For example Saverio Motta, a former client of Enjoy Dark Chocolate, gave evidence by affidavit:

> "1.   I am a former client of Enjoy Dark Chocolate.  In my capacity as Sales Manager for Readify/Telstra Purple I made Christmas purchases from Enjoy Dark Chocolate in 2017 and 2018 worth approximately $10,000 in each year.  A copy of some of the invoices are at pages 5 and 6 of the bundle exhibit to this my affidavit.
>
> 2.   In late October 2020 I again contacted Khuraman Armstrong with the view of providing EDC chocolate gift boxes to my clients as presents for Christmas 2020.
>
> 3.   I was disappointed to hear that wasn't possible given the wonderful customer service, the quality products, and the positive feedback from my clients that I had received over the prior years.
>
> 4.   I was even more saddened when Khuraman explained to me that the reason why she could no longer supply us chocolates was because of the impact of the online attacks upon Khuraman by various people that were unknown to her on her Facebook page. I know from previous conversations with Khuraman that the Christmas lead up was the busiest time for their chocolate sales."[20]

119   Elena Ponomareva gave evidence and relied on an affidavit in which she exhibited a comment she had posted in response to Mrs Assatryan.  She noted in that post

---

Exh. D26

'your chocolate is seriously the top quality, the best experience I've ever had and I'm not alone complaining about the lockdown simply because you are forced to stop production'.

120    I do not accept that customers stopped placing orders because of the false statements.

### Were the false statements responsible for Mrs Armstrong's mental state and inability to continue her business?

121    Mrs Armstrong says:

> "On 23 July 2020 even before the show aired, hate comments from Armenian group members started to appear on the Russian Women's Network Melbourne Facebook page...
>
> One of these comments was made by the first defendant
>
> ...
>
> I was too terrified to respond to any of those comments directly but immediately asked the administrator of the page to take the posts down. However as the administrator did not remove the comments until the next day 7500 members of that group potentially saw the first defendant's defamatory comment."

122    She said that the viral effects of her television appearance and her chocolate posts "led to a vicious, racially motivated mob attack" which included more than 80 trolling posts, fake reviews and threats of violence.

123    Mrs Armstrong said that Mrs Assatryan commented on, and liked others posts that had similar content which led Mrs Armstrong to form the view that Mrs Assatryan was directing the attacks.  She said she checked the Facebook pages of those attacking her and discovered that:

> "...long before they attacked me they all had one thing in common – an apparent hatred to Turks and Azerbaijanis.  I saw multiple threads on their personal profiles looking to find and punish Azerbaijanis in various countries because of their nationality, including publishing phone numbers and addresses of some of their targets.  This made me fear for my life, given they already knew my phone number and address and had started phone threats against myself."[21]

---

21    JCB 118                                    Exh. D27

124   Mrs Armstrong said reading all the messages made her very scared and even today she still shakes and cries when she reads them. She still feels scared to post her location on social media, and lives in constant fear.

125   She gave detailed evidence about the effects of the attacks on her, which included recurring memories, difficulty breathing, depression and anxiety.

126   She relies on a report of Dr Mark Schiff, psychiatrist, who started treating her in February 2021. He diagnosed her with post-traumatic stress disorder with secondary panic and depressive symptoms and severe dissociative and cognitive symptoms. He considers her prognosis guarded having regard to the length and severity of her symptoms. He says, "the effect of the defamatory actions has a direct and long-lasting impact on all aspects of [her] life including her mental and physical health, personal and social relationships and trajectory of her working career.".

127   Mrs Armstrong exhibited to her affidavit some of the messages she received but which are not sued on. For example: [22]

(a)   'Vito Mike' posted "Khuraman Armstrong Stay where you are and I am coming to show you the real fascist aggression, looks like you have never seen it in real life";

(b)   in response to a comment "Your country full of Terrorist" by an unknown person, Yeg Sat posted "yes you are right. Shusha is full of them now. Don't worry. Cleaning in process."

(c)   Mark Alexanian posted "I have two homes in Shushi, and been living there for 100 years. You stay dreaming azeri occupant barbaric rat. Karabagh is Armenia yesterday, today and tomorrow forever. azerGAYjan days are numbered, ISIS compound motherfucker bitches."

---

(d) Mark Alexanian posted a photograph of Mrs Armstrong with the text "the whore" written above it.

128 It is not difficult to imagine that these posts would cause fear and anxiety and could result in Mrs Armstrong feeling unsafe. However, there is no evidence that Mrs Assatryan had any involvement with these posts. These are not the posts that are the subject of her claim in injurious falsehood, or defamation.

129 The evidence supports a finding that in the period leading up to Christmas 2020, Mrs Armstrong was not in a state of mind to be able to run her business. I am satisfied that this was, at least in part, caused by the social media attack she was undergoing, and, in particular, her personal feelings of being unsafe because of threats made.

130 Of particular concern to Mrs Armstrong was the threat to her personal safety and the fact that phone calls were made to her at home. There is no evidence Mrs Assatryan was responsible for any of those threats or of making phone calls to Mrs Armstrong.

131 Nor, aside from suggesting people post reviews rather than comments, is there evidence that Mrs Assatryan directed or coordinated attacks by others. She specifically denied having done so. Although Mrs Armstrong appears to have attributed much of the blame for the overall social media attack to Mrs Assatryan, she has not made out this case. There are numerous other posts which make similar comments to those made by Mrs Assatryan and I am not satisfied that Mrs Assatryan was the instigator of those other posts.

132 Dr Schiff's opinion relates to 'the defamatory actions' but does not specifically consider the false statements of Mrs Assatryan. It is consequently of little assistance in determining the role of Mrs Assatryan's false statements in her business and pecuniary loss.

133    Rosalia Gonzalez gave evidence by affidavit that she saw many negative comments on the plaintiff's personal Facebook page in about October 2020.  She says Mrs Armstrong was extremely upset and could not believe "these Armenians" were attacking her so horribly.  Ms Gonzalez identifies the posts of Mrs Assatryan as "one of the worst" that was posted about Mrs Armstrong. The thread relied on by Mrs Gonzalez shows numerous other comments in support of Mrs Armstrong, including encouraging her to take matters further and noting Mrs Assatryan's comments are "despicable allegations" for which she should be reported, rhetorically asking "who is going to believe your nonsense arguments?" and "how come making chocolate can be a terrorist act?"

134    That thread does not support a finding that Mrs Assatryan's posts were the cause of Mrs Armstrong's loss.  Ms Gonzalez's evidence supports a finding that the social media attack generally caused Mrs Armstrong's mental health decline.

135    I am not satisfied on the evidence that Mrs Assatryan's false statements caused, or would have been capable of causing, the extent of Mrs Armstrong's psychiatric injuries which rendered her incapable of continuing her business at that time.

136    Therefore, Mrs Armstrong's claim for injurious falsehood is dismissed.

## Damages

137    Mrs Armstrong has established the imputations pleaded were conveyed and were defamatory.  Mrs Assatryan has not established any of her defences.  Mrs Armstrong is entitled to damages from Mrs Assatryan for defamation.

### Extent of publication

138    Mrs Armstrong gave evidence that when comments started to appear on the Russian Women's Network Melbourne Facebook page in relation to her television program the posts were not removed until the next day and the comments were available to be viewed by the 7,500 members of that Facebook community.

68

139   By October 2020, she says there were more than 80 posts, fake reviews and
      threats of violence posted on her Facebook pages.  The Enjoy Dark Chocolate
      Facebook page had about 4,500 followers at the time of the publications.  Her
      Instagram page has 1,426 followers.

140   She was contacted by many business colleagues and friends who saw the posts
      and relies on a grapevine effect.

**Damage to reputation**

141   Mrs Armstrong says that prior to the "attacks", her advertisements on the Russian
      Women's Network Facebook Group would get about 80 to 90 comments, but now
      those same advertisements get barely ten comments.

142   Her Enjoy Dark Chocolate page still has over 4,500 followers but is largely
      dormant.

143   She says, as a consequence of the publications by all defendants, she gets
      recurring memories, disturbed feelings, feels tight in her chest and is unable to
      breathe freely.  She no longer feels safe at home and can no longer do her job
      because of fear and anxiety.  She is under financial pressure.

144   She says she has been asked about her connection to terrorist organisations and
      is regularly asked about the comments and why "those people could hate [her]".

145   She says people assume that she does not like Armenians, which is not true, and
      which she finds humiliating.  This causes her to withdraw from individuals and
      Facebook groups.  She then feels socially isolated.

**Hurt and embarrassment**

146   After reading the comments posted by Mrs Assatryan, Mrs Armstrong says she
      was shaking, scared and crying for days.  She attempted to have the comments
      removed but her request was denied.  She says, even now, she feels scared to
      post her location on social media and she lives in constant fear.

**Medical expenses**

147    Mrs Armstrong says she suffers acute anxiety and post-traumatic stress disorder and has sought treatment from two psychiatrists and psychologists.  She has been prescribed anti-depressant medication and has had acupuncture, massage and herbal medicine.  She makes a claim for the costs of these treatments which total $20,141.36.  She claims for future medical expenses.

**Business losses**

148    Mrs Armstrong claims damages for business losses as special damages caused by the defamation if her claim for injurious falsehood is not made out.  She says as a consequence of the defendants' imputations and her "fear of further defamatory posts", she was unable to fully promote her business from October to December 2020.

149    She says that the COVID-19 lockdowns were easing in September 2020 and she had secured "the services of our chocolatiers in preparation for a strong run to Christmas".  However, as the Christmas marketing campaign was about to launch, the "trolling attack" began and caused her to cease production while she dealt with the attacks and the effect they were having on her.  As a result, she says the staff secured other work and she was unable to restart production.

150    She says her business suffered dramatically.  Despite her best efforts to keep trading, she has been unable to overcome the negative impacts of the publications. She claims $17,618.34 in lost income from sales.

151    She says she has lost the value of her business in the amount of $24,000.  She relies on an expert report prepared by forensic accountant, Carissa Lacey.[23]

152    She says she was unable to complete an expensive course she had enrolled in and claims the cost of this course in the amount of $13,000.

---

23    JCB 639                              Exh. D32

## Assessment

153    There are well-established principles for assessing damages in defamation. Such principles are helpfully summarised by John Dixon J in *Wilson v Bauer Media Pty Ltd*:[24]

    (a)    Damages should provide consolation for hurt feelings, damage to reputation and vindication of the plaintiff's reputation;[25]

    (b)    Damages ought to reflect the high value which the law places upon reputation and, in particular, upon the reputation of those whose work and life depends upon their honesty, integrity and judgment;[26]

    (c)    The gravity of the libel and the social standing of the parties are relevant to assessing the quantum of damages necessary to vindicate the plaintiff. The award must be sufficient to convince a bystander of the baselessness of the charge;

    (d)    There must be an appropriate and rational relationship between the harm sustained by the plaintiff and the amount of damages awarded;

    (e)    The extent of publication and the seriousness of the defamatory sting are pertinent considerations;

    (f)    In determining the damage done to a plaintiff's reputation, the Court should also take into account the "grapevine" effect arising from the publication;[27]

    (g)    It is well accepted that injury to feelings may constitute a significant part of the harm sustained by a plaintiff;[28] and

Exh. D33

---

[24]    [2017] VSC 521 at paragraph [59] ("*Wilson*")
[25]    *Belbin & Ors v Lower Murray Urban and Rural Water Corporation* [2012] VSC 535 at paragraph [242]
[26]    *Wilson* (supra) citing *Carson v John Fairfax & Sons Ltd* (1993) 178 CLR 34
[27]    *Lower Murray Urban and Rural Water Corporation v Di Masi; Lower Murray Urban and Rural Water Corporation v Belbin; Lower Murray Urban and Rural Water Corporation v Marciano* (2014) 43 VR 348 at 388-390
[28]    *Wilson* (supra) citing *Carson v John Fairfax & Sons Ltd* (supra) at 71

(h)  Aggravated damages are a form of compensatory damages and, where appropriate, form part of the general damages awarded to a successful plaintiff for non-economic loss, designed to reflect aggravation caused to a plaintiff's hurt or injury by reason of some conduct of the defendant.

154    Where there are multiple defamatory publications by different people:

> "... The defendant must answer fully in damages to the extent that its publication has brought about damage to reputation, but for the damage solely caused by its publication."[29]

155    Mrs Armstrong relied on her own evidence and evidence of a number of other people, including her husband and a colleague, Ms Elena Ponomareva, as to her standing within the Azerbaijani and Russian-speaking community in Australia. It is apparent that she has had a very successful career in a number of fields and appears to have an entrepreneurial spirit. As a migrant to this country she has started two businesses and is active in various communities. She is described by Mr Tofik Mamedov as offering "outstanding" customer service.[30] Ms Ponomareva gave evidence of the "enormous time and commitment" she has given to her Nu Skin business, including attending and presenting at numerous leadership events. She describes Mrs Armstrong as going "way above and beyond to firstly welcome and host clients in her home, and then to ensure they receive the best possible advice and support".[31]

156    It is clear that as a businesswoman in the Russian-speaking community, Mrs Armstrong had a reputation for hard work and excellent customer service.

157    Each case necessarily turns on its own facts. In this case, it is difficult to imagine that many people would have read the publications and formed the view that Mrs Armstrong was an international terrorist or involved in international terrorism. Nevertheless, those comments may have caused an ordinary reasonable reader to have a lower opinion of Mrs Armstrong, or for her reputation to be damaged by

---

[29]    *Uren v John Fairfax & Sons Pty Ltd* (1965) 66 SR (NSW) 223 ("*Uren*") at 229
[30]    JCB 418
[31]    JCB 398

Exh. D34

a reader thinking that there may be something sinister associated with Mrs Armstrong's business.

158   The comments, replies, and "likes" by other Facebook users also indicate that the publications were read. Given the number of followers Mrs Armstrong's pages had and the significant number of responses,[32] I am satisfied that it is likely that hundreds of people saw the comments.

159   There is also evidence of some grapevine effect within the relatively small community of Russian speakers in Australia, for example the evidence that people asked her about the comments, and formed a view that she had a problem with Armenian people.

160   It is clear from the evidence that a substantial component of the damage caused to Mrs Armstrong is the hurt and embarrassment she has suffered and the consequences for her mental health of the social media "attack" on her and her business.

161   No doubt each of the defamatory publications caused Mrs Armstrong hurt and embarrassment; however, it is apparent from her evidence that the overwhelming nature of the social media barrage was the cause of her psychiatric injury. In particular the threatening messages she received are more likely to be responsible for her fears for her personal safety, than comments about the quality of her chocolate.

162   Mrs Armstrong points to the role Mrs Assatryan had in encouraging others to "pile on" and directing people to leave reviews rather than comments (which were more difficult to delete) to support a claim that Mrs Assatryan had a significant role in the overall "attack". Having reviewed the numerous publications, I accept that Mrs Assatryan played an early and significant role. I do not accept that the evidence establishes that she orchestrated or directed the attack.

---

[32]    JCB 56, 108                                    Exh. D35

163    Mrs Assatryan's comments do not have to be the only cause of Mrs Armstrong's loss and damage, provided I am satisfied that they are one of the causes.

164    In assessing the appropriate damages for which Mrs Assatryan is liable, I must be satisfied of the damage caused, or capable of being caused, by her publications.

165    I do not accept, on the balance of probabilities, that the seven publications for which Mrs Armstrong sues Ms Assatryan caused or could have been capable of causing her post traumatic stress disorder, or any other psychiatric injury.

166    Therefore, Mrs Assatryan is not liable for the medical expenses claimed.

167    Mrs Armstrong's inability to run her business was a result of her psychiatric condition.  It was her inability to run her business that caused her business losses rather than any loss of custom, or inability to retain a chocolatier.

168    I am not satisfied, for the reasons set out in my findings in relation to injurious falsehood, that Mrs Assatryan is liable for the business losses sustained.

**Mitigation**

169    Section 38 of the *Defamation Act* provides factors that can be considered in mitigation of damages.  These include an apology or correction, the fact the plaintiff has already recovered damages in relation to other publication of the same matter, or for publications having the same meaning or effect.

***Apology***

170    Ms Assatryan commenced her evidence in court by saying that at the time of making the publications she was upset.  Melbourne was in a COVID-19 lockdown and reading the bad news about the situation in Nagorno-Karabakh caused an emotional response.  She did not respond in a healthy way.  She regretted her actions and had tried many times to rectify the situation.  She had offered to apologise and retract her statements.

171    Ms Assatryan's apology appeared genuine; however, it is somewhat diminished by the fact that she maintained her defences and conducted her case in a way that continued to suggest that Mrs Armstrong was, in part, to blame for posting what Mrs Assatryan considered to be inflammatory material. I do not consider the apology to be a mitigating factor.

### Settlement of other claims

172    If some of the damage done to a plaintiff's reputation is the result of multiple defamations, a plaintiff ought not be compensated twice for the same loss.[33]

173    Section 38 is to be applied in a broad way to prevent a plaintiff receiving double compensation. Whilst requiring the defendant to answer fully in damages, it restricts those damages to the injury caused by the publication sued upon by the plaintiff.[34]

174    With respect to hurt feelings, it is the hurt occasioned by matters complained of in the present proceeding that is to be compensated.[35]

175    Mrs Armstrong had settled defamation claims against a number of other defendants prior to trial and has received a total amount of about $80,000 in compensation. She submitted that the defamatory claims made by those other defendants afforded no mitigatory prospects as the imputations were significantly different, for example that Mrs Armstrong had stolen chocolate recipes or was a poor businesswoman.

176    Ms Assatryan's publications were across all three Facebook pages operated by the plaintiff. The publications for which the plaintiff has already been compensated were only on the business page.

Exh. D37

---

33    See *Uren* (*supra*) at 230
34    *Thompson v Australian Capital Television Pty Ltd & Ors* (1997) 129 ACTR 14 at 24
35    *Wagner & Ors v Harbour Radio Pty Ltd & Ors* [2018] QSC 201 ("*Harbour Radio*") at 887

177    In *Harbour Radio*,[36] the Court held that publication to different audiences is a factor to be considered in relation to mitigation.

178    I accept that the publications sued upon contain at least some distinct imputations. Mrs Assatryan made comments on different Facebook pages, though the evidence of Mrs Armstrong was that her social media platforms were significantly inter-related. Nevertheless, it is likely that some people who saw Mrs Assatryan's publications did not see the publications of the other defendants.

179    Given that a substantial part of Mrs Armstrong's damages are for hurt and embarrassment, and this can be awarded only in relation to the hurt caused by each defendant's publication, I do not consider there is any significant mitigatory effect of the settlement of other proceedings.

180    To the extent that the compensation already received provides vindication to Mrs Armstrong, it does so on the basis of those publications only. The settlement of those claims is likely to have had only a modest impact in ameliorating the harm she sustained and restoring her reputation. A simple arithmetical reduction of the compensation already received from damages she is entitled to against each of the remaining defendants is inappropriate, given that each of them is liable only for the damage they have caused. I am not persuaded there has been substantial rehabilitation afforded by the settlement of those other claims.

### *Republication by the plaintiff*

181    Ms Assatryan also argues that Mrs Armstrong has failed to mitigate her own loss by republishing some of the posts complained of. Mrs Armstrong republished those posts to demonstrate the attack she considered she had been under. I do not accept that this "republication" was itself responsible for any of the harm she sustained.

Exh. D38

---

36    *Ibid*

**Aggravation**

182 The plaintiff claims aggravated damages against each of the defendants to compensate her for the increased hurt and humiliation she has experienced as a result of the defendants' conduct up to the date of judgment.[37]

183 The test is whether the defendants' conduct was improper, unjustifiable or lacking in *bona fides*.[38]

184 Mrs Armstrong says Mrs Assatryan has aggravated her damages by relying on a truth defence. She says Mrs Assatryan was motivated by malice and with the sole purpose of causing Mrs Armstrong harm. She encouraged others to also attack Mrs Armstrong.

185 The defamatory statements in this case made by Mrs Assatryan as well as numerous other people on the plaintiff's social media page, are unfortunately indicative of the venting of spleen that can frequently be seen online.

186 The veneer of anonymity afforded by social media allows people who might ordinarily keep their thoughts to themselves to publicly vent without considering the consequences. A pile-on ensues. It is much easier to demonise an online presence and to forget that behind the online presence is a real person who is impacted.

187 Mrs Assatryan never genuinely thought Mrs Armstrong was a terrorist, a criminal, was poisoning people or was running a front for international terrorism. Mrs Assatryan, like many people, considered she had an entitlement to express her opinion. She said, "I had no idea about defamation". She did not think about the impact on the plaintiff's livelihood. She was upset about Mrs Armstrong's posts and wanted them to be removed. She did not want the conflict in Nagorno-Karabakh to be "melded" with chocolate. It goes without saying she was and is

Exh. D39

---

37  See for example *Praed v Graham* (1889) 24 QBD 53 at 55 (Lord Escher MR); *Broome v Cassell & Co Ltd* [1972] AC 1027 at 1071 (Lord Hailsham of St Marylebone LC); *Cerutti & Anor v Crestside Pty Ltd & Anor* [2014] QCA 33 at paragraph [37] (Applegarth J)

38  *Triggell v Pheeney* (1951) 82 CLR 497 at 514 (Dixon, McTiernan, Williams, Webb and Kitto JJ)

entitled to have and express those views. However, she went well beyond her entitlement to freely express her views. Making extreme allegations that Mrs Armstrong was a terrorist and a criminal, and posting untrue negative comments about the source of Mrs Armstrong's income – the quality of her chocolate – is not protected free speech.

188    Mrs Assatryan's conduct aggravated the harm caused to Mrs Armstrong and Mrs Armstrong is entitled to aggravated damages.

### Award of damages against Mrs Assatryan

189    In assessing all the factors I must weigh up, I consider the hurt to Mrs Armstrong to be the most significant consequence of the publications.

190    Mrs Assatryan published across multiple Facebook pages, ensuring greater exposure. She published numerous times. She encouraged others to post and provided a tip on how to ensure the posts were not easily removed. I consider an appropriate award of damages arising from the first defendant's publications is $70,000 including aggravated damages.

### Assessment of damages against the second and fifth defendants

191    Judgment was entered against the second and fifth defendants. As a result, the allegations in the pleading are taken to have been proved.

### Anna Gabrielyan's publications

192    The second defendant, Ms Anna Gabrielyan, published two reviews and one comment on the plaintiff's business page. In October 2020, Ms Gabrielyan posted that Mrs Armstrong "uses some sweets to make terrorist statements and support [A]zerbaijani aggression during war times".[39] Ms Gabrielyan's second review says Mrs Armstrong "deletes all the constructive criticism from her product comments" and exhibits "poor very ignorant behavio[u]r for an entrepreneur!".[40] After Mrs Armstrong comments on this review, saying that Ms Gabrielyan has never

---

[39]    JCB 48, FASOC 9(a)
[40]    JCB 49, FASOC 9(b)                                    Exh. D40

78

purchased her chocolates, Ms Gabrielyan says that she will never purchase Mrs Armstrong's chocolates, says Mrs Armstrong is "a terrorist" and that her "product" is the "terrorism that [she] support[s]!".[41]

### *Imputations pleaded*

193    Mrs Armstrong pleads the publications conveyed that she:

(a)    is a liar;

(b)    is ignorant;

(c)    is a poor businesswoman;

(d)    is involved in terrorism;

(e)    is a terrorist; and/or

(f)    supports terrorism.

### Katya Kahramanian's publication

194    In October 2020, the fifth defendant, Ms Katya Kahramanian, published a review on the plaintiff's business page alleging that Mrs Armstrong ignored multiple requests for a refund after Ms Kahramanian ordered chocolates that became lost in transit.[42]

### *Imputations pleaded*

195    Mrs Armstrong pleads the publication conveys she:

(a)    failed to deliver chocolates to her;

(b)    failed to refund money for undelivered chocolates;

(c)    ignored customers with complaints;

---

41    JCB 49, FASOC 9(c)
42    JCB 52, FASOC 27(a)                    Exh. D41

(d)    had poor customer service; and/or

(e)    had customer service that was worth zero stars.

**Mrs Armstrong's response to the publications of the second and fifth defendants**

196    Mrs Armstrong says, reading the second defendant's comments caused her to be shocked and shaking.  She cried in disbelief.  The second defendant also posted a fake review which "left ... [her] crying as all ... [her] hard work was collapsing all around ... [her]".[43]

197    Mrs Armstrong says she was devastated after reading the fifth defendant's comments.  The fifth defendant was never a customer and had no knowledge of her product or customer service.  When she responded in the comments to the review, the fifth defendant doubled down and said Mrs Armstrong was "rude" and that the comment proved her poor customer service.  Mrs Armstrong says she had no way of demonstrating to new people visiting her pages that the review was fake. It was damaging to her chocolate business as well as her own "brand".

**Damage to Mrs Armstrong's reputation**

198    I am satisfied that the publications by Ms Gabrielyan and Ms Kahramanian are likely to have caused harm to Mrs Armstrong's reputation.

199    There is evidence that the statements were seen by a number of people.[44]

200    While it is unlikely Ms Gabrielyan's posts would have caused anyone to be persuaded that Mrs Armstrong was a terrorist, they would tend to cause a reasonable reader to have concerns or doubts and to think less of Mrs Armstrong. Ms Gabrielyan's comments about Mrs Armstrong's customer service and business are likely to harm her reputation as a professional chocolate seller.

Exh. D42

---

[43]    JCB 119
[44]    JCB 406-456

201    Ms Kahramanian's comments were likely to be particularly damaging as they purport to be from an actual customer and make believable, albeit false, complaints which would cause concern to real customers.  Unlike posts accusing Mrs Armstrong of terrorism which are clearly partisan and coming from a particular aggrieved perspective, a post that claims the product never arrived and that Mrs Armstrong refused a refund would be more likely to be believed and more likely to cause a potential customer to decline to place an order.

202    Given that, at the time, it was not possible for a customer to place an order as production had not recommenced following the COVID lockdown, I do not find Ms Kahramanian's comments caused actual business loss.  However, I do consider the nature of her remarks and the fact that she pretended to be a customer so as to post a defamatory comment significantly aggravates the damage.

203    Neither Mrs Gabrielyan nor Mrs Kahramanian filed notices of appearance, and judgment was entered in default.  Mrs Armstrong has had to go to great lengths to bring the proceedings to their attention and has incurred additional costs of doing so.  Mrs Kahramanian was never a customer of Mrs Armstrong, despite purporting to be so, and one can infer her comments were motivated solely by malice and a desire to cause harm.  Ms Gabrielyan did engage in some discussion with the plaintiff and offered to take the post down, but never offered compensation.  One can infer from her posts that she was motivated by malice and an intention to cause harm.  Mrs Armstrong is entitled to an award of aggravated damages against each defendant.

204    Having considered all of the circumstances the appropriate award of damages for Ms Gabrielyan's publications is $25,000 including aggravated damages.  The appropriate award of damages for Ms Kahramanian's publications is $30,000 including aggravated damages.

**Injunction**

205    Mrs Armstrong seeks a permanent injunction restraining the defendants from further publication of the defamatory imputations.

206    Injunctions are only issued when some additional factor is evident, usually an apprehension that the defendant may, by reason of irrationality, defiance, disrespect of the Court's judgment or otherwise, publish allegations similar to those found to be defamatory,[45] or when the defendant's persistence in making repeated defamatory publications has the flavour of a vendetta.[46]

207    The second and fifth defendant have demonstrated disrespect of the Court's process by refusing to accept service, enter appearance or participate in the claim. Mrs Assatryan's comments over a number of days and her active participation on Mrs Armstrong's social media page during that period had the flavour of a vendetta against Mrs Armstrong.

208    The conflict over Nagorno-Azerbaijan clearly induces strong feelings in Mrs Assatryan, such that there is a risk that she will act irrationally, or defiantly in what she could consider to be defence of Armenia.

209    On that basis I consider there is a risk that Mrs Assatryan could, in future, post defamatory comments about Mrs Armstrong.   In those circumstances it is appropriate to make an order restraining her from doing so.

210    This means that if Mrs Assatryan publishes the defamatory imputations in the future, she would expose herself not just to a further claim in defamation, but would potentially be in contempt of court, and be exposed to the penalties for contempt as a consequence.


Exh. D44

---

[45]    *Polias v Ryall* [2014] NSWSC 1692 at paragraph [99]; *Sierocki v Klerck (No 2)* [2015] QSC 92 at 154, paragraphs [52]-[53]

[46]    *Graham v Powell (No 4)* [2014] NSWSC 1319 at paragraphs [45] and [48]; *Sierocki v Klerck (No 2)* (*supra*)

211    I order that Mrs Assatryan, Ms Gabrielyan and Ms Kahramanian be restrained from further publishing the defamatory imputations.

- - -

# EXHIBIT E

# ANC Pennsylvania Protests Dr. Oz Genocide Denial at Harrisburg Debate

**October 26, 2022 |**

**HARRISBURG, PA –** Armenian Americans again called on Pennsylvania Senate candidate Dr. Mehmet Oz to end his complicity in Turkey's Armenian Genocide denial, at a protest organized by the ANC of Pennsylvania (ANC-PA), timed with the



ANCA's Aram Hamparian speaking with Korean TV about Dr. Oz's genocide denial, ties to Turkey's dictator Recep Erdogan, and concerns about foreign influence in the Senate through a Dr. Oz victory

televised debate between Dr. Oz and his opponent, Pennsylvania Lieutenant Governor John Fetterman.

Protesters shared their concerns with local, national, and international media in the run-up to the debate, noting Dr. Oz's refusal to properly characterize the Armenian Genocide, his close ties of Turkey's dictator Recep Erdogan, and concerns that a Dr. Oz victory would open the door to foreign influence in the U.S. Senate.

ANCA Executive Director Aram Hamparian told the Philadelphia Inquirer's Julia Terruso that "we're worried that the unanimity that took us 50-60 years to secure will be rolled back." Hamparian was referencing the 2019 unanimous U.S. Senate vote recognizing the Armenian Genocide. The ANC-PA protest was also covered by MSNBC and the local York Dispatch, in addition to British, Japanese, and Korean television.

Your generosity empowers our advocacy, inspires our work, and sustains our momentum.

DONATE NOW!

their concerns in a live-streamed demonstration at Dr. Oz's headquarters in Huntingdon Valley, PA – organized by the ANCA national, Eastern US regional, and Pennsylvania local affiliates, Rabbi Shmuley Boteach – "America's Rabbi," – who leads the World Values Network, and the Hellenic American Leadership Council (HALC).

Earlier in October, a protest organized by Armenian and Jewish Americans, led by Rabbi Shmuley, forced the cancellation of a high-dollar fundraiser for Dr. Oz in Englewood, NJ. Another protest, organized by the Armenian Youth Federation Western U.S. (AYF-WUS), took place on October 6th at the Lyon Air Museum in Santa Ana, where the AYF called on "the Dr. Oz for U.S. Senate Campaign to right its wrong, by fully and transparently recognizing the Armenian Genocide, and standing with the U.S. government in holding Turkey accountable for its atrocious crime."

The ANCA has endorsed Dr. Oz's opponent, Pennsylvania Lieutenant Governor John Fetterman, who issued a series of statements outlining his support for Armenian Genocide affirmation and education as well as a broad range of Armenian and Greek American concerns. **Lt. Governor Fetterman stated:**

> — *"As a Pennsylvanian, I welcomed long overdue U.S. government recognition of the Armenian Genocide – by the U.S. House and Senate in 2019 and by President Biden in 2021 – and will, as a U.S. Senator, support promoting public education about this atrocity."*

> — *"I support policy provisions – adopted recently by the U.S. House as part of the FY23 National Defense Authorization Act (NDAA) – that require close U.S. scrutiny of U.S. military aid to Azerbaijan (Speier Amendment), call for State Department and Pentagon reports on Azerbaijani war crimes (Cardenas Amendment), and demand Azerbaijan's release of Armenian prisoners of war (Schiff Amendment). "*

> — *"I join with Senate Foreign Relations Committee Chairman Robert Menendez in calling for an immediate suspension of U.S. military aid to Azerbaijan and a robust U.S. humanitarian aid program for the victims of Azerbaijani aggression in both Artsakh and Armenia."*

> — *"I also support the NDAA Amendment adopted in the House (Pappas Amendment) and introduced in the Senate (Menendez Amendment). With regard to Greece & Cyprus, Sen. Menendez's two pieces of landmark legislation that have passed into law – the Eastern Mediterranean Security and Energy Partnership Act of 2019 and the US-Greece Defense and Interparliamentary Partnership Act of 2022 – promote U.S. interests and values. I support the continued and full implementation of Senator Menendez's legislation."*

#####

Your generosity empowers our advocacy, inspires our work, and sustains our momentum.

For Immediate Release

DONATE NOW!

**Media Contact: Lorig Baronian**

9/24/24, 4:06 PM






86

**ANCA**
October 12, 2022 ·

"It is deeply disturbing that Dr. Oz refuses to acknowledge the Armenian Genocide," stated PA Senate candidate John Fetterman in a statement supporting Armenian, Jewish, Greek, & Kurdish American protesters demanding Dr. Oz end his genocide denial. #StopOz

Fetterman's full statement below:

"As a Pennsylvanian, I welcomed the long overdue U.S. government recognition of the Armenian Genocide by the U.S. House and Senate in 2019 and by President Biden in 2021. As a U.S. Senator, I will continue to support promoting public education about this atrocity.

"On the other hand, it is deeply disturbing that Dr. Oz refuses to acknowledge the Armenian genocide. I support those out protesting Oz's continued and disgusting silence on this. This is an important issue and Oz's refusal to acknowledge it is both offensive and damning.

"Armenia is a democracy when democracy is being tested all across the world. Standing firm with them as they navigate ongoing tensions from neighboring Azerbaijan and Turkey is critical. As a senator, being clear about where you stand matters, and this is just another example of Oz not being up to the job."



EVERY COUNTY. EVERY VOTE.

**FETTERMAN**

U.S. SENATE | PENNSYLVANIA

Exh. E4

Pennsylvania Lt. Governor John Fetterman released the following

9/24/24, 4:06 PM

(3) ANCA - "It is deeply disturbing that Dr. Oz refuses to acknowledge... | Facebook

87

As a Pennsylvanian I welcomed the long overdue U.S. government recognition of the Armenian Genocide by the U.S. House and Senate in 2019 and by President Biden in 2021. As a U.S. Senator I will continue to support promoting public education about this atrocity.

"On the other hand it is deeply disturbing that Dr. Oz refuses to acknowledge the Armenian genocide. I support those out protesting Oz's continued and disgusting silence on this This is an important issue and Oz's refusal to acknowledge it is both offensive and damning

"Armenia is a democracy when democracy is being tested all across the world Standing firm with them as they navigate ongoing tensions from neighboring Azerbaijan and Turkey is critical As a senator being clear about where you stand matters, and this is just another example of Oz not being up to the job "

anca.org

154

17    26

Like    Comment    Copy    Share

Most relevant

 

Comment as Aynur Baghirzade

**Suzanna Aloian**
What Dark games you are playing... history will never forgive you this... ANCA should be ashamed for promoting that CROOK!! Shame on you!! Disgusted 😡

1y    Like    Reply

View all 8 replies

Gohar Sargsyan
https://www.facebook.com/3994329567737740/post s/63194159480727715/

Exh. E5










**Jenn Jungclaus**

Fettermans an idiot too so we really have no options here in pa

1y   Like   Reply   3 

Most relevant is selected, so some comments may have been filtered out.



# EXHIBIT F

← **Tweet**

not once have I left a negative review. You
on the other hand.. you're going to get
special treatment.

Yelp is just the beginning.

♡ 1    ⟲ 1    ♡ 1    ᵈᵢₗ 32    ⬆



**Aynur Baghirzade** @BaghirzadeAy... · 6h
Nice. Now I have a proof and acceptance
that you are a clan member. Could you
please also reveal your name and address
for a complete file ? :)

♡ 2    ⟲    ♡    ᵈᵢₗ 36    ⬆



**Melmoth━ ▌ ▌** @Melmouth1 · 5h
Yelp is the least of your problems someone
said they reported you to the board your
anti Armenian hate is catching up to you

♡ 1    ⟲    ♡ 1    ᵈᵢₗ 30    ⬆



**Aynur Baghirzade** @BaghirzadeAy... · 5h
You mean Mafia reported me ? :)

♡ 1    ⟲    ♡    ᵈᵢₗ 29    ⬆



**Melmoth━ ▌ ▌** @Melmouth1 · 4h
Ok, the mafia reported you

♡    ⟲    ♡ 1    ᵈᵢₗ 15    ⬆




Tweet your reply

🏠    🔍    🎙    🔔    ✉

Exh. F2

← **Tweet**



**Melmoth** ▬ ▌▐ @Melmouth1 · 4h
Ok, the mafia reported you

**Aynur Baghirzade** @Baghirzade... · 24m
Keep threatening me.. you should be so
afraid of me that you lost your head and
you don't know what to do...

**Melmoth** ▬ ▌▐
@Melmouth1

We know what to do, expose you as a racist
and get you disbarred

3:09 PM · 6/17/23 from Earth · View

**Aynur Baghirzade** @BaghirzadeAy... · 6s
More realistically you will get exposed as a
criminal gang which should be persecuted
and chased out of US. This is more realistic.

Exh. F3


Tweet your reply

# EXHIBIT G

10:21

← **Tweet**

 **Ray**
@raydar07

Remember.. your so-called Armenian mafia didn't come after you, you went looking for them and you have now been found.

Your only way out of this is to formally apologize to the Armenian community for posting such hateful comments. I will personally remove my review if you do.

8:37 AM · 6/17/23 from Earth · **5** Views

Exh. G2

 Tweet your reply

4:18

← **Tweet**

 🏁 **Ray** 🏁
@raydar07

I'm going to make you famous!

11:50 AM · 6/17/23 from Earth · **17** Views



**Aynur Baghirzade** @Baghirzade/y… · 4h
What do you want ?

🏁 **Ray** 🏁 @raydar07 · 4h
If you delete your Twitter account I will
delete my Yelp review. Fair?

 **gul sultani** @gulsultani314 · 9m
Blackmailing in the commission of a
terroristic threat..Keep on going:))



**gul sultani** @gulsultani314 · 3m
You have done the best to expose the
Armenian Mafia for conspiracy against an
Azerbaijani lawyer because you don't like
her free speech:))





Tweet your reply

Exh. G3

12:02

## Notifications

**All**          Verified          Mentions

**Ray** @raydar07 · 51s
Replying to

If you delete your Twitter account I will delete my Yelp review. Fair?

We received your report.

**Ray** @raydar07 · 5m
Replying to

Aynur, have you ever considered becoming a life coach?



Immigration Law





## Get a virtual consultation



Exh. G4

9:09

← **Tweet**

back to normal.

💬 2   ↻   ♡   ᵢₗₗ 9   ⬆

**Aynur Baghirzade** @BaghirzadeAy... · 7m
I am not going to do anything you provided
here because I didn't do anything wrong.
And leave FBI alone - just prepare to face
me in court for the organized defamation
and harassment campaign together with
corrupt Yelp.

💬 1   ↻   ♡   ᵢₗₗ 5   ⬆

🇺🇸 **Ray** 🇺🇸
@raydar07

Stop regurgitating nonsense. My attorneys will
run circles around you. I have your bar
number, I'm going to file a complaint against
your license if you keep running your mouth.
You will run out of what little money you have
before verdict.

California Penal Code [CPC] §422.6(a)

9:06 AM · 6/17/23 from Earth · View

🗨   ↻   ♡   🔖   ⬆

  Tweet your reply

Exh. G5

  🏠   🔍   🎙   🔔   ✉

8:46

 **Notifications** 

**All**          Verified          Mentions

 📧 **Ray** 📧 @raydar07 · 3m
Replying to

You must understand that actions have
consequences. You came looking for us and
you found now been found.

I know many Azeri businesses here in LA,
not once have I left a negative review. You
on the other hand.. you're going to get
special treatment.

Yelp is just the beginning.

                                  

      

**Emin Agayev** and 23 others followed you

 📧 **Ray** 📧 @raydar07 · 6m
Replying to

If you don't care about the reviews then why
are you on Twitter and yelp crying loudly
claiming that you're being targeted by the
Armenian mafia, demanding that Yelp
removes your reviews? Why cry so hard?

                  ılı 3

 **Melmoth** 🔪 @Melmouth1 · 7m
Replying to

Do you recognize the Armenian genocide

                        

Exh. G6

12:20

**Notifications**

**All**      Verified      Mentions

🇺🇸 **Ray** 🇺🇸 @raydar07 · 1m
Replying to

Ex-lawyer

💬      🔁      ♡      📊 2      ⬆️

🇺🇸 **Ray** 🇺🇸 @raydar07 · 1m
Replying to

If this attorney thing doesn't work out for
you, you can always write a book called
"how to ruin your career in minutes"

💬      🔁      ♡      ⬆️

🇺🇸 **Ray** 🇺🇸 @raydar07 · 5m
Replying to

California Penal Code [CPC] §422.6(a)



🏠      🔍      🎙️      🔔      ✉️

Exh. G7



8:47

← 🔍 ⋯

# 🏴 **Ray** 🏴
@raydar07

📅 Joined October 2022

**28** Following   **15** Followers

**Tweets**   Replies   Media   Likes

🔁 🏴 Ray 🏴 Retweeted

**Defiant L's**   @DefiantLs · 20h

The New York Times
## How the Russian Media Spread False Claims About Ukrainian Nazi's
July 2, 2022

The New York Times
## Nazi S... ...s on Ukraine's Front L...s Highlight Thorny ...... History
.........

🔁 🏴 Ray 🏴 Retweeted

**Ron DeSantis**   @RonDeSantis · 22h
My administration will never promote military leaders who abuse their power to

🏠   🔍   🎙   🔔   ✉

Exh. G8

# EXHIBIT H

9.21

< Ray's review

 **Ray D.**                                               • • •

Went to Aynur for help, was hoping to bring my family over from Armenia. She didn't let me past the door, yelling obscenities and shouting racist remarks about my culture after I mentioned that I'm Armenian. She told me that Armenians don't belong here or anywhere other than Russia and that the rest of that are here need to leave this country. Her eyes bulged open  and she displayed this hand sign as we were walking away. I went home and did some research, found out that it's a hand sign for a Turkish Terrorist Organization called Gray Wolves. She is apparently part of some militant islamist group from Turkey or Azerbaijan who clearly don't like Armenians very much. Such a sad little existence she has. I feel terrible for her, so much hate. We were willing to pay her good money for her help too. Absolutely sad .




Comment        Direct message

 You can publicly respond to show off your customer service and then resolve any complaints through direct messages.          ✕

Exh. H2

# EXHIBIT I

yelp.com/biz/law-offices-of-aynur-baghirzade-laguna-beach

103

## You Might
### Sponsored ⓘ



Clients with cases
death have time

"Where to star
having to deal,

## Photos & videos

See all 34 photos →







What are the Benefits
OF AN EB-5 VISA?

## Services Offered  Verified by Business ⊘

Government law

## You Might Also Consider  Sponsored ⓘ



Exh. 12

https://www.yelp.com/biz_photos/M2M1Ef01A31nrPJwvn7CBQ?select=p7TwO_W5G65HL6M29ydCwmw



Center

oport/contact/business_account_closure?src_article_id=000005409

# Business account closure request

If you'd like to close your business account on Yelp, fill out and submit the form below. Keep in mind that closing a business account does not remove the business page from Yelp. In some situations, we may not be able to close your account immediately, such as if there are outstanding ad programs or Yelp Deals vouchers tied to your account.

## Business Name

**Law Offices of Aynur Baghirzade**
4 reviews

Immigration Law

1968 S Coast Hwy
Laguna Beach, CA 92651
(619) 630-6646

Change

## Additional information

I do not need any longer any business page with you. You gave your platform to the gang to use it to harass business owners. Please, remove my account immediately!

## Your Email Address

contact@aynurlawyers.com

I'm not a robot

reCAPTCHA
Privacy - Terms

Exh. 13

# EXHIBIT J

9:36

< Ara's review

 **Ara Ariana K.**



...

After seeing reviews we decided to check her social media before reaching out to her office for some legal services. Unfortunately, her racist remarks against Armenian Americans is disgusting anwere a big turn off. Will definitely take our business somewhere else.

**Aynur Baghirzade**
Your daily reminder that
a threat to South Caucasus, it
carcinoma that must be reform
to its core to allow Caucasus to
peacefully and prosperously.

### Direct message

This person has never been my consumer and everything stated here is a complete lie. His and majority of other reviews on my Yelp account are the product of the organized, planned and sinister defamation campaign aimed to silence me at Twitter, to close my Twitter account and stop telling people the truth about political agenda of the Armenian far left nationalists in the United States . Neither my Yelp account nor my business has anything to do with my tweets on political issues. Yelp has to remove all these reviews from my account or face charges under RICO together with all this gang members. I received a lot of threats from these people and it had to be stopped.

**Exh. J2**

More

Very racist, I wanted to get some information on my family coming over but once she found we were Armenian she claimed she wanted nothing to do with us. Wont be attempting with her again as it was very embarrassing to be turned down in 2023 just because my ethnicity

**Direct message**



This person has never been my consumer and everything stated here is a complete lie. His and majority of other reviews on my Yelp account are the product of the organized, planned and sinister defamation campaign aimed to silence me at Twitter, to close my Twitter account and stop telling people the truth about political agenda of the Armenian far left nationalists in the United States . Neither my Yelp account nor my business has anything to do with my tweets on political issues. Yelp has to remove all these reviews from my account as they are product of bullying and defamation. I received a lot of threats from these people and it had to be stopped.

7:21

◀ Gmail

‹ **Dav's review**

 **Dav M.**

• • •

Very racist, I wanted to get some information on my family coming over but once she found we were Armenian she claimed she wanted nothing to do with us. Wont be attempting with her again as it was very embarrassing to be turned down in 2023 just because my ethnicity

Direct message

This person has never been my consumer and everything stated here is a complete lie. His and majority of other reviews on my Yelp account are the product of the organized, planned and sinister defamation campaign aimed to silence me at Twitter, to close my Twitter account and stop telling people the truth about political agenda of the Armenian far left nationalists in the United States . Neither my Yelp account nor my business has anything to do with my tweets on political issues. Yelp has to remove all these reviews from my account as they are product of bullying and defamation. I received a lot of threats from these people and it had to be stopped.



Exh. J4

# M Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## New review with old comments
1 message

Aynur Baghirzade <contact@aynurlawyers.com>
To: Yelp <customersuccess@yelp.com>

Mon, Feb 19, 2024 at 12:09 PM

Hello Yelp,

Could you please explain how it happens that a new review with my old comment from February 7, 2024 appears in my business page again ? It's on my page today on February 19, 2024. See photo attached.

I would appreciate your response. I would also appreciate your answer why contrary to your policy you keep my page open after i asked you to close it? I hope you understand that you are now part of the harassment campaign against me and one of the co-conspirators in it.

Also, I still didn't get the answer why defamatory reviews from non clients in my page , like Solomon and Kerimov are still there despite my complaints to you and requests to remove them?

What is your justification for those reviews to be on my page ?

Exh. J5

# EXHIBIT K

6:55

< Alex's review



**Alex K.**

···

Yes your right non of us have been your customer and never been in your place but very soon we will visit you you resist B

Comment          Direct message

Exh. K2

# EXHIBIT L

← → C 🔒 yelp.com/biz/law-offices-of-aynur-baghirzade-laguna-beach#reviews

**Kerimili E.**
Glendale, CA

5/26/2023

⊕ First to Review

They take your money with false promises and fail to deliver. Cant even speak proper understand how this lady passed the bar exam.

**Aynur B.**
Business Owner

6/6/2023

Exh. L2

This person has never been my consumer and has never asked for my services. She requested my services he simply lies. It is a part of the smear compaign organized



Chrome   File   Edit   View   History   Bookmarks   Profiles   Tab   Window   Help

yelp.com/user_details?userid=b9n1J_vxa5KHlSo-ZeKReQ

**Kerimili E.**

From Glendale, CA

0 Friends    1 Review    0 Photos

**Kerimili's Profile**

Profile Overview

Reviews

Compliments

Collections

Add friend
Compliment
Send message
Follow Kerimili E.
Similar Reviews

About Kerimili E.

Stats

Firsts 1

Location

Glendale, CA

Yelping Since

May 2023

Reviews

Sort by: Date ▼

Law Offices of Aynur Baghirzade

Immigration Law

1968 S Coast Hwy

Laguna Beach, CA 92651

5/26/2023

First to Review

They take your money with false promises and fail to deliver. Cant even speak proper English, I dont understand how this lady passed the bar exam.

Was this review ...?    Useful    Funny    Cool

Report this profile

Exh. L3

Proof of Service f....pdf

pos040.pdf

POS UPS Store PS .pdf

scan1260 (1).pdf

9/10/24, 7:48 PM                    Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 13456489

 Gmail                                                    Aynur Baghirzade <contact@aynurlawyers.com>

## Message from Yelp HQ: 13456489
2 messages

**Yelp HQ <feedback@yelp.com>**                                           Wed, May 31, 2023 at 2:54 PM
To: "contact@aynurlawyers.com" <contact@aynurlawyers.com>

Hi,

Thanks for writing in. You've asked us to take another look at Kerimili E.'s review of Law Offices of Aynur Baghirzade. I'm writing you back to let you know that we have taken another look at this review and to clarify our policies as they pertain to cases like this.

Our moderators aren't in a position to take sides when factual accounts differ. As long as a review appears to reflect the reviewer's personal experiences and opinions, while describing a relevant consumer experience, we'll allow them to stand behind their review. Additionally, each reviewer may take their own approach to writing reviews, taking into account the various elements of their consumer experience and weighting those elements as they see fit.

While we encourage reviewers to use their full names on Yelp, this isn't a requirement; we allow reviewers to share their consumer experiences even if they don't want to identify themselves by their real names. As a result, it may be difficult to match up a reviewer's name to the records maintained by many businesses, and our moderators aren't in a position to arbitrate these situations.

With that in mind, we've taken another look and we stand by our original decision to leave the review up, as we did not find it to be in violation of our guidelines.

It looks like you've already taken advantage of the messaging feature on your business account to post a public comment in response to the review. You also have the ability to directly message the reviewer; you can learn more at https://www.yelp-support.com/Responding_to_Reviews. And for additional guidance on using your business account, visit https://www.yelp-support.com/Free_Tools_for_Your_Business.

Regards,

Mariah
Yelp Support
San Francisco, California

Yelp Official Blog | https://www.yelpblog.com
Yelp Support Center | http://www.yelp-support.com
Yelp for Business Owners | https://biz.yelp.com

ref_00D6guJNS_5004u2tuwK8:ref                              Exh. L4

**Aynur Baghirzade <contact@aynurlawyers.com>**                           Wed, May 31, 2023 at 3:06 PM

115

116

9/10/24, 7:48 PM                                                    Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 13456489

To: Yelp HQ <feedback@yelp.com>

Dear Yelp,

Could you please send me documentation or any verification that this person hired me or did anything to communicate with me as my consumer ?

As I requested you to investigate this person's review you have to have all the information I cited above. Could you please send it to me ?

I am telling you one more time that I disagree with your opinion and if you immediately do not take down this review from my profile you will be held responsible for intentionally harming my reputation and for keeping defamatory comment on my profile.

Aynur
[Quoted text hidden]
--
Respectfully,

Aynur Baghirzade

Law Offices of Aynur Baghirzade
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. L5

9/10/24, 7:47 PM    Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 13485282

117

 **Gmail**

Aynur Baghirzade <contact@aynurlawyers.com>

## Message from Yelp HQ: 13485282
2 messages

**Yelp HQ <feedback@yelp.com>**
To: "'contact@aynurlawyers.com'" <contact@aynurlawyers.com>

Thu, Jun 8, 2023 at 1:20 PM

Hi Aynur,

Thanks for contacting Yelp!

If you see content that you believe violates Yelp's Content Guidelines (http://www.yelp.com/guidelines), please let our moderators know by reporting it if you haven't already. You'll need to be logged into your account to report content.

You can report a review by clicking or tapping the three dots next to the content and then selecting Report Review. To learn how to report other types of content, please visit: http://www.yelp-support.com/article/How-do-I-report-content-that-violates-Yelp-s-Content-Guidelines-or-Terms-of-Service?l=en_US

While reporting content doesn't guarantee that it'll be removed, our team looks at every inquiry and carefully evaluates the content against our guidelines. Each case will be reviewed by our team in the order it was received.

Typically, you will receive a response to your report of a review within a few business days. If you don't believe you've received our response, please be sure to check all email and spam folders (you may want to add no-reply@yelp.com to your contact list).

Please also note that we are unable to disclose user information due to privacy concerns. Please see our Privacy Policy (http://www.yelp.com/static/?p=privacy) for more information about how and when we might disclose this kind of information.

Thank you!

Regards,

Veronica
Yelp Support
San Francisco, California

Yelp Official Blog | https://www.yelpblog.com
Yelp Support Center | http://www.yelp-support.com
Yelp for Business Owners | https://biz.yelp.com

Exh. L6

ref_00D6guJNS_5004u2vLxES:ref

9/10/24, 7:47 PM                                    Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 13485282

**Aynur Baghirzade** <contact@aynurlawyers.com>                                    Fri, Jun 9, 2023 at 8:29 AM
To: Yelp HQ <feedback@yelp.com>

Thank you Veronica for your feedback.

I reported the review and it was sustained by your team. The person registered as E. Karimli has never been my customer, so the review 'he left on my profile "that I took his money and didn't provide services" is not true. Same person left the same review on my AVVO profile and it was removed immediately after my complaint. I also informed your staff that this review is a part of the smear campaign organized against me by Armenian Mafia ( after posting in my personal Twitter account my political opinion about situation around South Caucasus).

I do not understand why your platform purposefully and intentionally keeps a fake review on my profile.

As I have other concerns with using my account at your platform before this review  I believe that I am targeted intentionally by the Armenian Mafia employed in your organization.

Could you please remove this review?

Thank you,

Aynur Baghirzade, Esq.
[Quoted text hidden]
—
Respectfully,

Aynur Baghirzade

**Law Offices of Aynur Baghirzade**
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient.  Use or distribution by an unintended recipient is prohibited and may be a violation of law.  If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

118

Exh. L7

9/10/24, 7:46 PM

119

Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 13479881

# ![Gmail] Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## Message from Yelp HQ: 13479881

2 messages

**Yelp HQ** <feedback@yelp.com>
To: "contact@aynurlawyers.com" <contact@aynurlawyers.com>

Mon, Jun 12, 2023 at 2:17 PM

Hi,

Thanks for writing back regarding Kerimili E.'s review of Law Offices of Aynur Baghirzade. Please be assured that we have investigated the content you brought to our attention and carefully evaluated it against our Terms of Service and Content Guidelines. Although we have left the content intact because our investigation did not find a violation of our guidelines, we hope that you will use Yelp's free tools for business owners to engage with the user who posted this content. Please note that we cannot assist you further in this matter.

Regards,

Marion
Yelp Support
San Francisco, California

Yelp Official Blog | https://www.yelpblog.com
Yelp Support Center | http://www.yelp-support.com
Yelp for Business Owners | https://biz.yelp.com

ref_00D6guJNS._5004u2tvdmV.ref

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: Yelp HQ <feedback@yelp.com>

Mon, Jun 12, 2023 at 2:22 PM

Excellent. It is in violation with your policy and I will be suing you, not this person.

Aynur
[Quoted text hidden]
--
Respectfully,

Aynur Baghirzade

Exh. L8

9/10/24, 7:46 PM
Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 13479881

120

Law Offices of Aynur Baghirzade
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. L9

# M Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## Fake review from non-consumer
2 messages

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: "'madi.posey@bbbcommunity.org'" <madi.posey@bbbcommunity.org>

Thu, Jun 8, 2023 at 10:20 AM

Hello Madi,

I believe we spoke yesterday about the smear campaign which was launched against me by the group of people targeting my social business accounts.

I got another fake review yesterday - Review ID: 728369
My business ID is **1000090204**

This person has never interacted with me and has never been my customer or requested my services. Besides, the information she provided is false since I have a U.S. degree - LLM degree from UCONN Law.

Could you please remove this review ?

Thank you so much for your help!

--

Respectfully,

Aynur Baghirzade, Esq.

--
**Law Offices of Aynur Baghirzade, Esq.**
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

**Madi Posey** <madi.posey@bbbcommunity.org>
To: Aynur Baghirzade <contact@aynurlawyers.com>

Tue, Jun 13, 2023 at 12:59 PM

Aynur,

Exh. L10

9/24/24, 8:02 PM

122

Law Offices of Aynur Baghirzade Mail - Fake review from non-consumer

Thank you for contacting the Better Business Bureau! Review ID #728369 does not have to do with an interaction from the business, the review has been removed. Substantiation requests were sent to the consumer; if the consumer provides substantiation of an interaction with the business, we will review again for publication. Thank you kindly for your time with this matter!

**Madi Posey**
*Conciliation & Engagement Specialist*
**Better Business Bureau Serving the Pacific Southwest**
**Direct** 602-899-5417
**Office** 602-264-1721
A Community of Trustworthy Businesses | bbb.org
Not BBB-Accredited? Click to Apply



**Arizona Campuses**
Maricopa County: 1010 E Missouri Ave, Phoenix, AZ 85014
Mohave County: 2119 McCulloch Blvd N, Lake Havasu City, AZ 86403
Yavapai County: 213 Grove Ave, Prescott, AZ 86301
Yuma County: 350 W 16th St #205, Yuma, AZ 85364

**California Campuses**
Orange County: 120 Newport Center Dr, Newport Beach, CA 92660
San Diego County: 4747 Viewridge Ave, Ste 200, San Diego, CA 92123



[Quoted text hidden]

*This email and any files transmitted with it regarding a consumer complaint and your response may be publicly posted on BBB's website. Therefore, please do not include any information that personally identifies your customer. BBB may edit the complaint or your response to remove personally identifiable information or inappropriate language.*

Exh. L11

https://mail.google.com/mail/u/1/?ik=69aea2854&view=pt&search=all&permthid=thread-a:r-750474052939400100l4&simpl=msg-a:r6153620711001759113&simpl=msg-f:1768618874497317116

22

M Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## Removing negative review from my profile
1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: CustomerCare@avvo.com

Tue, May 30, 2023 at 10:52 AM

Hi,

I received a negative review On May 26, 2023 from the person who wasn't my customer. Review comes from an anonymous person whom I don't know and who has never retained my services.

My URL: https://www.avvo.com/attorneys/authorized/92651-ca-aynur-baghirzade-5136191

My name is Aynur Qafar Baghirzade

Could you please remove this review ?

--

Respectfully,

Aynur Baghirzade, Esq.

Law Offices of Aynur Baghirzade, Esq.
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. L12

# EXHIBIT M

125

 Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

# 4 reviews from non customers
2 messages

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: Yelp <customersuccess@yelp.com>

Mon, Jan 15, 2024 at 11:26 PM

Hello Yelp,

I still didn't get the answer why you keep reviews from non customers and remove all positive reviews from my customers. Moreover, you keep the most vicious reviews from the people lying about getting my services.

I am still waiting for your answer as to why all these reviews are still on my page. Could you please present to me the evidence that these people have retained me in any way?

You also keep a review of the person literally threatening me.

Also, my question is why the reviews which you deleted were placed in not recommended reviews instead being removed fully from my page?

--
Respectfully,

Aynur Baghirzade, Esq.

Law Offices of Aynur Baghirzade, Esq.
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com
www.aynurimmigrationlaw.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: Yelp <customersuccess@yelp.com>

Mon, Jan 15, 2024 at 11:41 PM

I am absolutely disgusted by what you do and how you treat businesses. Besides, I have plenty of other evidence of how you give a platform to Armenians to bully businesses. You will face a federal lawsuit together with ANCA. Continue abusing your power.

Exh. M2
[Quoted text hidden]

9/10/24, 7:14 PM                           Law Offices of Aynur Baghirzade Mail - Negative reviews on my page from non- customers

126

**M** Gmail                                                          Aynur Baghirzade <contact@aynurlawyers.com>

# Negative reviews on my page from non- customers
1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>                        Sat, Jan 13, 2024 at 7:21 AM
To: Yelp <customersuccess@yelp.com>

Hello Yelp,

Recently I asked you to remove negative reviews from my page as they were from non-customers. You removed all positive ones and you still keep 4 negative
reviews on my page which are from NON-Customers.

Could you please explain your actions ? Since I complained to you last time you could see that my page was under attack and reviews were placed one after
another nonstop within 2-3 days.

What is your reason that you removed only part of them ? What is your reason that you removed positive reviews and kept negative on my page?

I need an explanation.

Respectfully,

Aynur Baghirzade, Esq.

Law Offices of Aynur Baghirzade, Esq.
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended
recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please
delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. M3

9/10/24, 7:13 PM

127

Law Offices of Aynur Baghirzade Mail - Removing reviews from my platform

# M Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## Removing reviews from my platform
1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: Yelp <customersuccess@yelp.com>

Tue, Jan 9, 2024 at 11:09 AM

Hi,

Recently around 50 persons of Armenian origin placed defamatory and false reviews on my page. None of them are my customers and have to do anything with my business.

Please, remove all these reviews which have been added for the last couple of days.

Thank you,

Respectfully,

Aynur Baghirzade, Esq.

Law Offices of Aynur Baghirzade, Esq.
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. M4

# Removing reviews of my customers

1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: Yelp <customersuccess@yelp.com>

Fri, Jan 5, 2024 at 9:13 AM

Aynur Baghirzade <contact@aynurlawyers.com>

Hi,

It's not a first time when you remove from the platform reviews of my CUSTOMERS.

You've recently removed a review from my customer who contacted me over Yelp.

Please, restore this review or explain why it was removed.

This becomes ridiculous and your discriminatory attitude is unacceptable.

Respectfully,

Aynur Baghirzad, Esq.

Law Offices of Aynur Baghirzade, Esq.
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. M5

9/10/24, 7:11 PM                                    Law Offices of Aynur Baghirzade Mail - Removing all positive reviews from my page

# Gmail                                                                                    129

                                                                                          Aynur Baghirzade <contact@aynurlawyers.com>

## Removing all positive reviews from my page
1 message

**Aynur Baghirzade <contact@aynurlawyers.com>**                                    Tue, Nov 28, 2023 at 8:24 PM
To: Yelp <customersuccess@yelp.com>

Hi,

May I know the reason why you constantly remove all positive reviews from my page by leaving only one fake negative review ?

What are you trying to prove to me by doing so ?

It is just going beyond of all limits and I will surely see you in court.

--
Respectfully,

Aynur Baghirzade, Esq.

Law Offices of Aynur Baghirzade, Esq.
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com
www.aynurimmigrationlaw.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. M6

9/10/24, 7:10 PM                    Law Offices of Aynur Baghirzade Mail - All positive reviews are moved from my account

130

# M Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## All positive reviews are moved from my account
1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>                    Sun, Jun 25, 2023 at 7:10 PM
To: Yelp <customersuccess@yelp.com>

Hi,

Could you please explain why you removed all positive reviews from my Yelp account and left only negative reviews ? I remind you one more time that all negative
reviews you kept on my account are false and are not from my customers.

May I know why you kept them ? And why  34 positive reviews were removed  ?

Thank you,

Aynur
--
Respectfully,

Aynur Baghirzade

**Law Offices of Aynur Baghirzade**
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient.  Use or distribution by an unintended
recipient is prohibited and may be a violation of law.  If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please
delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. M7

9/10/24, 7:09 PM                    Law Offices of Aynur Baghirzade Mail - Correcting the bill information for ads

# M Gmail

131

Aynur Baghirzade <contact@aynurlawyers.com>

## Correcting the bill information for ads
1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>                    Sat, Dec 31, 2022 at 10:29 AM
To: Yelp <customersuccess@yelp.com>

Hi,

I was running an ad at your platform which brought me a 0 clients, and I was promised that you will apply $ 300 credit for me to run a campaign for the first month - you didn't do that. Also, I was not informed that my campaign will continue running for the next month if I don't stop it, and now I have $ 702 bill from you. Please, apply the credit as you promised to me and remove the rest of the charge as I didn't give my consent for the ad to run next month.

Thank you,

Aynur

Exh. M8




# Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## Message from Yelp HQ: 13513456
2 messages

**Yelp HQ <feedback@yelp.com>**
Fri, Jun 23, 2023 at 10:18 AM
To: "contact@aynurlawyers.com" <contact@aynurlawyers.com>

Hi Aynur,

Thank you for your response.

Please note our moderators are currently monitoring this business page. Cleanup of these reviews will take place once unusual activity on the business page has decreased. You can learn more about our approach to these cases here: https://www.yelp-support.com/article/What-does-Yelp-do-when-a-local-business-becomes-the-focus-of-widespread-media-attention?l=en_US

Please also note that our moderators' evaluation of reviews against our Content Guidelines is separate from actions taken by Yelp's automated recommendation software.

Our recommendation software applies to all reviews in an effort to show the most helpful and reliable content to our users. Because our users overall write more positive than negative reviews, many of the reviews in the not recommended section tend to be some of those positive reviews.

Our recommendation software is entirely automated and applies the same rules to every business. The reviews that are recommended for any business can change over time as Yelp's software learns more about the reviewer and the business. Not recommended reviews are still visible to consumers and can be found through a link on the bottom of Yelp business pages.

Please note no employee at Yelp has the ability to recommend or not recommend a business's reviews. This approach is deliberate to avoid conflicts of interest.

Regards,

Beatrice
Yelp Support
San Francisco, California

Yelp Official Blog | https://www.yelpblog.com
Yelp Support Center | http://www.yelp-support.com
Yelp for Business Owners | https://biz.yelp.com

ref_00D6guJNS_5004o2My4A:ref

Exh. M9

9/10/24, 7:43 PM

Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 13513456

133

Fri, Jun 23, 2023 at 2:18 PM

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: Yelp HQ <feedback@yelp.com>

Hi,

You keep deleting the positive reviews.

Please return all positive reviews back. Your software is obviously working in a discriminative way.

Aynur
[Quoted text hidden]
--
Respectfully,

Aynur Baghirzade

**Law Offices of Aynur Baghirzade**
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. M10

# EXHIBIT N

# Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## Closing my page
3 messages

**Aynur Baghirzade <contact@aynurlawyers.com>**
To: Yelp <customersuccess@yelp.com>

Tue, Feb 6, 2024 at 9:57 PM

Hi Yelp,

I don't understand why my business page is still open since I asked you to close it. Are you keeping my page open to allow certain people to come and harass me
?

Please, remove all reviews as they are not from clients and close my page immediately!

Respectfully,

Aynur Baghirzade, Esq.

**Law Offices of Aynur Baghirzade, Esq.**
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended
recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please
delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

**Daiana B <customersuccess@yelp.com>**
To: "contact@aynurlawyers.com" <contact@aynurlawyers.com>

Fri, Feb 9, 2024 at 5:51 PM

Hello,

Your Yelp Business page will not be closed.

Since there are is no further escalation and no further action will be taken on our end, I am closing this email thread.

Best,
[quoted text hidden]
Daiana B.
Customer Success Manager | Yelp Inc.
(855) 380-9357

Exh. N2

9/10/24, 7:20 PM                                                136
                                        Law Offices of Aynur Baghirzade Mail - Closing my page

Please note: Phone calls with Yelp may be monitored or recorded for quality purposes

ref:!00D300vCN.!5004y02a2drY:ref

**Aynur Baghirzade** <contact@aynurlawyers.com>                          Fri, Feb 9, 2024 at 5:53 PM
To: Daiana B <customersuccess@yelp.com>

I am happy to hear that. You will close it on court's injunction.

Respectfully,

Aynur Baghirzade, Esq.

**Law Offices of Aynur Baghirzade, Esq.**
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

[Quoted text hidden]

Exh. N7

# Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## How long your monitoring will take ?
1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>    Fri, Feb 2, 2024 at 5:14 PM
To: Yelp <customersuccess@yelp.com>

Hi,

For how long are you going to keep my profile under "monitoring" mode - I've made it clear to you that I don't want my page to be on your platform. Why don't you close it ?

Also, you still keep an offensive photo on my page (edited without my permission) and you still keep a threatening review on my page, clearly not from my client.

Could you please remove all offensive/harassing content from my profile and close it accordingly. None of the negative reviews on your platform are from my clients - I make it clear to you once again.

--
Respectfully,

Aynur Baghirzade, Esq.

**Law Offices of Aynur Baghirzade, Esq.**
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. N8

9/10/24, 7:15 PM                                            Law Offices of Aynur Baghirzade Mail - Close my Account

## Gmail                                                                                            Aynur Baghirzade <contact@aynurlawyers.com>

## Close my Account
1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>                                       Wed, Jan 17, 2024 at 5:26 PM
To: Yelp <customersuccess@yelp.com>

Hi,

I requested to close my account - not to monitor it ! I am the owner of the business and I chose to be on your platform or not, this right does not belong to you. You abused your power enough to keep my account active after I asked you to close it.

Please close it immediately! Nobody gave you the right to manipulate my business for your own needs. This is beyond outrageous!

You also blocked my phone number - may I know why ?

Respectfully,

Aynur Baghirzade, Esq.

**Law Offices of Aynur Baghirzade, Esq.**
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. N9

 Gmail

Aynur Baghirzade <contact@aynurlawyers.com>

## Closing my account and removing all data including reviews
1 message

**Aynur Baghirzade** <contact@aynurlawyers.com>
To: Yelp <customersuccess@yelp.com>

Wed, Jan 17, 2024 at 11:57 AM

Hi,

I requested to close my account and remove all data including reviews. Please, follow my request and remove everything, including photos and reviews.

--
Respectfully,

Aynur Baghirzade, Esq.

Law Offices of Aynur Baghirzade, Esq.
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com
www.aynurlawyers.com

**CONFIDENTIAL COMMUNICATION**
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

Exh. N10

139

9/10/24, 7:35 PM

Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 14165087

140

# M Gmail

**Aynur Baghirzade <contact@aynurlawyers.com>**

## Message from Yelp HQ: 14165087
2 messages

**Yelp HQ <feedback@yelp.com>**
To: "contact@aynurlawyers.com" <contact@aynurlawyers.com>

Thu, Jan 18, 2024 at 9:30 AM

Hello,

Thank you for your request.

Please note that we are not able to delete your account information at this time because you have an outstanding payment associated with your account.

Please note that before we can proceed with deleting your Yelp account information, the outstanding balance on the account will need to be paid. Please contact our main finance department at (415) 632-4021 between 9am and 5pm PT to resolve your outstanding payment.

You also asked for your business to be removed from Yelp; however, we don't remove business information. While some business owners might prefer to keep a lower profile, this kind of information is publicly available and its use is protected under the law. More importantly, we believe that the public benefits from sharing their experiences with local businesses.

Please also note that the CCPA does not apply to information about a business, and even if your business page includes some personal information about you, the CCPA allows Yelp to maintain your personal information to "ensure the right of another consumer to exercise his or her right of free speech." (Cal. Civ. Code § 1798.105(d).)

Regards,

Amara
Yelp Support
San Francisco, California

Yelp Official Blog | https://www.yelpblog.com
Yelp Support Center | http://www.yelp-support.com
Yelp for Business Owners | https://biz.yelp.com

ref:_00D6guJNS._500Pj6R6t:ref

Exh. N11

**Aynur Baghirzade <contact@aynurlawyers.com>**
To: Yelp HQ <feedback@yelp.com>

Thu, Jan 18, 2024 at 9:43 AM

9/10/24, 7:35 PM                                                    Law Offices of Aynur Baghirzade Mail - Message from Yelp HQ: 14165087

141

Hi,

We can not delete your account because you have an outstanding balance sounds like a blackmailing me. Read certain provisions of Penal Code. You do not have
a right to keep my account because you have an outstanding balance sounds like a blackmailing me. Read certain provisions of Penal Code. You do not have
corruption mode. You can send me an invoice or apply for collection - the method you are using is illegal. Consult your lawyers, or show me the agreement I signed
with you where you have this right.

As to the information on my page - you keep information and comments coming from non consumers in direct violation with your community standards. You have no
right to place on my account defamatory content coming from non consumers, moreover doing that intentionally.

My business owes you nothing in terms how you treated it for the last 2 years. You will be sued together with the gang who assaulted my public pages for
conspiracy and corruption to suppress my First Amendment rights.

Please, remove my page and information immediately if you at least want to mitigate your damages.

Respectfully,

Aynur Baghirzade, Esq.

Law Offices of Aynur Baghirzade, Esq.
1968 S. Coast Hwy # 2429 Laguna Beach, CA, 92651
Tel: 619-630-6646; E-mail: contact@aynurlawyers.com

CONFIDENTIAL COMMUNICATION
E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended
recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items, please
delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and copies thereof.

[Quoted text hidden]

Exh. N12

https://mail.google.com/mail/u/0/?ik=69aaa2854&view=pt&search=all&permthid=thread-f:1788450204092864964&simpl=msg-f:1788450204092864964&simpl=msg-a:r4227295167222923592          2/2